1  Jeff S. Westerman (SBN 94559)
       jwesterman@milberg.com
2  **MILBERG LLP**
   One California Plaza
3  300 S. Grand Avenue, Suite 3900
   Los Angeles, CA  90071
4  Telephone:  (213) 617-1200
   Facsimile:  (213) 617-1975
5
   Michael C. Spencer (*admitted pro hac vice*)
6      mspencer@milberg.com
   Janine L. Pollack (*admitted pro hac vice*)
7      jpollack@milberg.com
   **MILBERG LLP**
8  One Pennsylvania Plaza
   New York NY  10119
9  Telephone:  (212) 594-5300
   Facsimile:  (212) 868-1229

   Eric M. George (SBN 166403)
       egeorge@bwgfirm.com
   **BROWNE WOODS GEORGE LLP**
   2121 Avenue of the Stars, Suite 2400
   Los Angeles, CA  90067
   Telephone:  (310) 274-7100
   Facsimile:   (310) 275-5697

   Lee A. Weiss
       lweiss@bwgfirm.com
   **BROWNE WOODS GEORGE LLP**
   49 West 37th Street, 15th Floor
   New York, NY  10018
   Telephone:  (212) 354-4901
   Facsimile:   (212) 354-4904

   (Additional Counsel on Signature Page)

10

11              *Attorneys for Plaintiff*

12

13

14              **UNITED STATES DISTRICT COURT**
                **NORTHERN DISTRICT OF CALIFORNIA**
15                       **OAKLAND DIVISION**

16  BRADLEY C. SMITH, derivatively on behalf of      )
    FRANKLIN CUSTODIAN FUNDS,                         )
17                                                    )
                          Plaintiff,                  )
18            vs.                                     )   Civil Action No. C 09-4775 PJH
                                                      )
19  FRANKLIN/TEMPLETON DISTRIBUTORS,                  )
    INC., HARRIS J. ASHTON, ROBERT F.                 )
20  CARLSON, SAM GINN, EDITH E. HOLIDAY,              )
    FRANK W.T. LAHAYE, FRANK A. OLSON,                )   **PLAINTIFF'S MEMORANDUM**
21  LARRY D. THOMPSON, JOHN B. WILSON,                )   **OF LAW IN OPPOSITION TO**
    CHARLES B. JOHNSON, AND RUPERT H.                 )   **DEFENDANTS' MOTION TO DISMISS**
22  JOHNSON,                                          )
                          Defendants,                 )
23  and                                               )
                                                      )
24  FRANKLIN CUSTODIAN FUNDS,                         )
                          Nominal Defendant.          )
25  _____         )

26

27

28

_____

PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO MOTION TO DISMISS
C-09-4775 PJH

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ...................................................................................................1

STATUTORY AND REGULATORY BACKGROUND.............................................................3

STATEMENT OF FACTS ........................................................................................................9

LEGAL STANDARD.............................................................................................................11

ARGUMENT .........................................................................................................................11

    I.     ICA SECTION 47(B) PROVIDES A VALID BASIS FOR PLAINTIFF'S
          CLAIM...............................................................................................................11

          A.     ICA Section 47(b) Is a Private Right of Action............................................11

          B.     Section 47(b) Applies to a Violation of a Regulation Under the ICA ..........16

    II.    The Court Should Exercise Supplemental Jurisdiction Over The State Law
          Claims ...............................................................................................................19

    III.   The Complaint Satisfies the Particularity Element of Fed. R. Civ. P. 23.1 ..............19

    IV.   Plaintiff Has Standing to Sue on Behalf of the Trust................................................24

CONCLUSION.......................................................................................................................25

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Aronson v. Lewis*,
  473 A.2d 805 (Del. 1984) ......................................................................20

*Balistreri v. Pacifica Police Dep't*,
  901 F.2d 696 (9th Cir. 1990) ................................................................11

*Brown v. Bullock*,
  194 F. Supp. 207 (S.D.N.Y. 1961) .....................................................7, 12

*Burks v. Lasker*,
  441 U.S. 471 (1979)........................................................................7, 22, 23

*Cal. Pub. Employees Ret. Sys. v. Coulter*,
  2002 Del. Ch. LEXIS 144 (Del. Ch. Dec. 18, 2002) ............................21

*Couldock & Bohan, Inc. v.Societe Generale Securities Corp.*,
  93 F. Supp. 2d 220 (D. Conn. 2000)......................................................13

*Davis v. Bailey*,
  2005 U.S. Dist. LEXIS 38204 (D. Col. Dec. 22, 2005)........................14

*Fidelity Federal Savings and Loan Ass'n v. de la Cuesta*,
  458 U.S. 141 (1982).................................................................................22

*Financial Planning Association v. SEC*,
  482 F.3d 481 (D.C. Cir. 2007)..............................................2, 6, 10, 17

*Franklin Nat'l Bank v. L.B. Meadows & Co.*,
  318 F. Supp. 1339 (E.D.N.Y. 1970) ......................................................12

*Freeman v. Marine Midland Bank-New York*,
  1979 U.S. Dist. LEXIS 12177 (E.D.N.Y. May 24, 1979) .....................12

*Gantler v. Stephens*,
  2008 Del. Ch. LEXIS 20 (Del. Ch. Feb. 14, 2008)...............................20

*Goldstein v. Groesbeck*,
  142 F.2d 422 (2d Cir. 1944)...................................................................13

*Grimes v. Donald*,
  1995 Del. Ch. LEXIS 3 (Del. Ch. Jan. 12, 1995) .................................21

*Grimes v. Donald*,
  673 A.2d 1207 (Del. 1996) .....................................................................20

*Guttman v. Huang*,
    823 A.2d 492 (Del. Ch. 2003)...................................................................................21

*In re Mutual Funds Inv. Litigation*,
    384 F. Supp. 2d 873 (D. Md. 2005) ...........................................................................13

*In re Mutual Funds Invest. Litig.*,
    519 F. Supp. 2d 580 (D. Md. 2007) ...........................................................................25

*In re Silicon Graphics Inc. Sec. Litig.*,
    183 F.3d 970 (9th Cir. 1999) .....................................................................................20

*Intri-Plex Techs., Inc. v. Crest Group, Inc.*,
    499 F.3d 1048 (9th Cir. 2007) ...................................................................................11

*Kahn v. Roberts*,
    679 A.2d 460 (Del. 1996) ..........................................................................................20

*Kardon v. Nat'l Gypsum Co.*,
    69 F. Supp. 512 (E.D. Pa. 1946) ...............................................................................12

*Lapidus v. Hecht*,
    232 F.3d 679 (9th Cir. 2000) ...............................................................................24, 25

*Levine v. Smith*,
    591 A.2d 194 (Del. 1991) ..........................................................................................20

*Metro Commc'n Corp. BVI v. Advanced Mobilcomm Techs., Inc.*,
    854 A.2d 121 (Del. Ch. 2004).....................................................................................21

*Miller v. AT&T*,
    507 F.2d 759 (3d Cir. 1974).......................................................................................21

*Moss v. U.S. Secret Serv.*,
    572 F.3d 962 (9th Cir. 2009) .....................................................................................11

*Mutchka v. Harris*,
    373 F. Supp. 2d 1021 (C.D. Cal. 2005) ....................................................................14

*O'Neal v. Smithkline Beecham Corp.*,
    551 F. Supp. 2d 993 (E.D. Cal. 2008)........................................................................22

*Rheem Mfg. Co. v. Rheem*,
    295 F.2d 473 (9th Cir. 1961) .....................................................................................18

*Rhoades v. Powell*,
    644 F. Supp. 645 (E.D. Cal. 1986).............................................................................13

*Roberts v. Smith Barney Harris Upham & Co.*,
    653 F. Supp. 406 (D. Mass. 1986) .............................................................................13

*SEC v. Keating*,
  1992 U.S. Dist. LEXIS 14630 (C.D. Cal. 1992)....................................................23

*Stegall v. Ladner*,
  394 F. Supp. 2d 358 (D. Mass. 2005) ..........................................................14, 25

*Tarlov v. Paine Webber Cashfund Inc.*,
  559 F. Supp. 429 (D. Conn. 1983)...............................................................14, 15

*Transamerica Mortgage Advisors, Inc. v. Lewis*,
  444 U.S. 11 (1979).......................................................................................14, 15

*United States v. First City Nat'l Bank of Houston*,
  386 U.S. 361 (1967)............................................................................................18

**STATUTES**

15 U.S.C. § 80a-35(a) .............................................................................................7

15 U.S.C. § 80a-46(b) .........................................................................................8, 16

15 U.S.C. § 80b-2(11).....................................................................................3, 4, 5

17 C.F.R. § 270.12b-1(a)(2)...............................................................................9, 16

17 C.F.R. § 270.38a-1(a)(2)................................................................................8, 16

17 C.F.R. § 270.12b-1(a)(2)...............................................................................9, 16

17 C.F.R. § 275.202(a)(11)-1 .............................................................................5, 6

28 U.S.C. § 1367(a) .............................................................................................19

Fed. R. Civ. P. 23.1 .......................................................................................19, 20

**OTHER AUTHORITIES**

Final Rule, Promulgating Rel. No. IC-26299,
  2003 SEC LEXIS 2980 (Dec. 17, 2003) ..............................................................8

S. Rep. No. 76-1775,
  76th Cong., 3d Sess. 22 (1940) ............................................................................4

Plaintiff Bradley C. Smith, suing derivatively on behalf of Franklin Custodian Funds (hereinafter the "Trust"), respectfully submits this opposition to Defendants' motion to dismiss the complaint.

**PRELIMINARY STATEMENT**

This is a shareholder derivative action, filed on behalf of the Trust, which is a series-type open-end management investment company, registered with the SEC under the Investment Company Act of 1940 ("ICA"), 15 U.S.C. § 80a-1 *et seq*. -- commonly referred to as a mutual fund. As is generally true for mutual funds sold through brokers,[1] the brokers receive compensation agreed to by the mutual fund for their provision of marketing and ongoing service to shareholders. In this case, the Trust has a contract with its exclusive underwriter/distributor, Defendant Franklin/Templeton Distributors ("F/T Distributors"), which commit the Trust and F/T Distributors to pay retail broker-dealer firms that sold and service the Franklin mutual funds held in their customers' accounts.

Brokers' compensation received from entities like the Trust and F/T Distributors with respect to mutual funds typically takes the form of (1) transactional commissions, which are earned and paid when the mutual fund shares are sold, and based on the value of shares sold, or (2) ongoing payments, not related to transactions, but instead calculated as a percentage of the average daily net asset value of shares held in the customer's account, and disbursed to the broker on a monthly or quarterly basis. This second type is called "asset-based compensation." It typically continues as a payment to the broker for as long as the customer owns the mutual fund shares. The Trust offers different share classes, each of which has different fee and expense structures for the shareholder and different forms of compensation for the broker.

For nearly two decades, the Securities and Exchange Commission encouraged broker-dealers to replace transactional commissions with asset-based compensation, in order to discourage excessive trading to generate commissions. As described more fully below, however, the Investment Advisers Act of 1940 ("Advisers Act") prohibited brokers from receiving asset-based

---

[1] In this brief, the terms "broker" and "broker-dealer" are used interchangeably.

compensation unless they were registered as investment advisers and offered advisory accounts (as opposed to brokerage accounts) to their customers.  Advisory accounts, governed by the fiduciary standard of the Advisers Act, were disfavored by broker-dealers, who preferred the lower "salesman" standards of the Securities Exchange Act that applies to brokerage accounts.

In order to support the shift away from transactional commissions, while also protecting the broker-dealer business model, the SEC promulgated a new rule under its "designated" authority to prescribe exclusions from the Advisers Act by regulation, authorizing brokers to receive asset-based compensation on assets held in brokerage accounts, so long as certain disclosures to customers were made.

However, in *Financial Planning Association v. SEC*, 482 F.3d 481 (D.C. Cir. 2007) ("*Financial Planning Ass'n*"), the court invalidated that new SEC rule as exceeding the Commission's authority.  At the SEC's request, the court stayed its mandate for six months, until October 1, 2007.  *See* 2007 U.S. App. LEXIS 15169 (D.C. Cir. June 25, 2007).

Accordingly, as of October 1, 2007, brokers could not receive asset-based compensation with respect to brokerage accounts, but must instead either (a) receive their compensation solely in the form of transactional commissions or (b) provide advisory accounts, subject to the Advisers Act, to hold the shares, in which case asset-based compensation may be received.  Nevertheless, since October 1, 2007, and continuing to the present, the Trust and F/T Distributors have continued to make unlawful asset-based compensation payments with respect to Trust shares held in brokerage accounts.

Pursuant to SEC Rule 38a-1 under the ICA, the Trust and its Board have primary responsibility for policing F/T Distributors and the retail brokers receiving compensation for servicing shareholders of the Trust for compliance with the Advisers Act.  Voiding the Trust's illegal contractual commitments for the payment of asset-based compensation with respect to Trust shares held in brokerage accounts is therefore an obligation of the Trust under the ICA and SEC Rule 38a-1.  Section 47(b) of the ICA provides a right of action to accomplish that obligation.

Despite this obligation, the Board refused the Plaintiff's demand that the Trust void its own contractual commitment to make the unlawful payments.  In response to this shareholder derivative

case, Defendants' primary argument is that the subject payments are permissible under SEC Rule 12b-1. However, Defendants do not identify any conflicts between SEC Rule 12b-1 and the Advisers Act, as compliance with both laws is easily accomplished, so their contention that this litigation will "abrogate or repeal, by judicial fiat, SEC Rule 12b-1" lacks any basis.

Defendants also seek to invoke the protection of Delaware's "business judgment rule." But, as recognized by Delaware law, "business judgment" cannot justify any decision to continue violating federal securities laws, and accordingly the Board may not terminate this litigation on that basis.

## STATUTORY AND REGULATORY BACKGROUND

Payment of asset-based compensation to brokers implicates the following provisions of the federal securities laws and regulations.

### *The Investment Advisers Act*

The Advisers Act mandates certain disclosure, liability, record-keeping and conflict management requirements to protect the clients of professional investment advisers. Unless a statutory exclusion applies, the Advisers Act applies to full service broker-dealers[2] because those firms make securities recommendations, conduct suitability reviews, and otherwise provide investment advice to their customers. *See* Section 202(a)(11), 15 U.S.C. § 80b-2(11) ("investment adviser" defined as "any person who, for compensation, engages in the business of advising others. . . as to the value of securities or as to the advisability of investing in, purchasing, or selling securities").[3]

A broker-dealer firm may comply with the Advisers Act by registering as an investment adviser (commonly referred to as a "dual registrant"). Broker-dealers may avoid Advisers Act regulation if a statutory exclusion applies. Pursuant to what is known as the "Broker-Dealer

---

[2] Some broker-dealers offer execution-only (discount brokerage) accounts -- typically Internet-based trading accounts -- that do not include any advice, *i.e.* there are no recommendations or suitability reviews, and therefore the broker-dealer firm falls outside the Advisers Act's definition of "investment adviser." The Trust does not sell shares through execution-only broker-dealers.

[3] *See* Declaration of Janine L. Pollack, Esq. Exhibit 1 (hereinafter, "Pollack Decl."). Key statutes and regulations and certain other documents referenced in this brief have been attached as exhibits to the Pollack Decl.

---

Exclusion," the Advisers Act excludes from the definition of investment adviser "any broker or dealer whose performance of such services [advice] is solely incidental to the conduct of his business as a broker or dealer and who receives no special compensation therefor."  15 U.S.C. § 80b-2(11)(C).  The term "special compensation" means any form of compensation other than transactional commissions.  *See* S. Rep. No. 76-1775, 76th Cong., 3d Sess. 22 (1940) (section 202(a)(11)(C) of the Advisers Act applies to broker-dealers "insofar as their advice is merely incidental to brokerage transactions for which they receive *only* brokerage commissions.") (emphasis added).[4]  Accordingly, asset-based compensation is "special compensation" under the statute because it is not a transactional commission.

Therefore, the *form of compensation* that a broker-dealer receives on a particular customer account is determinative of what law governs the account.  Accounts maintained by the broker-dealer that are subject to the Advisers Act are commonly referred to as "advisory accounts."  Accounts excluded from the Advisers Act, and subject only to broker-dealer regulation (the Securities Exchange Act and FINRA rules) are known as "brokerage accounts."  *See* Complaint ¶¶ 4, 72 (the Complaint is hereinafter cited as "Complaint, ¶ __" or "¶ __").  A broker-dealer that is not a dual registrant cannot offer advisory accounts.

That clear distinction -- a broker-dealer offering brokerage accounts can receive only transactional commissions, while an investment adviser (or dual registrant) offering advisory accounts can receive asset-based compensation or hourly fees -- worked well for decades following the enactment of the Advisers Act.[5]

---

[4] *See Certain Broker-Dealers Deemed Not To Be Investment Advisers*, SEC Release No. 34-51523, 70 Fed. Reg. 20424, 20425 (Apr. 19, 2005) ("2005 Final Rule Release") ("the broker-dealer exception 'amounts to a recognition that brokers and dealers commonly give a certain amount of advice to their customers in the course of their regular business and that it would be inappropriate to bring them within the scope of the [Advisers Act] merely because of this aspect of their business.'") *quoting Opinion of the General Counsel Relating To Section 202(a)(11)(C) of the Investment Advisers Act of 1940*, Investment Advisers Act Release No. 2 (Oct. 28, 1940), 11 Fed. Reg. 10996 (Sept. 27, 1946).

[5] *See* 2005 Final Rule Release, 70 Fed. Reg. at 20424 ("Many broker-dealers are also registered with us as advisers because of the nature of the services they provide or the form of compensation they receive.  Until recently, the division between broker-dealers and investment advisers was fairly clear, and the regulatory obligations of each fairly distinct.  Of late, however, the distinctions have begun to blur, raising difficult questions regarding the application of statutory provisions written by Congress more than half a century ago.").

1       By the 1990's, the lines had blurred.  Many broker-dealers were holding their

2  representatives out to the public as trusted advisers, rather than as mere stockbrokers or product

3  pushers, even though they were not registered as investment advisers.  Moreover, with a roaring

4  bull market increasing the value of customers' accounts, many in the broker-dealer industry became

5  dissatisfied with the Broker-Dealer Exclusion's bar on asset-based compensation.  Yet, most

6  broker-dealers avoided becoming dual registrants offering advisory accounts, because the standard

7  of care required under the Advisers Act is higher than the standard under the Exchange Act and

8  FINRA rules for broker-dealers and brokerage accounts.[6]  ¶ 49.

9       In the 1990's, the broker-dealer industry convinced the SEC that it would be good policy for

10  broker-dealers to be able to receive asset-based compensation on brokerage accounts, primarily

11  relying on the argument that asset-based compensation eliminated the incentive to churn accounts

12  for transactional commissions.  *See, e.g.,* Report of the Committee on Compensation Practices

13  (April 10, 1995) (known as the Tully Report), available at www.sec.gov/news/studies/bkrcomp.txt.[7]

14       The SEC obliged by invoking another statutory exclusion -- the SEC Designates Exclusion,

15  *see* 15 U.S.C. § 80b-2(11)(F) (Pollack Decl., Exhibit 1) --  which allows the SEC to designate by

16  regulation or order "such other persons not within the intent of this paragraph" to be excluded from

17  the Advisers Act.  Through a series of "no action" positions and temporary regulations, culminating

18  with the promulgation of a new regulation -- SEC Rule 202(a)(11)-1, 17 C.F.R. § 275.202(a)(11)-1

19

20  [6] A 204-page SEC-sponsored report, published on January 8, 2008, authored by the RAND Corporation, titled "Investor and Industry Perspectives on Investment Advisers and Broker-

21  Dealers," (available at www.sec.gov/news/press/2008/2008-1.htm ) ("RAND Report"), contains an extensive comparison of the legal duties owed by broker-dealers versus investment advisers.  The

22  RAND Report observes that "unlike broker-dealers, federally registered investment advisers owe fiduciary obligations to their clients as a *categorical* matter. . . such obligations require the adviser

23  to act solely with the client's investment goals and interests in mind, free from any direct or indirect conflicts of interest that would tempt the adviser to make recommendations that would also benefit

24  him or her. . . ."  Report at 13 (emphasis in original).  The RAND Report notes that its discussion of the differences in regulation between broker-dealers and investment advisers "is by no means a

25  complete exegesis of the copious regulatory distinctions within these fields, which would require volumes."  RAND Report at 7 n.1.

26  [7] According to the Tully Report, "[t]he most important role of the [broker-dealer] registered

27  representative is, after all, to provide investment counsel to individual clients, not to generate transaction revenues.  The prevailing commission-based compensation system inevitably leads to

28  conflicts of interest among the parties involved."  *Id.* at 4.

1   (the "Rule," *see* Pollack Decl., Exhibit 2) -- the SEC used the SEC Designates Exclusion to

2   authorize broker-dealers to receive asset-based compensation with respect to brokerage accounts.[8]

3          The Rule required brokers, as a condition to their ability to receive asset-based

4   compensation, to inform their customers that their "account is a brokerage account and not an

5   advisory account," and that arrangements with "people who compensate us based on what you buy"

6   may create conflicts of interest, among other disclosures.  *See* 17 C.F.R. § 275.202(a)(11)-

7   1(a)(1)(ii); ¶¶ 50-62.

8          The Rule was subsequently vacated in its entirety by the Court of Appeals for the D.C.

9   Circuit in *Financial Planning Ass'n*.  *See* 482 F.3d at 493.  The court ruled that the SEC lacked the

10  authority to contradict the Broker-Dealer Exclusion and its prohibition on asset-based

11  compensation.  *Id*.

12         Accordingly, as of October 1, 2007, broker-dealers may no longer receive asset-based

13  compensation on assets held in brokerage accounts.

14         *The Investment Company Act*

15         The ICA requires that pooled investment vehicles, such as the Trust, register with the SEC

16  as "investment companies."  When classified under the ICA as an "open-end management

17  investment company," commonly referred to as a mutual fund, the investment company will be

18  organized under state law as a trust or corporation, managed by a board of trustees or directors.  The

19  ICA requires a certain percentage of the board to be unaffiliated with the service providers to the

20  mutual fund, and imposes a unique "watchdog" role on these independent trustees/directors -- a role

21  that does not exist in any other type of company in America[9] -- to oversee the service providers,

22  _____

23  [8] The Final Rule states that a broker or dealer "will not be deemed to be an investment adviser based
    solely on its receipt of special compensation" if certain conditions are met, and that a broker or

24  dealer "is an investment adviser solely with respect to those accounts for which it provides services
    or receives compensation that subject to the broker or dealer to the Advisers Act."  *See* 17 C.F.R. §
    275.202(a)(11)-1(a)(1) and (c); Pollack Decl., Exhibit 2.

25  [9] As explained by the Investment Company Institute ("ICI"), the mutual fund industry's trade

26  group: "Unlike the directors of other corporations, mutual fund directors are responsible for
    protecting consumers, in this case, the fund's investors.  This unique `watchdog' role, which does

27  not exist in any other type of company in America, provides investors with the confidence of
    knowing that directors oversee the advisers who manage and service their investments.  In

28  particular, under the Investment Company Act of 1940, the board of directors of a mutual fund is
    charged with looking after how the fund operates and overseeing matters where the interests of the

1  such as the distributor/underwriter.  *See Burks v. Lasker*, 441 U.S. 471, 484 (1979) (ICA was

2  "designed to place the unaffiliated directors in the role of `independent watchdogs'. . . [with] the

3  primary responsibility for looking after the interests of the funds' shareholders."), *quoting*

4  *Tannenbaum v. Zeller*, 552 F.2d 402, 406 (2d Cir. 1977).

5         The independent board members' role as "watchdogs" over the service providers arises from

6  Section 36(a) of the ICA, 15 U.S.C. § 80a-35(a) (Pollack Decl., Exhibit 3), which codifies that the

7  board of an investment company *and the service providers to an investment company*, including the

8  distributor/underwriter, owe a fiduciary duty to the investment company and its shareholders.

9  Section 36(a) was designed as a "reservoir of fiduciary obligations" to prevent more "subtle

10  abuses . . . not otherwise specifically dealt with in the Act."  *Brown v. Bullock*, 194 F. Supp. 207,

11  250 n. 1 (S.D.N.Y. 1961), *aff'd*, 294 F.2d 415 (2d Cir. 1961).[10]

12         The service providers -- who already have a fiduciary duty to maximize income for *their*

13  *own* shareholders (in this case, Franklin Resources, Inc. (NYSE: BEN), a publicly traded company)

14  -- nevertheless must, under the ICA, act in the best interests of the mutual fund and *its shareholders*,

15  which gives rise to an impossible conflict of interest.  Therefore, the fundamental purpose and

16  structure of the ICA is to force the independent board members -- the only non-conflicted advocates

17  for the fund and its shareholders -- to actively police the service providers' compliance with their

18  fiduciary duties to the fund and its shareholders.

19         Since mutual fund operations are conducted entirely through its conflicted service providers,

20  an essential aspect of the board's fiduciary duty and watchdog role under the ICA is to oversee the

---

21  fund and its shareholders differ from the interests of its investment adviser or management

22  company."  *See* Brochure titled "Understanding the Role of Mutual Fund Directors" at 3-4 (1999)
available at www.ici.org/pdf/bro_mf_directors.pdf .

23  The ICI also stated in its 1999 brochure: "Because mutual fund directors are, in essence, looking out

24  for shareholders' money, the law holds directors to a very high standard of behavior in carrying out
their responsibilities.  They must act with the same degree of care and skill that a reasonably

25  prudent person would use in the same situation or in connection with his or her own money.
Lawyers call this being a `fiduciary' or having a 'fiduciary duty.'"  *Id.* at 11; Complaint, ¶¶ 31-32.

26  [10] Although the provision speaks only of the SEC's authority to file civil actions for breach of

27  fiduciary duty, it implicitly codifies the duty, because the SEC could not enforce a duty that does
not exist.  *See Fogel v. Chestnutt*, 533 F.2d 731, 745 (2d Cir. 1975) ("the Act implicitly established

28  a federal standard of fiduciary duty").

---

1   compliance of service providers with the federal securities laws, including the Advisers Act.  *See*

2   SEC Rule 38a-1, 17 C.F.R. § 270.38a-1 (Pollack Decl., Exhibit 4); *see also* Final Rule,

3   Promulgating Release No. IC-26299, 2003 SEC LEXIS 2980 (Dec. 17, 2003) at n.122 (citing

4   Section 36(a) of the ICA, along with other pertinent provisions, as the authority for Rule 38a-1)

5   (hereinafter, "Rule 38a-1 Promulgating Release").

6         Rule 38a-1 was enacted in 2003 following a series of scandals in the mutual fund industry

7   involving illegal arrangements by fund distributors and broker-dealers that profited the fund

8   sponsor/service providers and, despite the violations of law, were either ignored or approved by the

9   fund's independent board members.  *See* Rule 38a-1 Promulgating Release at 6 (stating that

10  "unlawful conduct involving a number of fund advisers, broker-dealers, and other service

11  providers. . . confirms the need for these rules. . .[the service providers] placed the. . . business

12  interests of the fund adviser ahead of the interests of fund shareholders, thus breaching their

13  fiduciary obligations to the funds involved and their shareholders."); *see also* ¶¶ 33-40.

14        SEC Rule 38a-1 implements the existing ICA Section 36(a) duties by setting forth the

15  Board's primary responsibility to prevent, detect and correct violations of the federal securities

16  laws, including the Advisers Act, by service providers and their agents.  Accordingly, with SEC

17  Rule 38a-1 in place, it is clear that the job of a mutual fund trustee is to actively police service

18  providers (including the distributor/underwriter) for compliance with the federal securities laws.

19        One way to maintain compliance with Section 36(a) and SEC Rule 38a-1 is to promptly void

20  unlawful contractual commitments.  The drafters of the ICA anticipated this need by including

21  Section 47(b) in the ICA, 15 U.S.C. § 80a-46(b) (Pollack Decl., Exhibit 5), which provides that

22  "either party" to "a contract that is made, or whose performance involves, a violation of [the ICA],

23  or of any rule, regulation, or order thereunder," may request "a court" to void the contract, or partial

24  rescission if the "lawful portion. . . may be severed from the unlawful portion of the contract."

25        Together, the foregoing provisions prohibit broker-dealers advising shareholders of mutual

26  funds from receiving asset-based compensation on brokerage accounts, *and make it the affirmative*

27  *obligation of the boards of mutual funds to police compliance*, including pursuing legal actions to

28  void the fund's contractual commitments to pay such illegal compensation.

---

## STATEMENT OF FACTS

In the 1990's, the SEC encouraged broker-dealers to shift to asset-based compensation, relying on the SEC Designates Exclusion to the Advisers Act as its authority for this initiative. ¶¶ 50-62.  In response, mutual funds sold through broker-dealers began offering new share classes that reduced or eliminated transactional sales loads in favor of asset-based compensation.  ¶ 52.

Taking advantage of the new regulatory climate, on May 1, 1995, the Trust began to offer new "Class II" shares, which reduced the upfront transactional sales charge and instead compensated broker-dealers servicing shareholders with permanent ongoing payments calculated on the basis of the daily net asset value of the investor's shares.  *See* Pollack Decl., Exhibit 6 (excerpt from Franklin Custodian Funds prospectus supplement effective May 1, 1995).[11]  "Class II" shares were later re-named "Class C" shares.

Plaintiff Bradley C. Smith is invested in Class C shares of the Franklin Income Fund, a series of the Trust, and is therefore a shareholder in the Trust.  ¶ 10.  Plaintiff's shares are held in a brokerage account at Merrill Lynch, Pierce, Fenner & Smith Incorporated.  ¶ 10.

The Trust has elected to act as the distributor of its own shares.  ¶ 41; *see* SEC Rule 12b-1, 17 C.F.R. § 270.12b-1(a)(2) ("a company will be deemed to be acting as a distributor of securities of which it is the issuer. . . if it engages directly or indirectly in financing [distribution activities]"). The Trust is financing distribution activities, including the costs of distributing prospectuses, and compensating broker-dealers for servicing shareholders, out of Trust assets, as allowed by SEC Rule 12b-1.  ¶ 42.

Rule 12b-1 is silent on what form of compensation can be financed out of trust assets.  The Trust has elected to finance both transactional commissions and payments of asset-based compensation to broker-dealers out of its assets.  *See* ¶ 42.  In the fiscal year ending September 30, 2008, the Trust funded payment of approximately $99.2 million in asset-based compensation to broker-dealers pursuant to a Rule 12b-1 distribution plan for Class C shares.  ¶ 41.

The Trust has made a contractual commitment to pay asset-based compensation to F/T

---

[11] On a motion to dismiss, the court may take judicial notice of SEC filings and other public records.  *Dreiling v. Am. Exp. Co.*, 458 F.3d 942, 946 n.2 (9th Cir. 2006).

Distributors.  *See* Distribution Agreement dated February 1, 2008 (Pollack Decl., Exhibit 7).  F/T Distributors is a broker-dealer that acts on behalf of the Trust on an agency basis (since the Trust has elected to act as the distributor of its own shares).  ¶ 41.  In turn, F/T Distributors sub-appoints retail broker-dealer firms (such as Merrill Lynch) to distribute Trust shares and receive compensation for servicing shareholders on an agency basis on behalf of the Trust (since the Trust has elected to act as distributor of its own shares).  *Id.*  F/T Distributors pays asset-based compensation financed from Trust assets to the sub-agent broker-dealers, which are calculated based on the average daily net asset values of the particular shares held by each respective sub-agent broker-dealer's customer accounts holding Trust shares.  ¶¶ 22, 41.  In addition, F/T Distributors makes ongoing "marketing support payments" to broker-dealers based on daily net asset values of shares held in each respective customer account.  ¶ 41.  These payments are ongoing, which means they continue to be made to that particular broker-dealer for as long as the shareholder owns Trust shares held in an account serviced by that broker-dealer.  *Id.*

These ongoing payments of asset-based compensation with respect to shares held in brokerage accounts have continued after October 1, 2007, the effective date of the court's mandate in *Financial Planning Ass'n* (vacating SEC Rule SEC Rule 202(a)(11)-1 which had authorized broker-dealers to receive asset-based compensation).  *Id.*  The illegal payments improperly deplete the assets of the Trust and deprive shareholders of the protections and benefits of the advisory accounts to which they are entitled under the law.  ¶ 42.

Plaintiff, through counsel, made demand on the Board of Trustees by letter dated January 8, 2009, for the Board to cause the Trust and its service providers to cease funding and paying asset-based compensation to broker-dealers in connection with Trust shares held in brokerage accounts, to restore to the Trust certain of such payments made in the past, and to remedy the Trustees' breaches of their fiduciary duties of loyalty and due care and their waste of Trust assets.  ¶ 78; Complaint Exhibit 1.

By letter dated March 4, 2009, counsel for the independent Trustees responded that:  "The Board of Trustees has carefully considered Mr. Smith's demands on behalf of the Trust, and has sought and considered legal advice on the subject matter of the demands.  The Board of Trustees

has determined that the demands are not well-founded, as a matter of law, and declines to take the steps, including litigation, that you propose." ¶ 79; Complaint Exhibit 2.

In the absence of any substantive content in the response from the Board, Plaintiff's counsel continued their pre-suit investigation, and subsequently filed this shareholder derivative action on behalf of the Trust on October 6, 2009. Counsel for F/T Distributors requested a quite lengthy extension for medical and other reasons, to which the Plaintiff consented and the Court granted. Defendants' motion to dismiss was timely filed on January 22, 2010.

## LEGAL STANDARD

Dismissal under Rule 12(b)(6) is not appropriate unless the complaint lacks a cognizable legal theory or sufficient facts to support a cognizable legal theory. *Balistreri v. Pacifica Police Dep't*, 901 F.2d 696, 699 (9th Cir. 1990). For a complaint to survive a motion to dismiss, "the non-conclusory factual content, and reasonable inferences from that content, must be plausibly suggestive of a claim entitling the plaintiff to relief." *Moss v. U.S. Secret Serv.*, 572 F.3d 962, 969 (9th Cir. 2009) (internal quotation marks omitted). The court accepts as true the allegations in the complaint and construes them in favor of the plaintiff. *Intri-Plex Techs., Inc. v. Crest Group, Inc.*, 499 F.3d 1048, 1050 n. 2 (9th Cir. 2007). The Complaint in this case is properly pled and should be sustained.

## ARGUMENT

### I. ICA SECTION 47(B) PROVIDES A VALID BASIS FOR PLAINTIFF'S CLAIM

Defendants contend that the Trust is prohibited from voiding its own illegal contractual commitments, arguing that there is no private right of action under Section 47(b); that there has been no predicate violation of the ICA or any regulation thereunder containing a private right of action; and that the payments at issue are financed pursuant to SEC Rule 12b-1 and therefore compliance with the Advisers Act and any other applicable law is "irrelevant." Def. Mem. at 7.

None of those arguments has any merit.

### A. ICA Section 47(b) Is a Private Right of Action

A contract cannot void itself. Section 47(b) of the ICA refers to "a court" as the tribunal that

will void an illegal agreement.  The statute refers to "either party" of the contract as the person with the right to void the contract.  For these reasons, Section 47(b), as with its nearly identical counterparts in the other securities laws,[12] has been properly viewed as an independent and express private right of action.  *See, e.g.*, *Franklin Nat'l Bank v. L.B. Meadows & Co.*, 318 F. Supp. 1339, 1341 (E.D.N.Y. 1970) (listing Section 47(b) among "[o]nly few sections of the various Securities Acts [that] provide explicitly for private actions"); *see also Freeman v. Marine Midland Bank-New York*, 1979 U.S. Dist. LEXIS 12177, at *5-6 (E.D.N.Y. May 24, 1979) ("[T]he Court is not being asked to imply a private right of action for damages. . . courts have held that section 29(b) provides a plaintiff with an independent and express statutory right to relief." (citations omitted)); *Kardon v. Nat'l Gypsum Co.*, 69 F. Supp. 512, 514 (E.D. Pa. 1946) ("a statutory enactment that a contract of a certain kind shall be void almost necessarily implies a remedy in respect of it.  The statute would be of little value unless a party to the contract could apply to the Courts to relieve himself of obligations under it or to escape its consequences."); *Bullock*, 194 F. Supp. at 232 (a right of action "must be granted; otherwise section 47(b) would be an idle legislative gesture"), *aff'd*, 294 F.2d 415 (2d Cir. 1961) (en banc).

As the SEC has explained, in an *amicus curiae* brief submitted to the Second Circuit Court of Appeals, Section 47(b) is a "version of the common law doctrine of `void for illegality'"; "given the explicit language in Section 47(b)(2) that creates a presumption in favor of rescission, the remedy under the current version of Section 47(b) should be viewed as an express rather than an implied one."  *See* Brief of the SEC, Amicus Curiae, Submitted at the Court's Request (Dec. 5, 2001) at Section II, filed in *Olmsted v. Pruco Life Ins. Co.*, 283 F.3d 429 (2d Cir. 2002), *available at* www.sec.gov/litigation/briefs/olmsted.htm ("SEC Amicus Brief").

The SEC's legal analysis also concluded that Section 47(b) provides a distinct cause of action irrespective of whether the predicate violation of the ICA contains any express or implied private right of action for damages.  *Id., citing Transamerica Mortgage Advisors, Inc. v. Lewis*, 444 U.S. 11, 18 (1979) (construing Section 215 of the Advisers Act to permit rescission and restitution

---

[12] There are counterparts at Section 29(b) of the Securities Exchange Act, 15 U.S.C. § 78cc(b), and Section 215(b) of the Advisers Act, 15 U.S.C. § 80b-15.

when a contract is contrary to statute or regulations, while at the same time finding no implied right of action for damages under the predicate statute alleged to have been violated in that case, the antifraud provision of the Advisers Act); *see also Rhoades v. Powell*, 644 F. Supp. 645, 661-64 (E.D. Cal. 1986) (a Section 29(b) claim can be based on a violation of an Exchange Act provision that does not contain a private right of action); *Roberts v. Smith Barney Harris Upham & Co.*, 653 F. Supp. 406, 414 (D. Mass. 1986) ("section 29(b) creates substantive rights to void a contract that are independent of the rights created by section 15(c)(1)"); *Couldock & Bohan, Inc. v.Societe Generale Securities Corp.*, 93 F. Supp. 2d 220, 231 (D. Conn. 2000) (performance of a clearing agreement involved numerous violations of Exchange Act provisions and is therefore void pursuant to Section 29(b)).[13]

The SEC amicus brief also explained that Section 47(b) creates a right to sue for "rescission or for an injunction against continued operation of the contract, and for restitution."  SEC Amicus Brief; *see also Goldstein v. Groesbeck*, 142 F.2d 422, 426 (2d Cir. 1944) (the contract voiding provision "in express terms declares the contracts void.  It should follow that the [plaintiffs] are entitled to a refund, for no other result can fulfill the expressed purpose of the Act"); *In re Mutual Funds Inv. Litigation*, 384 F. Supp. 2d 873, 880 (D. Md. 2005) ("Section 47(b) of the Act contemplates civil suits for relief by way of rescission and for damages."), *quoting Mathers Fund, Inc. v. Colwell Co.*, 564 F.2d 780, 783 (7th Cir. 1977).

Ignoring seven decades of authorities on point, Defendants argue that it is "settled law" that "ICA § 47(b) provides a remedy rather than a distinct cause of action or basis of liability."  Def.

_____

[13] The basic concept reflected in Section 47(b) -- that statutes and regulations are a source of duty that, if breached or violated, can establish an element of a cause of action -- appears throughout the law.  *See, e.g.*, *Clark v. John Lamula Investors, Inc.*, 583 F.2d 594, 601 (2d Cir. 1978) (violation of NASD rules, which contain no private right of action, may nevertheless be used to prove the duty element of securities fraud); *O'Connor v. R.F. Lafferty & Co.*, 965 F.2d 893, 898 (10th Cir. 1992) (same); *Practico v. Portland Terminal Co.*, 783 F.2d 255, 266 (1st Cir. 1985) (as held by "every other court that has considered this issue," violation of OSHA regulation may be used to prove negligence or negligence *per se*, even though there is no private right of action under the OSHA regulations); *In re Charles Schwab Corp. Securities Litig.*, 257 F.R.D. 534, 553 (N.D. Cal. 2009) (violations of the ICA without private rights of action can be used as predicate acts for claims under Section 17200 of California's unfair competition laws); *Colbert & Winstead, PC 401(k) Plan v. AIG Financial Advisors, Inc.*, 2008 U.S. Dist. LEXIS 53179 at *27 (M.D. Tenn. July 8, 2008) (no private right of action for violation of NASD rules, but the violation may be used to prove negligence).

Mem. at 5 *citing Mutchka v. Harris*, 373 F. Supp. 2d 1021, 1027 (C.D. Cal. 2005); *Stegall v. Ladner*, 394 F. Supp. 2d 358, 378 (D. Mass. 2005); *Davis v. Bailey*, 2005 U.S. Dist. LEXIS 38204, at *18-19 (D. Col. Dec. 22, 2005).  However, that was not a holding in those cases.

The three cases, *Mutchka*, *Stegall*, and *Davis*, each involved a nearly identical complaint (evidently filed against more than 40 mutual fund defendant groups by the same plaintiffs' counsel)[14] filed as direct shareholder class actions against mutual fund companies for allegedly failing to file claims in securities class action settlements to benefit the funds.  Presumably because the plaintiffs in those cases had no standing to bring Section 47(b) claims (because they did not file derivative actions and were not parties to the fund adviser contracts that they sought to void), the plaintiffs in each case "conceded" or "agreed" that their Section 47(b) count should be dismissed if they had no other claims to pursue as individual shareholders.  *See Mutchka*, 373 F. Supp. 2d at 1027; *Stegall*, 394 F. Supp. 2d at 378; *Davis*, 2005 U.S. Dist. LEXIS 38204, at *18.

Because plaintiffs in the cases cited by the Defendants lacked standing, consented to dismissal, never briefed the issues, and the courts in those cases conducted no analysis (and appeared to be unaware of controlling Supreme Court authority), the results in those cases are hardly "settled law" or even a "holding" of those courts.

Moreover, the only precedent cited in these cases (other than citations among these same cases where the plaintiffs were consenting to dismissal of their Section 47(b) claim) is *Tarlov v. Paine Webber Cashfund Inc.*, 559 F. Supp. 429, 438 (D. Conn. 1983), which approvingly described the Supreme Court's opinion in *Transamerica Mortgage Advisors*, holding that the contract voiding provisions of the federal securities laws provide independent private rights of action, irrespective of whether the predicate violation has a private right of action.  *See, e.g., Mutchka*, 373 F. Supp. 2d at 1027; *Davis,* 2005 U.S. Dist. LEXIS 38204, at *18, *citing Tarlov*.

In *Tarlov*, the court also confirmed that Section 47(b) would allow a right of action irrespective of whether the predicate violation had a right of action: "In an action founded on some

---

[14] *See Everett v. Bozic*, 2006 U.S. Dist. LEXIS 55824, at *3 (S.D.N.Y. Aug. 3, 2006) (another of "more than 40 virtually identical actions filed by Plaintiffs' counsel against major U.S. mutual fund companies").  In *Everett*, the court dismissed the Section 47(b) count for failure to plead as a derivative action.

1   violation of the Act other than payment of excessive fees [under ICA Section 36(b)], the holding of

2   [the Supreme Court in *Transamerica Mortgage Advisors*] would seem to apply and Section 47

3   might serve as the basis for an implied right of action." *Id.*

4         The court in *Tarlov* did not allow the Section 47(b) claim to go forward with respect to the

5   alleged violation of Section 36(b) because of its concern that the plaintiff was expanding the remedy

6   provided to shareholders under Section 36(b).  Section 36(b) provides for the recovery of excessive

7   fund advisory fees, and has a one-year look-back on damages and other restrictions.[15]  According to

8   the court, a plaintiff who "already has stated a cause of action under Section 36(b) . . . would

9   undermine the carefully considered limits which Congress placed on this action in Section 36(b)(3)"

10  if the plaintiff could void the advisory contract under Section 47(b).  *Id.  Tarlov* seeks to uphold

11  Section 36(b) as the exclusive remedy for excessive advisory fee cases. *Id*. at 437.[16]

12        *Tarlov* does not purport to preempt Section 47(b) outside the context of excessive advisory

13  fees, and the opinion expressly states that it poses no bar to contract voiding under Section 47(b)

14  arising from violations of provisions other than Section 36(b), *id.* at 438, as is the case here.

15        In sum, the contract voiding provisions of the federal securities laws, including Section

16  47(b), are independent rights of action, as recognized by a long line of cases, including the Supreme

17  Court in *Transamerica Mortgage Advisors*.  Defendants' cases, to the extent they even purport to be

18  decisional authority, rely only on *Tarlov*, which, in turn, expressly coincides with Plaintiff's

19  position on this motion.

20

21  ---

[15] Section 36(b) provides a limited remedy to shareholders on behalf of a fund for breaches of
22  fiduciary duty by an investment adviser to a fund solely with respect to the receipt of excessive fees.
*See, e.g., Bellikoff v. Eaton Vance Corp.*, 481 F.3d 110, 117, 118 (2d Cir. 2007) (Section 36(b) only
23  remedies excessive, not improper, fees), *citing Gartenberg v. Merrill Lynch Asset Management,*
*Inc.,* 694 F.2d 923, 928 (2d Cir. 1982).  Section 36(b) was added to the ICA by amendment in 1970
24  to expand shareholder rights by eliminating the restrictions of derivative actions, including the
demand requirement and any power of the board to terminate the litigation.  *See Daily Income*
25  *Fund, Inc. v. Fox*, 464 U.S. 523, 529-530 (1984); *In re Dreyfus Mutual Funds Fee Litig.*, 428 F.
Supp.2d 357, 359 (W.D. Pa. 2006).

26  [16] In so doing, the *Tarlov* court was essentially applying the rule of statutory construction that a
27  specific remedy will preempt any general remedies.  *See, e.g., Hinck v. U.S.*, 550 U.S. 501, 506
(2007) ("in most contexts, a precisely drawn, detailed statute pre-empts more general remedies"
28  (citations omitted)).

---

PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO MOTION TO DISMISS
C-09-4775 PJH       - 15 -

### B.   Section 47(b) Applies to a Violation of a Regulation Under the ICA

Defendants make a series of arguments that seek to obfuscate the Trust's claim under Section 47(b), rather than analyze the applicable law.

Contrary to Defendants' premise, a regulation can be the predicate for violation of Section 47(b).  *See* 15 U.S.C. § 80a-46(b) (referring to "a contract that is made, or whose performance involves, a violation of this title, or of *any* rule, *regulation*, or order thereunder") (emphasis added).  Moreover, the regulation at issue here, SEC Rule 38a-1, is not limited to requiring "compliance policies and procedures," as Defendants argue, but also assigns to the board the primary responsibility for overseeing the fund's service providers' compliance with the federal securities laws.  17 C.F.R. ¶ 270.38a-1(a)(2), ¶¶ 32-41; *see* Pollack Decl., Exhibit 4.  As part of the Board's duty to implement compliance procedures reasonably designed to prevent, detect and correct violations of the federal securities laws, the Board must also act on any "Material Compliance Matter," which is defined to include "a violation of the federal securities laws by the fund, . . . principal underwriter,. . .  or agents thereof."  17 C.F.R. ¶ 270.38a-1(e)(2).  Federal securities laws are specifically defined in the regulation to include the Advisers Act.  17 C.F.R. ¶ 270.38a-1(e)(1).

Therefore, by the plain language of the regulation, it is the responsibility of the Board to police the service providers (including F/T Distributors) and their agents (the retail broker-dealers that act on its behalf) who are receiving compensation from the Trust.  When there is an actual violation of the Advisers Act by F/T Distributors or its agents -- a "Material Compliance Matter" in the language of the regulation -- then the Board is compelled to act.  Therefore, voiding or reforming any contract containing payment provisions causing violations (Material Compliance Matters) is not merely an option for the Board but an affirmative obligation.

Defendants contend that since the payments are financed by SEC Rule 12b-1, compliance with the Advisers Act is "irrelevant."  Def. Mem. at 7.  Rule 12b-1 allows the Trust to elect to act as the distributor of its own shares.  *See* SEC Rule 12b-1, 17 C.F.R. § 270.12b-1(a)(2) ("a company will be deemed to be acting as a distributor of securities of which it is the issuer. . . if it engages directly or indirectly in financing [distribution activities]").  However, the fact that the broker-dealer compensation is financed out of Trust assets, as allowed by Rule 12b-1, does not mean that the

1  payments do not need to comply with all other applicable laws.  For instance, while the printing and

2  distribution of prospectuses may be financed using fund assets through Rule 12b-1 (and Rule 12b-1

3  is often used for this purpose), all the other laws that govern the content and distribution of

4  prospectuses are also still applicable.  Accordingly, Defendants' suggestion that Rule 12b-1 shields

5  all parties involved from compliance with the Advisers Act, without identifying any actual conflicts

6  between Rule 12b-1 and the Advisers Act, is without merit.[17]

7  Defendants also argue, in *ipse dixit* fashion, that distribution activities are "a very different

8  function" than providing investment advice, *see* Def. Mem. at 8, but it is irrefutable that investment

9  advice is included in the package of services that broker-dealers provide to their customers.  "*The*

10  *primary use of 12b-1 fees is to compensate financial intermediaries for advice and other services to*

11  *their clients*," according to Defendants' trade group, the Investment Company Institute ("ICI").  *See*

12  ICI letter to SEC dated July 19, 2007 at 4 (Pollack Decl., Exhibit 8) (emphasis added); *see also*

13  *American Mutual Funds Fee Litig.,*2009 U.S. Dist. LEXIS 12059 at *32, *56-57 (C.D. Cal. Dec.

14  28, 2009) (American Funds, the largest mutual fund family sold through broker-dealers,

15  successfully argued, and the court adopted as a factual finding following a trial in the case, that

16  "12b-1 fees are widely used in the mutual fund industry as a method of compensating broker-

17  dealers for distributing fund shares as well as providing information, *advice*, and ongoing support

18  services to mutual fund investors." (emphasis added)).

19  Defendants further argue that *Financial Planning Ass'n* is "irrelevant."  Def. Mem. at 7.  As

20  described above, the decision invalidated SEC Rule 202(a)(11)-1, which had authorized broker-

21  dealers to receive asset-based compensation.  The regulation was enacted pursuant to the SEC

22  Designates Exclusion to the Advisers Act.  Therefore, *Financial Planning Ass'n* is undoubtedly not

23  "irrelevant."  If Defendants believe the decision is irrelevant because they do not rely on the SEC

---

24  [17] In any event, there is no conflict between Rule 12b-1 under the ICA and the requirements of the
25  Advisers Act.  Rule 12b-1 is silent about the form of compensation paid and the licensing of the
   recipient.  Nothing prevents the Trust, F/T Distributors, and the retail broker-dealers from
26  complying with both -- such as by paying asset-based compensation only on fund shares that are
   held in advisory accounts offered by dual registrants.  Finally, even if there were a conflict, Rule
27  12b-1 would yield to the Advisers Act.  *See United States v. Maes*, 546 F.3d 1066, 1068 (9th Cir.
   2008) ("a regulation does not trump an otherwise applicable statute unless the regulation's enabling
28  statute so provides.").

Designates Exclusion to authorize the payments at issue, then they must identify some other statutory exclusion that authorizes the asset-based compensation payments.  *See United States v. First City Nat'l Bank of Houston*, 386 U.S. 361, 366 (1967) (a party that needs the benefit of an exception to the prohibition of a statute has the burden of proof); *Rheem Mfg. Co. v. Rheem*, 295 F.2d 473, 475 (9th Cir. 1961) (the party that needs an exception to a statute has the burden of bringing himself clearly within it).  Defendants have not made any attempt, and therefore have failed, to meet their burden of establishing that another statutory exclusion applies to authorize the asset-based compensation payments.[18]

Defendants also argue that, even assuming the payments are illegal for the broker-dealers to receive, it is nevertheless lawful for Defendants to make the payments.  Def. Mem. at 8-9 ("even if. . . broker-dealers who received such fees were required to register under the Investment Advisers Act. . . SEC Rule 38a-1. . . does not impose on funds a duty to assure that broker-dealers comply with registration requirements.").  That ignores that Defendants' duty under the ICA and SEC Rule 38a-1 is to police the service providers (F/T Distributors) and their agents (the retail broker-dealers) for violations of the Advisers Act, as stated by the plain language of SEC Rule 38a-1.  The Trust cannot meet this duty and make illegal payments at the same time.  It also ignores that under the "void for illegality" doctrine, contracts to make payments that are unlawful for the recipient to receive are themselves illegal agreements.[19]

Next, Defendants argue that "the claim in this case is barred" by Section 38(c) of the ICA, which, according to Defendants, protects them from liability if this Court invalidates Rule 12b-1, due to their good faith compliance in the past with Rule 12b-1.  Def. Mem. at 9.  Plaintiff does not

---

[18] Defendants have evidently concluded that the Broker-Dealer Exclusion does not authorize the asset-based compensation payments, since they never mention or discuss the Broker-Dealer Exclusion in their brief, and presumably will not raise a contrary position for the first time on reply.

[19] *See, e.g.*, *Birbrower, Montalbano, Condon, Frank, P.C. v. The Superior Court of Santa Clara County*, 949 P.2d 1, 13 (Cal. 1998) (voiding attorney fee agreement that was to pay out-of-state attorney who had practiced law in California without a California license); *Vierra v. Workers' Compensation Appeals*, 154 Cal. App. 4th 1142 (Cal. Ct. App. 2007) (contract that conflicts with an express provision of the law is illegal).  Since Section 47(b) codifies a version of the common law "void for illegality" doctrine, precedents construing what constitutes an illegal agreement are persuasive.  *See* SEC Amicus Brief at Section II ("Section 47(b). . . enacts a version of the common law doctrine of "void for illegality.").

seek to invalidate Rule 12b-1 by this action.  However, even assuming that happened, Section 38(c) would only impact the amount of restitution Defendants owed, and would not operate to dismiss the claim entirely.  In any event, since Defendants have not shown any conflict between Rule 12b-1 and the Advisers Act, there is no possibility that Rule 12b-1 will be invalidated, and therefore the entire argument is inapposite.[20]

Finally, Defendants argue that because SEC Rule 38a-1 imposes duties and obligations on the Trust, and not on the service providers, F/T Distributors is incapable of violating Rule 38a-1. Def. Mem. at 10.  However, Section 47(b) states that "either party" may void a contract that cannot be performed without causing a violation of any ICA statute or regulation.  Therefore, the Trust may void a contract that causes the Trust to violate SEC Rule 38a-1. The case cited by Defendants does not involve Section 47(b) or any other contract voiding provision, *see* Def. Mem. at 10, *citing Northstar Fin. Advisors, Inc. v. Schwab Inv.*, 609 F. Supp. 2d 938, 945 n.4 (N.D. Cal. 2009), and is inapplicable here.

## II.     The Court Should Exercise Supplemental Jurisdiction Over The State Law Claims

Defendants move to dismiss the state law claims on the basis that the Court may elect not to exercise supplemental jurisdiction after dismissal of the federal claim.  Def. Mem. at 10-11.  If the Court determines that Count One states a cognizable federal claim for contract voiding, then the state law claims arising from the same facts should be adjudicated in this Court.  28 U.S.C. § 1367(a).

## III.    The Complaint Satisfies the Particularity Element of Fed. R. Civ. P. 23.1

Defendants argue that this action should be terminated pursuant to Delaware law because Plaintiff allegedly failed to plead any facts, such as corruption or bad faith, which could rebut the business judgment rule, as required by the "particularity" element of Rule 23.1(b)(3) governing derivative actions.  *See* Def. Mem. at 10-16.  However, the Complaint alleges that the Trust is

---

[20] Plaintiff does *not* seek restitution for the Trust for payments made in good faith conformity with SEC Rule 202(a)(11)-1 -- which was invalidated by *Financial Planning Ass'n* effective October 1, 2007 -- pursuant to Section 38(c) of the ICA and its counterpart, Section 211(d) of the Advisers Act. ¶¶ 9, 70, 83.  Therefore, Defendants do not face any liability for their compliance with the regulation that actually was invalidated.

1   involved in an illegal contractual commitment, and no business judgment is involved in the

2   obligation to cease violating the federal securities laws.  ¶ 80.  In any event, the business judgment

3   rule is preempted by the federal policies underlying the claims asserted.  *Id.* Accordingly,

4   Defendants' entire argument is a red herring.  Plaintiff does not seek to rebut or overturn any

5   business judgment made by the Board of the Trust.

6          To determine whether a complaint meets the pleading standard of Rule 23.1, the court first

7   looks to the law of the state of the Trust's charter (in this case, Delaware) to ascertain what it is that

8   a plaintiff must show to satisfy the demand requirement.  *See In re Silicon Graphics Inc. Sec. Litig.*,

9   183 F.3d 970, 989-90 (9th Cir. 1999).  Because "[b]y its very nature the derivative action impinges

10  upon the managerial freedom of directors," Delaware law imposes a demand requirement.  *See*

11  *generally*, *Aronson v. Lewis*, 473 A.2d 805, 811 (Del. 1984), *overruled in part on other grounds by*

12  *Brehm v. Eisner*, 746 A.2d 244 (Del. 2000).  Following a demand refusal, the shareholder maintains

13  a right to file derivative litigation on behalf of the trust if demand was wrongfully refused.  *See*

14  *Grimes v. Donald*, 673 A.2d 1207, 1219 (Del. 1996) ("The stockholder does not, by making

15  demand, waive the right to claim that demand has been wrongfully refused.").  To establish

16  wrongful refusal, the plaintiff must "allege[] facts with particularity which, taken as true, support a

17  reasonable doubt that the challenged transaction was the product of a valid exercise of business

18  judgment."  *Levine v. Smith*, 591 A.2d 194, 210 (Del. 1991), *citing Aronson*, 473 A.2d at 808.[21]

19         It is axiomatic that engaging in illegal activity is *ultra vires* and not a valid business

20  judgment.  *See Kahn v. Roberts*, 679 A.2d 460, 465 (Del. 1996) (business judgment rule only

21  protects lawful actions of a board); *Gantler v. Stephens*, 2008 Del. Ch. LEXIS 20, at *59 n.112

22  (Del. Ch. Feb. 14, 2008) ("[v]oid acts contrary to public policy or beyond the authority of the

23

24  ─────────────────
    [21] Plaintiff made a demand in this case, even though the board could not exercise business judgment
    to engage in ongoing illegal activity, because "[t]he purpose of a pre-suit demand is to assure that
25  the stockholder affords the corporation the opportunity to address an alleged wrong without
    litigation[.]"  *Kaplan v. Peat, Marwick, Mitchell & Co.*, 540 A.2d 726, 730 (Del. Sup. Ct.1988); *see*
26  *also Aronson*, 473 A.2d at 812  (the making of a demand "promot[es] [a] form of alternative dispute
    resolution, rather than immediate recourse to litigation"); *Kaufman v. Beal*, 1983 Del. Ch. LEXIS
27  391 at *7 (Del. Ch. Feb. 25, 1983) ("There is a laudable purpose behind the demand before suit
    requirement which is to allow a corporation on whose behalf a stockholder's derivative suit is
28  brought, the chance to correct the wrong without suit").

corporation. . . cannot be cured by ratification"); *Metro Commc'n Corp. BVI v. Advanced Mobilcomm Techs., Inc.*, 854 A.2d 121, 131 (Del. Ch. 2004) ("[u]nder Delaware law, a fiduciary may not choose to manage an entity in an illegal fashion, even if the fiduciary believes that the illegal activity will result in profits for the entity"); *Guttman v. Huang*, 823 A.2d 492, 506 n. 34 (Del. Ch. 2003) ("one cannot act loyally as a corporate director by causing the corporation to violate the positive laws it is obligated to obey"); *Cal. Pub. Employees Ret. Sys. v. Coulter*, 2002 Del. Ch. LEXIS 144, at *34, *39-40 (Del. Ch. Dec. 18, 2002) (holding that a repricing of stock options where "the underlying stock option plan does not permit repricing of options" is *ultra vires*, that "the business judgment rule may not be invoked to shelter unauthorized actions of a board of directors" and that "[a]ny action of the board that falls outside the rather broad scope of its authority is not entitled to the protection of the business judgment rule"); *Grimes v. Donald*, 1995 Del. Ch. LEXIS 3, at *21 (Del. Ch. Jan. 12, 1995) ("The question whether these contracts are valid or not does not fall into the realm of business judgment, it cannot be definitively determined by the informed, good faith judgment of the board.  It must be determined by the court."), *aff'd*, 673 A.2d 1207 (Del. 1996).[22]

Although there are circumstances when a company board can exercise business judgment not to seek a damages remedy for past illegal conduct (for instance, the board of a manufacturing company may make a business decision not to antagonize a critical parts supplier), the illegal conduct has to have been completely in the past.  *See Miller v. AT&T*, 507 F.2d 759, 762-63 (3d Cir. 1974) (business judgment rule does not insulate directors from liability stemming from current violation of federal statute).

Defendants' request that the Court effectively permit them to continue their ongoing violations of the federal securities laws, on the basis of state law corporate governance rules, also

---

[22] *See also In re Walt Disney Co. Derivative Litig.*, 2004 Del. Ch. LEXIS 132, at *31-32 (Del. Ch. Sept. 10, 2004), *aff'd*, 906 A.2d 27 (Del. 2006) ("if the transaction constitutes waste, illegality, fraud, or an *ultra vires* act, not even ratification by disinterested directors or anything less than a unanimous shareholder vote will protect the transaction, or those participating in it"); *Desimone v. Barrows*, 924 A.2d 908, 934 (Del. 2007) (directors have "wide authority to take lawful action on behalf of the corporation" but "have no authority knowingly to cause the corporation to become a rogue, exposing the corporation to penalties from criminal and civil regulators").

implicates the Supremacy Clause.[23]  In *Burks v. Lasker*, 441 U.S. 471 (1979), the Supreme Court -- in a case that, like this one, involved a mutual fund shareholder derivative action alleging violations of the ICA and the Advisers Act -- set forth a two-step inquiry to determine if the mutual fund board has the power to terminate derivative litigation consistent with the Supremacy Clause.  First, the court should "determine whether state law permitted [the mutual fund's] disinterested directors to terminate respondents' suit.  If so, the next inquiry should have been whether such a state rule was consistent with the policy of the ICA and [Adviser's Act]."  *Id*. at 480.

According to the Supreme Court, "[t]he ICA and [Adviser's Act]. . . do not require that federal law displace state laws governing the power of directors unless the state laws *permit action prohibited by the Acts*, or unless '*their application would be inconsistent with the federal policy underlying the cause of action*. . . .'"  *Burks,* 441 U.S. at 479 (*citing Johnson v. Railway Express Agency*, 421 U.S. 454, 465 (1975)) (emphasis added).  "Federal courts must be ever vigilant to insure that application of state law poses 'no significant threat to any identifiable [federal] policy or interest.'"  *Id. quoting Wallis v. Pan American Petroleum Corp.*, 384 U.S. 63, 68 (1966).

The *Burks* opinion is controlling authority here, and essentially follows the established "conflict preemption" prong of Supremacy Clause jurisprudence.  *See O'Neal v. Smithkline Beecham Corp.*, 551 F. Supp. 2d 993, 1002 (E.D. Cal. 2008) ("Conflict preemption can be either direct or indirect.  Direct conflict, or 'impossibility preemption,' occurs where it is 'impossible for a private party to comply with both state and federal requirements,' indirect conflict, or 'obstacle preemption,' exists 'where state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress") (*quoting Sprietsma v. Mercury Marine*, 537 U.S. 51, 64 (2002)) (internal quotations and citations omitted).  Regulations promulgated pursuant to federal statutory authority "have no less pre-emptive effect than federal statutes."  *Fidelity Federal Savings and Loan Ass'n v. de la Cuesta*, 458 U.S. 141, 153 (1982).

This Court does not need to reach the preemption issue here, because under the first step of

---

[23] The United States Constitution and federal laws and treaties "shall be the supreme Law of the Land, and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding."  U.S. Const. Art. VI, Cl. 2.

the *Burks* test, the Court looks to Delaware law to determine if the business judgment rule applies to

ongoing illegal conduct.  Since it does not, as described above, the Board lacks the authority to

terminate the litigation, and therefore no conflict preemption analysis is necessary.  *Even if* step two

of the *Burks* test were to be reached, it is clear that, under the standards for conflict preemption, this

is a case of "direct conflict" because the board cannot both police for violations of the Advisers Act

and perform contractual commitments to pay compensation in violation of the Advisers Act.[24]

The significance of *Burks*, as aptly summarized by the district court in *SEC v. Keating*, 1992

U.S. Dist. LEXIS 14630 (C.D. Cal. 1992), is that it is "impermissible to allow the business

judgment rule, a creation of state law, to supersede the requirements, prohibitions, and policies of

the federal securities laws":

> First, the business judgment rule usually applies to actions (generally those brought by shareholders) to enjoin corporate acts or to seek damages from directors based on the actions taken by the directors. Second, it would be impermissible to allow the business judgment rule, a creation of state law, to supersede the requirements, prohibitions, and policies of the federal securities laws. A state business judgement rule cannot permit action otherwise prohibited by the federal securities laws. *Burks v. Lasker, 441 U.S. 471, 479, 99 S. Ct. 1831, 1838, 60 L. Ed. 2d. 404 (1979); Galef v. Alexander, 615 F.2d 51, 62 (2d Cir. 1980).* State law cannot be used to supplement the federal securities law if the state law would be inconsistent with the principles underlying federal law. *Kamen v. Kemper Financial Services, Inc., 111 S. Ct. 1711, 1717,* 114 S. Ed. 2d 152 (1991). In sum, if Ligget's conduct was in violation of the federal securities laws, the business judgment rule could not be allowed to apply; if his conduct did not violate those laws, the defense is superfluous.

*Id.* at *11-12.

The Complaint contains over 15 pages of factual allegations and background explaining the

violations of the federal securities law that have given rise to the Board's duty to void the Trust's

contractual commitments to make payments of asset-based compensation to broker-dealers acting

---

[24] Applying *Burks*, courts have preempted the business judgment rule in a number of contexts under the federal securities laws.  *See Galef v. Alexander*, 615 F.2d 51, 64 (2d Cir. 1980) (applying *Burks*, "we conclude that to the extent that a states claims against directors under § 14(a) [of the Exchange Act] upon which relief may be granted, federal policy prevents the summary dismissal of those claims pursuant to the business judgment of those defendant directors."); *In re Westinghouse Securities Litig.*, 832 F. Supp. 989, 997-98  (W.D. Pa. 1993) (applying *Burks*, where "the challenged transaction itself is not a business decision, *per se*, but [a violation of the federal securities laws]. . . the *Aronson* presumption that the business judgment rule cloaks the directors' challenged actions does not arise[.]").

1   on its behalf.  *See* ¶¶ 22-75.  Accordingly, Plaintiff has met the "particularity" element of Fed. R.

2   Civ. P. 23.1(b)(3), because these detailed allegations are referenced as the support for the contention

3   that this litigation is not protected by the business judgment rule.  ¶ 80.

4   **IV.    Plaintiff Has Standing to Sue on Behalf of the Trust**

5           Finally, Defendants ask the Court to "rule that Plaintiff has standing to sue derivatively on

6   behalf of only the one mutual fund in which Plaintiff allegedly owns and owned shares at the time

7   of the alleged wrongdoing -- namely, Franklin Income Fund."  Def. Mem. at 17 n.10. [25]  To the

8   contrary, Plaintiff alleges that Franklin Income Fund is a series of the Trust (one of five series in the

9   Trust), and that he is therefore "a shareholder in the Trust."  ¶¶ 10, 11.  Since the Trust is the legal

10  entity that is chartered under Delaware law, issues shares, and registers under the ICA as an

11  investment company, Plaintiff has standing to sue derivatively on behalf of the Trust.

12          Franklin Income Fund is an accounting notation,[26] not a legal entity.  It has never issued

13  shares, has no shareholders, has no capacity to sue or be sued, has no board of trustees or directors,

14  and has never registered as an investment company under the ICA.  Accordingly, there is no such

15  concept as a derivative action on behalf of "Franklin Income Fund."

16          Moreover, there is no right to bring a direct action on behalf of a subset of the Trust's

17  shareholders for indirect harm.  Even where shareholders in other series are not impacted, the law

18  requires that suit be brought derivatively on behalf of the trust.  *See Lapidus v. Hecht*, 232 F.3d 679,

19  683 (9th Cir. 2000) ("While it is true that only shareholders in the series corresponding to the fund,

20  and not shareholders in the other ten series, were affected. . . an injury. . . would be an injury to the

21  trust generally" and therefore the shareholder must sue derivatively on behalf of the trust).  In this

22
23  [25] Defendants' use of the term "mutual fund" is inappropriate in this context because the term has
    no ascertainable legal meaning -- the term nowhere appears in the ICA.  In common parlance,
24  people can use "mutual fund" to refer to a series portfolio of a registered investment company or
    sometimes to refer to a registered investment company.

25  [26] Just as operating companies issue different classes of stock (common stock, preferred stock) with
    different voting rights, the ICA permits a registered investment company to issue shares in "series"
26  that have separately allocated underlying assets and may vote on issues unique to the series
    separately.  *See* 15 U.S.C. § 80a-18(f)(2); 17 C.F.R. § 270.18f-2 ("a series company is a registered
27  open-end investment company which, in accordance with the provisions of section 18(f)(2) of the
    Act, issues two or more classes or series of preferred or special stock each of which is preferred
28  over all other classes or series in respect of assets specifically allocated to that class or series").

case, shareholders in all series are impacted, but pursuant to *Lapidus*, even if only some shareholders were impacted, because the injury is to the Trust, not the shareholder directly, Plaintiff is *required to sue derivatively on behalf of the Trust.*

Defendants cite cases involving plaintiffs that had mistakenly alleged that they owned shares in the series and not the trust.  Def. Mem. at 17 n.10 (*citing Stegall*, 394 F. Supp. 2d at 362; *In re Mutual Funds Invest. Litig.*, 519 F. Supp. 2d 580, 588-90 (D. Md. 2007)).  *Stegall* was filed as a direct shareholder class action, and does not purport to address derivative standing.  *In re Mutual Funds Invest. Litig.* was filed as a derivative case, but the court rests its conclusion on a total factual misunderstanding of the structure of series-type investment companies.  *See In re Mutual Funds Invest. Litig.*, 519 F. Supp. 2d at 589 ("no individual investor owns shares in the entity that registers as an investment company that issues separate series, and therefore an investor plaintiff could not meet the standing requirement imposed by Section 36(b) that he be a "security holder of" the entity on whose behalf he seeks to bring suit.").[27]  Accordingly, Defendants' cases confirm that a derivative action is properly brought in the name of the legal entity in which the Plaintiff owns shares, which in this case is the Trust.  Therefore, Plaintiff has standing to sue on behalf of the Trust.

## CONCLUSION

For the reasons above, Defendants' motion to dismiss should be denied.

Dated:  February 12, 2010

**MILBERG LLP**

/s/  Janine L. Pollack

Janine L. Pollack (*admitted pro hac vice*)

Michael C. Spencer
mspencer@milberg.com
Janine L. Pollack
jpollack@milberg.com
**MILBERG LLP**
One Pennsylvania Plaza
New York NY  10119
Telephone:  (212) 594-5300

---

[27] When courts have accurately identified the legal entity that issued shares, the courts have correctly recognized standing to sue derivatively on behalf of that entity, including in cases involving a series-type investment company. *See, e.g., Maharana Pratap Batra v. Investors Research Corp.*, 1991 U.S Dist. LEXIS 14773, at *3-4 (W.D. Mo. Oct. 4, 1991) (each series is not an investment company, and has never issued any shares; by owning shares in the registered investment company, the shareholder has standing to bring a Section 36(b) claim on behalf of the registered investment company).

Facsimile:   (212) 868-1229

Jeff S. Westerman (SBN 94559)
jwesterman@milberg.com
**MILBERG LLP**
One California Plaza
300 S. Grand Avenue, Suite 3900
Los Angeles, CA  90071
Telephone:  (213) 617-1200
Facsimile:   (213) 617-1975

Eric M. George (SBN 166403)
egeorge@bwgfirm.com
**BROWNE WOODS GEORGE LLP**
2121 Avenue of the Stars
Suite 2400
Los Angeles, CA  90067
Telephone:  (310) 274-7100
Facsimile:   (310) 275-5697

Lee A. Weiss
lweiss@bwgfirm.com
**BROWNE WOODS GEORGE LLP**
49 West 37th Street, 15th Floor
New York, NY  10018
Telephone:  (212) 354-4901
Facsimile:   (212) 354-4904

Ronald A. Uitz
ron877@yahoo.com
**UITZ & ASSOCIATES**
1629 K Street, N.W. Suite 300
Washington, D.C.  20006
Telephone:  (202) 296-5280
Facsimile:   (202) 521-0619

Alfred G. Yates, Jr. Esq.
yateslaw@aol.com
**LAW OFFICE OF**
   **ALFRED G. YATES, JR. P.C.**
519 Allegheny Building
429 Forbes Avenue
Pittsburgh, Pennsylvania 15219
Telephone:  (412) 391-5164
Facsimile:   (412) 471-1033

*Attorneys for Plaintiff*

## CERTIFICATE OF SERVICE

I hereby certify that on February 12, 2010, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system.

Participants in the case who are registered CM/ECF users will be served by the CM/ECF system.

I further certify that some of the participants in the case are not registered CM/ECF users. I have mailed the foregoing document by First-Class Mail, postage prepaid to the non-CM/ECF participants indicated on the attached Manual Notice List.

I certify under penalty of perjury that the foregoing is true and correct. Executed on February 12, 2010.

_____
Jeffrey Baum