1    Daniel A. Pollack (*pro hac vice*)              Mark Holland (*pro hac vice*)
     dpollack@mccarter.com                          mholland@goodwinprocter.com
2    Edward T. McDermott (*pro hac vice*)           Mary K. Dulka (*pro hac vice*)
     emcdermott@mccarter.com                        mdulka@goodwinprocter.com
3    Anthony Zaccaria (*pro hac vice*)              **GOODWIN PROCTER LLP**
     azaccaria@mccarter.com                         The New York Times Building
4    **McCARTER & ENGLISH, LLP**                    620 Eighth Avenue
     245 Park Avenue, 27th Floor                    New York, NY 10018
5    New York, NY 10167                             Telephone:  (212) 813-8800
     Telephone:  (212) 609-6800                     Facsimile:  (212) 355-3333
6    Facsimile:  (212) 609-6921                     *Attorneys for Defendants Ashton, Carlson, Ginn,*
     *Attorneys for Defendants Franklin/Templeton*   *Holiday, Lahaye, Olson, Thompson, Wilson and*
7    *Distributors, Inc., Charles B. Johnson and*    *Franklin Custodian Funds*
     *Rupert H. Johnson*

8                                        - and -

9                      Lloyd Winawer (State Bar No. 157823)
                       lwinawer@goodwinprocter.com
10                     **GOODWIN PROCTER LLP**
                       135 Commonwealth Drive
11                     Menlo Park, CA 94025-1105
                       Telephone:  (650) 752-3100
12                     Facsimile:  (650) 853-1038
                       *Attorneys for All Defendants*

13

14                    **UNITED STATES DISTRICT COURT**
                   **NORTHERN DISTRICT OF CALIFORNIA**
15                          **OAKLAND DIVISION**

16
     BRADLEY C. SMITH, derivatively on behalf       Case No. C 09-4775 PJH
17   of FRANKLIN CUSTODIAN FUNDS,

18                 Plaintiff,                        **REPLY MEMORANDUM**

            v.
19
     FRANKLIN/TEMPLETON DISTRIBUTORS,
20   INC., HARRIS J. ASHTON, ROBERT F.
     CARLSON, SAM GINN, EDITH E.
     HOLIDAY, FRANK W.T. LAHAYE, FRANK            Date:      April 14, 2010
21   A. OLSON, LARRY D. THOMPSON, JOHN            Time:      9:00 a.m.
     B. WILSON, CHARLES B. JOHNSON, AND           Place:     Courtroom 3
22   RUPERT H. JOHNSON,                           Judge:     Hon. Phyllis J. Hamilton

23                 Defendants,

     and
24   FRANKLIN CUSTODIAN FUNDS,

25                 Nominal Defendant.

26

27

28

1

**<u>Table of Contents</u>**

2

3

**Page**

4

Table of Authorities ……….………………………………..………………………   ii

5

6

Overview of Reply ……………………………………………………………….   1

7

Reply to Point I.A. —
    Section 47(b) of the Act is <u>not</u> a private right of action …………………………..   1

8

9

Reply to Point I.B. —
    Rule 38a-1 does not provide the requisite predicate violation ...……………………   5

10

11

Reply to Point II —
    This Court should decline to exercise supplemental jurisdiction ………………….   7

12

13

Reply to Point III —
    The Complaint fails to satisfy the particularity requirements
    of Fed. R. Civ. P. 23.1 and the Delaware Business Judgment Rule ………………   8

14

15

Coda on *Financial Planning Ass'n* ………………………………………………   12

16

17

Conclusion …………………………………………………………………..   14

18

19

20

21

22

23

24

25

26

27

-i-

28

1

## <u>TABLE OF AUTHORITIES</u>

2

**Page(s)**

3

CASES

4
*Abramowitz v. Posner*,
   672 F.2d 1025 (2d Cir. 1982).............................................................................. 10

5

6
*Alexander v. Sandoval*,
   532 U.S. 275 (2001) ................................................................................... 2, 4, 5

7
*Am. Bankers Ass'n v. SEC*,
   804 F. 2d 739 (D.C. Cir. 1986) ............................................................................ 3
8

9
*Brown v. Bullock*,
   194 F. Supp. 207 (S.D.N.Y. 1961) ....................................................................... 2

10
*Burks v. Lasker*,
11   441 U.S. 471 (1979) ........................................................................... 6, 8, 9, 10

12
*Dull v. Arch*,
   2005 U.S. Dist. LEXIS 14988 (N.D. Ill. July 27, 2005) ...................................... 4
13

14
*Financial Planning Ass'n v. SEC*,
   482 F.3d 481 (D.C. Cir. 2007) ....................................................... 1, 7, 12, 13, 14

15
*Franklin Nat'l Bank v. L.B. Meadows & Co.*,
16   318 F. Supp. 1339 (E.D.N.Y. 1970) ..................................................................... 2

17
*Freeman v. Marine Midland Bank-New York*,
   1979 U.S. Dist. LEXIS 12177 (E.D.N.Y. May 24, 1979) ..................................... 2
18

19
*Furman v. Walton*,
   2007 WL 1455904 (N.D. Cal. May 16, 2007),
20   *aff'd*, 320 F. App'x 638 (9th Cir. Mar. 26, 2009) ................................................. 8

21
*Galef v. Alexander*,
   615 F.2d 51 (2d Cir. 1980)................................................................................. 10
22

23
*In re Amer. Mutual Funds Fee Litig.*,
   2009 U.S. Dist. LEXIS 120597 (C.D. Cal. December 28, 2009)............................ 7

24
*In Re Mutual Funds Investment Litig.*,
   519 F. Supp. 2d 580 (D. Md. 2007) .................................................................... 14
25

26

27

28

*In re Westinghouse Sec. Litig.*,
    832 F. Supp. 989 (W.D. Pa. 1993) .................................................................. 10

*Kamen v. Kemper Fin. Services, Inc.*,
    500 U.S. 90 (1991) ............................................................................... 9, 10

*Kardon v. Nat'l Gypsum Co.*,
    69 F. Supp. 512 (E.D. Pa. 1946) ................................................................. 2

*Lapidus v. Hecht*,
    232 F.3d 679  (9th Cir. 2000) .................................................................. 14

*Miller v. Am. Telephone & Telegraph Co.*,
    507 F.2d 759 (3d Cir. 1974) .................................................................... 11

*Mutchka v. Harris*,
    373 F. Supp. 2d 1021 (C.D. Cal. 2005) ................................................... 3, 4, 5

*Olmsted v. Pruco Life Ins. Co. of New Jersey*,
    283 F. 3d 429 (2d Cir. 2002) .................................................................... 3

*SEC v. Keating*,
    1992 WL 207918 (C.D. Cal. Jul. 23, 1992) ............................................. 10

*Stein v. Bailey*,
    531 F. Supp. 684 (S.D.N.Y. 1982) .......................................................... 11

*Tarlov v. Paine Webber Cashfund Inc.*,
    559 F. Supp. 429 (D. Conn. 1983) ......................................................... 4, 5

*Thomas v. Metro. Life Ins. Co.*,
    2009 U.S. Dist. LEXIS 78014 (W.D. Okla. Aug. 31, 2009) ..................... 12

*Transamerica Mortgage Advisors, Inc. v. Lewis*,
    *444 U.S. 11 (1979)* ................................................................................ 2, 5

*Williams v. Bank One Corp.*,
    2003 U.S. Dist. LEXIS 23522 (N.D. Ill. Dec. 15, 2003) ........................ 14

### STATUTES AND RULES

Investment Advisers Act
    Section 202(a)(11)(C), 15 U.S.C. § 2(a)(11)(c) ................................. 12, 13

-iii-

Investment Company Act of 1940
    Section 22, 15 U.S.C. § 80a-22 ........................................................................... 13
    Section 36, 15 U.S.C. § 80a-35 ............................................................................. 1
    Section 38, 15 U.S.C. § 80a-37 ............................................................................. 7
    Section 47, 15 U.S.C. § 80a-46 ............................................................. 1, 2, 3, 4, 5

Securities Exchange Act of 1934
    Section 15(b)(8), 15 U.S.C. § 78o(b)(8) ......................................................... 11, 13

SEC Rule 12b-1, 17 C.F.R. § 270.12b-1 .................................................... 5, 7, 12, 13, 14

SEC Rule 38a-1, 17 C.F.R. § 270.38a-1 ...................................................... 1, 2, 3, 5, 6

NASD Rule 2830 ................................................................................................ 13, 14

Fed. R. Civ. P. 23.1 ............................................................................................... 1, 8

**OTHER AUTHORITIES**

*Certain Broker-Dealers Deemed Not To Be Investment Advisers*,
    70 Fed. Reg. 20,424 (April 19, 2005) ................................................................. 12

*Compliance Programs of Investment Companies and Investment
    Advisers*, Release No. IC-26299, 68 F.R. 74714, 74721 (Dec. 24, 2003) ............................... 6

## <u>Overview of Reply</u>

Pages 1-10 of Plaintiff's Memorandum in Opposition might fairly be titled "Mr. Smith Goes to Washington." In those pages Mr. Smith presents his view of the world as he would like it to be, rather than as it is. Mr. Smith fails to address, head-on, the principles of law that underlie this Motion to Dismiss. Accordingly, and because this motion is premised on solid principles of law (§ 47(b), Rule 38a-1, Fed.R.Civ.P. 23.1 and the Delaware business judgment rule), this Reply Memorandum first addresses those dispositive issues, *i.e.* pages 11-25 of Plaintiff's Memorandum in Opposition. Thereafter, we address Mr. Smith's view of the world, *i.e.* pages 1-10 of Plaintiff's Memorandum in Opposition, and the inapplicability of his principal case, *Financial Planning Ass'n*.

### Reply to Point I.A. —
### Section 47(b) of the Act is <u>not</u> a private right of action

Plaintiff argues (Memorandum in Opposition, pp. 11-15) that "ICA Section 47(b) ***Is*** a Private Right of Action" (emphasis supplied) or, stated another way by Plaintiff, that § 47(b) "has been properly viewed as ***an independent and express private right of action***." (emphasis supplied). Plaintiff's position is fallacious for several reasons:

First, Plaintiff has not cited and cannot cite a single case ever decided (or even brought) under § 47(b) alone, *i.e.* without linkage to another section of the Act.[1] This, itself, is persuasive evidence that § 47(b) is <u>not</u> a private right of action and does not create "***an independent and express private right of action.***"

Second, there simply is no language Plaintiff can point to in § 47(b) that states that there is a private right of action under that section. When Congress wanted to create a private right of action it knew how to do so, and did so explicitly. Thus, in § 36(b) of the Act, the statute says:

---

[1] "Act" as used herein refers to the Investment Company Act.

1

1

> An action may be brought under this subsection [i.e. § 36(b)] by . . . a
> security holder of such registered investment company on behalf of
> such company . . .

2

3  The absence of any such language in § 47(b) further demonstrates the fallacy of Plaintiff's

4  assertion that § 47(b) "**is**" or should be viewed as "***an independent and express private right of***

5  ***action.***"

6

7       Plaintiff relies on four cases to support his position (Memorandum in Opposition, p. 12):

8  *Franklin Nat'l Bank*, *Freeman*, *Kardon* and *Bullock*.  The first three cases did not involve claims

9  under or rulings on § 47(b).  *Bullock*, a case decided in 1961, supports Defendants at bar, not

10  Plaintiff.  The Court in *Bullock* first found an "implied" right of action under § 20(a) of the Act

11  and, <u>only then</u>, invoked § 47(b).  Thus, the Court said:

12

> Section 47(b) *in connection with Section 20(a) of the Act*, creates a
> right of civil action … 194 F. Supp. at 232.  (emphasis supplied)

13

14  Query:  whether the finding of an "implied" right in *Bullock* would be good law today in light of

15  *Sandoval* and its progeny; the important point here, however, is that even *Bullock* does <u>not</u> support

16  Plaintiff's view that § 47(b) creates "***an independent and express private right of action.***"

17       Another case cited by Plaintiff is *Transamerica* (Memorandum in Opposition, p. 12).

18  *Transamerica* is not on point.  That was a case under the Investment Advisers Act ("the IAA"),

19  not under the Investment Company Act.  For § 47(b) to be activated, by its own terms, there has to

20  be a predicate violation of a section of the Investment Company Act, not some other statute.  Even

21  if (contrary to the fact) there were a violation of the IAA at bar, § 47(b) would not be activated

22  because, as noted, § 47(b) requires a violation of "**this subchapter**", *i.e.* the Investment Company

23  Act.  *See* Memorandum in Support, p. 5, n.4.  Furthermore, unlike the case at bar, which relies on

24  a supposed violation of a "rule" (*i.e.* Rule 38a-1) as the predicate violation, *Transamerica* did not

25  involve a "rule," but a statute.  As we now know from *Sandoval*, which Plaintiff has completely

26

27

28

REPLY MEMORANDUM
C-09-4775 PJH
ME1 9693693v.1

1   ignored, a "rule" cannot create a private right of action.  532 U.S. at 291.  If a "rule" could create a

2   private right of action, the SEC would be in a position to legislate, whereas that function belongs

3   solely to Congress.  *See e.g. Am. Bankers Ass'n v. SEC*, 804 F. 2d 739, 754 (D.C. Cir. 1986).

4       The SEC *amicus* brief in *Olmsted*, cited by Plaintiff (Memorandum in Opposition, pp. 12-

5   13), is hardly compelling authority for the proposition that § 47(b) provides a "distinct cause of

6   action," as argued by Plaintiff.  The SEC *amicus* brief characterized § 47(b) as an "express

7   remedy," not as a distinct cause of action.  The Second Circuit in *Olmsted* refused to find an

8   "implied" right of action under §§ 26 or 27 of the Act, or, indeed, under <u>any</u> section of the Act.

9   *Olmsted v. Pruco Life Ins. Co. of New Jersey*, 283 F. 3d 429 (2d Cir. 2002).

10      If there is no private right of action under § 47(b) and no private right of action under Rule

11  38a-1, there is no private right of action at bar.  Stated more starkly, $0 + 0 = 0$, *i.e.* no private right

12  + no private right = no private right.

13                              *    *    *

14      Plaintiff's attempted rebuttal of our authority, *i.e. Mutchka*, *Stegall* and *Davis*, is without

15  force.  Plaintiff argues that the plaintiffs in those three cases "lacked standing," "consented to

16  dismissal," "never briefed the issues," and "the courts . . . conducted no analysis" (Memorandum

17  in Opposition, p. 14).  Those criticisms are all false.

18      First, the dismissals in *Mutchka* and *Davis* were not based on "lack of standing" as

19  Plaintiff contends (Memorandum in Opposition, p. 14).  *See*, *e.g. Mutchka,* 373 F. Supp. 2d at

20  1027 (standing argument relating to state law claims was addressed only <u>after</u> Court dismissed

21  § 47(b) claim); *Davis,* 2005 U.S. Dist. LEXIS 38204 at *20 ("[s]ince I have dismissed all the

22  claims [including the § 47(b) claim] in this lawsuit on the grounds stated, I need not address the

23  Defendants' [standing] argument …"); in *Stegall*, 394 F. Supp. 2d at 367, 378, it appears that the

24  Court may have considered both "lack of standing" <u>and</u> the failure to plead a legally sufficient

REPLY MEMORANDUM
C-09-4775 PJH
ME1 9693693v.1

predicate violation.

Second, neither the *Mutchka*, *Stegall* nor *Davis* plaintiffs "consented to dismissal"; in fact, Judge Selna in *Mutchka*, Judge Woodlock in *Stegall* and Judge Wiley in *Davis* each dismissed those actions, including the § 47(b) claims, after articulating well-reasoned analyses of the alleged predicate violations, including claims under § 36(a) of the Act.  Relying on the Supreme Court's Opinion in *Sandoval*, a seminal case, each of those courts found no private right of action under § 36(a).  Upon dismissal of the alleged predicate claims, each of those courts then dismissed the § 47(b) claims.[2]  *See*, *e.g. Mutchka*:

> Since the Court **has already determined** that the Mutchkas' other ICA claims must be dismissed, the claim under Section 47(b) necessarily fails.  373 F. Supp. 2d at 1027  (emphasis supplied)

Plaintiff also seeks to make much of the fact that the *Mutchka*, *Stegall* and *Davis* plaintiffs "agreed" that § 47(b) provides a remedy rather than a distinct cause of action; the fact is that plaintiffs in those cases were correct.  More to the point, the courts evidently agreed with their concession.  As Judge Wiley in *Davis* wrote:

> Both parties agree in their briefs, **and I find**, that the equitable remedy set forth in § 47(b)(1) is only available upon a showing of other violations of the ICA.  2005 U.S. Dist. LEXIS 38204, at **18-19 (emphasis supplied)

*See also, Dull v. Arch*, 2005 U.S. Dist. LEXIS 14988 at *8 (N.D. Ill. July 27, 2005) (§ 47(b) "does not provide for an independent cause of action where no violation of the ICA has occurred.").

In sum, the plaintiffs in *Mutchka*, *Stegall* and *Davis* <u>did</u> oppose dismissal, <u>did</u> file memoranda in opposition, and the courts <u>did</u> conduct analyses.

*Tarlov*, another case cited by Plaintiff, is hardly robust authority for the proposition for which Plaintiff cites the case (Memorandum in Opposition, pp. 14-15), *i.e.* that "the court . . .

---

[2]   In two of the three cases, Judge Selna and Judge Wiley dismissed the § 47(b) claims **with prejudice**.

REPLY MEMORANDUM
C-09-4775 PJH
ME1 9693693v.1

confirmed that Section 47(b) would allow a right of action irrespective of whether the predicate violation had a right of action."  The Court in *Tarlov* merely posits, as a hypothetical, that the holding of *Transamerica* "would seem to apply" and "might serve as the basis for an implied right of action."  This speculative language by the Court in *Tarlov* was surely swept away by *Sandoval* and its progeny.  The day of "implied" rights under the Act has come and gone.  *See e.g. Mutchka*:

> Despite the authority cited by the Mutchkas, cases decided after *Sandoval* have refused to find an implied private right of action in the ICA.  373 F. Supp. 2d at 1026.


### Reply to Point I.B —
### Rule 38a-1 does not provide the requisite predicate
### violation for invocation of § 47(b)

Even if a rule under the Act could provide the predicate violation to invoke § 47(b), this particular rule, *i.e.* Rule 38a-1, does not do so at bar because no violation of Rule 38a-1 has been pleaded.  As we stated in the Memorandum in Support, p. 7, "[n]o facts are pleaded in the Complaint identifying any defect in the compliance policies and procedures" of the Fund (emphasis supplied).  Accordingly, no violation of Rule 38a-1 has been pleaded at bar.  And, of course, there is no private right of action under Rule 38a-1.

Plaintiff argues (Memorandum in Opposition, p.16) that, under Rule 38a-1 "it is the responsibility of the Board to police the service providers (including F/T Distributors) and their agents (the retail broker-dealers that act on its behalf)" who sell the Fund shares, and that the Board is **"compelled to act"** to void or reform any contract under which the broker-dealers receive payments from the Fund.  Arguing (erroneously) that the 12b-1 payments to broker-dealers not registered under the IAA are "illegal" under the IAA, Plaintiff then jumps to the ill-founded conclusion that failure of the Board to terminate and recoup the 12b-1 payments constitutes a

violation of Rule 38a-1 (Memorandum in Opposition, p.16).   This entire construct is totally fallacious.

First, as to the "responsibility" of the Board, Plaintiff erroneously asserts that "Rule 38a-1 … assigns to the board the primary responsibility for overseeing the fund's service providers' compliance with the federal securities laws," and "by the plain language of the regulation, it is the responsibility of the board to police the service providers."  (Memorandum in Opposition, p. 16). Rule 38a-1 does no such thing.  *Per contra*, Rule 38a-1 requires only that a <u>fund</u> "[o]btain the approval of the fund's board" of the policies and procedures of designated entities -- those entities do not include broker-dealers. In fact, there is nothing in the rule that requires a board "to police" broker-dealers -- Rule 38a-1 does not even mention broker-dealers.[3]

Second, as to the "affirmative obligation" of the Board, Rule 38a-1 does not and could not **compel** a board to seek to void a contract, reform a contract or institute litigation.  Such decisions are always up to the board in the good faith exercise of its business judgment.  That is the very essence of a board as conductors of the business of a corporation. *See Burks v. Lasker*, *infra* p.9 et seq.  Rule 38a-1(a), as noted, merely obligates a fund to:  "[a]dopt and implement policies and procedures reasonably designed to prevent violation of the Federal Securities Laws."   There

---

[3]  Plaintiff attempts to gloss over the inapplicability of Rule 38a-1 to broker-dealers by referring to them erroneously as "agents" of the service providers identified in Rule 38a-1, *e.g.* Franklin/Templeton Distributors.  Plaintiff offers no support for his position.  There is absolutely no suggestion in the SEC release accompanying the adoption of Rule 38a-1 that the SEC intended that Rule 38a-1, somehow, to apply to broker-dealers.  *See Compliance Programs of Investment Companies and Investment Advisers*, Release No. 1C-26299, 68 F.R. 74714, 74721 (Dec. 24, 2003).  Surely, this would have been considered important and worthy of mention by the SEC as it would impose a tremendous burden on a fund's board -- fund complexes, like Franklin, have their fund shares sold and distributed through hundreds, if not thousands, of broker-dealers.  Simply put, it would defy common sense to suggest that a fund board is responsible for overseeing and policing the compliance functions of hundreds or thousands of broker-dealers.  Broker-dealers who sell Franklin Templeton Funds are not agents of Franklin/Templeton Distributors -- they are agents of their customers.

simply is no credible basis in law for concluding that payment of 12b-1 fees to broker-dealers violates "the Federal Securities Laws." The SEC has never taken this position and no court has ever so held. *See In re Amer. Mutual Funds Fee Litig.*, 2009 U.S. Dist. LEXIS 120597 (C.D. Cal. December 28, 2009).

*   *   *

Finally, and in any event, Plaintiff's contention that § 38(c), at most, reduces his recovery rather than bars his claim (Memorandum in Opposition, pp. 18-19) ignores the language of § 38(c) that no provision imposing any "liability" shall apply to a party's action taken in good faith reliance on an SEC rule (Memorandum in Support, p. 9). Here, Plaintiff does not dispute Defendants' good faith reliance on Rule 12b-1 for the payment of the 12b-1 fees right up until today. The world did not suddenly change when the Opinion in *Financial Planning Ass'n* was issued: 12b-1 fees were entirely legal prior thereto and are still entirely legal thereafter. *See* **Coda**, *infra*, pp. 14-15. Indeed, to date neither the SEC nor any court has found, or even suggested, that *Financial Planning Ass'n* has any implications for the payment of 12b-1 fees. Under § 38(c), good faith reliance on Rule 12b-1 provides a full defense to the claims in this case.

### Reply to Point II — This Court should decline to exercise supplemental jurisdiction

Plaintiff offers no case law authority for his position; Defendants' cases are, we respectfully submit, controlling.

REPLY MEMORANDUM
C-09-4775 PJH
ME1 9693693v.1

**Reply to Point III —**
**The Complaint fails to satisfy the particularity requirements**
**of Fed. R. Civ. P. 23.1 and the Delaware Business Judgment Rule**

### A.  Rule 23.1  Fed. R. Civ. P.

Plaintiff has failed to answer Defendants' point that the Complaint fails to comply with the strict pleading requirements of Fed. R. Civ. P. 23.1, *i.e.* to allege with particularity *facts* showing that the Board's refusal of his demand was unreasonable or made in bad faith.  On that same subject, Plaintiff totally ignores *Furman v. Walton*, 2007 WL 1455904, at *3 (N.D. Cal. May 16, 2007), *aff'd*, 320 F. App'x 638 (9th Cir. Mar. 26, 2009), a principal case (from this District), relied on by Defendants on this motion (Memorandum in Support, pp. 11-13, 16).

### B.  Preemption

Plaintiff's argument that the Act preempts application of Delaware's business judgment rule relies principally on *Burks v. Lasker*, 441 U.S. 471 (1979) (Memorandum in Opposition, pp. 21-23).  Plaintiff is correct that *Burks v. Lasker* "is controlling authority here." *Id.* at 22.  *Burks*, however, held quite the opposite of what Plaintiff contends.  The *Burks* Court recognized that federal courts should respect a board's decision under Delaware law not to sue and to terminate a shareholder derivative suit alleging violations of the Act.

In *Burks*, the plaintiff brought a derivative action on behalf of Fundamental Investors, Inc., a registered investment company.  Plaintiff alleged that the fund's investment adviser, Anchor Corp., and several of the fund's directors breached the Act, the IAA, and contractual and common law duties in connection with the fund's purchase of $20 million of commercial paper issued by Penn Central Transportation Co., a railway company that subsequently filed for bankruptcy. *Id.* at 473.  The district court held that the independent directors had properly exercised their authority under the business judgment rule not to sue and to terminate a derivative action asserting federal as well as state law claims.  The Second Circuit, echoing the logic Plaintiff employs here, reversed

8

and held that "as a consequence of the [Act], 'disinterested directors of an investment company do not have the power to foreclose the continuation of nonfrivolous litigation brought by shareholders . . . .'" *Id.* at 475.  The Supreme Court reversed the Second Circuit, and explained that the Act and IAA do <u>not</u> "forbid director termination of all nonfrivolous actions."  *Id.* at 486.  The Court ruled that "federal courts should apply state law governing the authority of independent directors to discontinue derivative suits to the extent such law is consistent with the policies of the [Act] and IAA."  *Id.*  In so doing, the Court emphasized Congress' purpose in structuring the Act to place a fund's unaffiliated directors in the role of "independent watchdogs" overseeing the fund's internal affairs, including the decision whether to bring litigation:

> [T]he structure and purpose of the ICA indicate that Congress entrusted to the independent directors of investment companies, exercising the authority granted to them by state law, the primary responsibility for looking after the interests of the funds' shareholders.    There may well be situations in which the independent directors could reasonably believe that the best interests of the shareholders call for a decision not to sue – as, for example, where the costs of litigation to the corporation outweigh any potential recovery . . . . In such cases, it would certainly be consistent with the [ICA] to allow the independent directors to terminate a suit, even though not frivolous.  Indeed, it would have been paradoxical for Congress to have been willing to rely largely upon "watchdogs" to protect shareholder interests and yet, where the "watchdogs" have done precisely that, require that they be totally muzzled.

*Id.* at 484-85 (internal citation omitted).  *Burks* thus embraces the principle that a fund's independent directors may, in the exercise of their business judgment, refuse a demand to bring litigation under the Act.

The Supreme Court later reiterated these principles in *Kamen v. Kemper Fin. Services, Inc.*, 500 U.S. 90 (1991).  There, a mutual fund shareholder brought a derivative suit alleging that a fund's proxy statement contained misleading facts in violation of § 20(a) of the Act.  Rejecting an argument similar to the one Plaintiff asserts here – that the Act preempts state law on the issue of demand -- the Court ruled that courts should apply state law in determining whether

9

REPLY MEMORANDUM
C-09-4775 PJH
ME1 9693693v.1

shareholders are required to make a demand before bringing claims under the Act. *Id.* at 108. The *Kamen* Court emphasized the importance of the demand requirement "to protect the directors' prerogative to take over the litigation or to oppose it," and explained that the board's "decision to do the latter is subject only to the deferential 'business judgment rule' standard of review . . . ." *Id.* at 101 (citations omitted).

Plaintiff cites *SEC v. Keating*, 1992 WL 207918 (C.D. Cal. Jul. 23, 1992). In *Keating*, the SEC sought to enjoin violations of the federal securities laws, and an individual defendant asserted the business judgment rule as an affirmative defense to the SEC's charges. The court held that such a defense "is inapplicable to an injunctive action brought by the SEC to enforce the securities laws." *Id.* at *4. *Keating*'s refusal to allow assertion of the business judgment rule as a defense to securities claims brought by the SEC does not in any way preclude application of the business judgment rule to terminate private shareholder derivative actions alleging violations of the Act.

Plaintiff's other authorities are similarly inapposite or support Defendants at bar. In *In re Westinghouse Sec. Litig.*, 832 F. Supp. 989 (W.D. Pa. 1993) (Memorandum in Opposition, p. 23 n.24), the plaintiff argued that he did not have to make a demand upon a corporation's board to pursue a claim for violations of federal securities laws arising out of misleading proxies, because those alleged violations did not involve a business judgment. The court distinguished between claims, such as Plaintiff asserts here, alleging an improper decision to terminate a lawsuit after a demand has been made, from claims where no demand is required. *Id.* at 997-98. *Galef v. Alexander*, 615 F.2d 51 (2d Cir. 1980) (Memorandum in Opposition, p. 23 n.24), has been superseded by subsequent cases recognizing that the policies underlying the federal securities laws did not preclude application of Delaware's business judgment rule to a board's rejection of a plaintiff's demand. *Abramowitz v. Posner*, 672 F.2d 1025, 1032 (2d Cir. 1982), applying *Burks*, affirmed dismissal of a derivative complaint alleging violations of the federal securities laws

10

because "the policies underlying section 10(b) [of the Securities Exchange Act of 1934] are not offended by interpreting [Delaware's] business judgment rule to bar shareholder derivative litigation when a corporation's disinterested directors, independently and in good faith, determine that the action is not in the company's best interests."  *Accord*, *Stein v. Bailey*, 531 F. Supp. 684, 696 (S.D.N.Y. 1982).

**C.  Ongoing "Illegal" Activity**

Plaintiff also argues that the business judgment rule does not apply because the Complaint alleges that that the Defendants are involved in "ongoing violations of the federal securities laws." (Memorandum in Opposition, p. 21.)  The only authority Plaintiff cites for this proposition, *Miller v. Am. Telephone & Telegraph Co.*, 507 F.2d 759 (3d Cir. 1974) (Memorandum in Opposition, p. 21), is inapposite.  *Miller* involved purported ongoing violations of federal **criminal** statutes. Plaintiff makes no such  allegation of **criminal** activity here.  Further, unlike this case, in *Miller* there was no indication that the company's board of directors sought and considered legal advice. Indeed, the *Miller* court noted that "[h]ad plaintiffs' complaint alleged only a failure to pursue a corporate claim, application of the sound business judgment rule would support the district court's ruling that a shareholder could <u>not</u> attack the directors' decision." *Id*. at 762.  (emphasis supplied) None of Plaintiff's other cases (Memorandum in Opposition, pp. 20-21) found any illegal conduct which precluded application of the business judgment rule.

**Coda on *Financial Planning Ass'n***

Plaintiff wildly overstates the implications of the Opinion in *Financial Planning Ass'n*. It simply is not the case that a requirement that certain broker-dealers register under the IAA makes payment of 12b-1 fees "illegal" or that it requires fund boards to police broker-dealers' compliance with registration requirements, if any.

First, the *Financial Planning Ass'n* Opinion did not address 12b-1 fees. That case, *per contra*, concerned "special compensation." The rule struck down by the Court of Appeals focused on "special compensation" in the form of (1) asset-based fees charged to CUSTOMERS by broker-dealers and (2) differentials in fees between "full-service" and "execution only" accounts. In short, although *Financial Planning Ass'n* found that a *particular* type of asset-based fee constituted "special compensation" within the meaning of § 202(a)(11)(c) of the IAA, it, in no way, held that *all* asset-based fees (*e.g.* 12b-1 fees) fell within this category. Further, there is absolutely nothing in the SEC Release (70 Fed. Reg. 20,424 (April 19, 2005)) promulgating Rule 202(a)(11)-1 to suggest that Rule 12b-1 fees paid by a fund to *any* broker-dealer, whether registered or not, were thought to be "illegal" or even to raise an issue of legality under the IAA.[4] Thus, Plaintiff's assertion that "Defendants have evidently concluded that the Broker-Dealer

---

[4]   *Cf. Thomas v. Metro. Life Ins. Co.*, 2009 U.S. Dist. LEXIS 78014, at **23-24 and 29 (W.D. Okla. Aug. 31, 2009), in which the court **rejected** plaintiffs' argument that compensation for services which included investment advice, among other services, constituted "special compensation" within the meaning of the IAA, such that the broker-dealer exception in the IAA was lost. Plaintiff, himself, asserts that the contested payments at bar were <u>not</u> specifically for investment advice, but were for a "package of services" rendered to clients. *See* Memorandum in Opposition, p.17, "*investment advice is included in the package of services* that broker-dealers provide to their customers." (emphasis supplied). The fact that investment advice is included in "the package of services" does not magically transform "broker-dealers" into "investment advisers" subject to the IAA. As the court in *Thomas* noted (at *31), that result would require the Court to rewrite the IAA. It would "read[ ] the word 'special' out of the phrase 'no special compensation' " in the language excepting a broker from the reach of the IAA. See § 202(a) (11)(C) of the IAA. 15 U.S.C. § 80b-2(a)(11)(C).

---

REPLY MEMORANDUM
C-09-4775 PJH
ME1 9693693v.1

Exclusion does not authorize the asset-based compensation payments . . ." (Memorandum in Opposition, p. 18, n.18) is simply baseless.

Second, even if *Financial Planning Ass'n* were construed to apply to Rule 12b-1 fees (not the case), the implication of that case, at most, was that the broker-dealers who received such fees were required to register under the IAA.  The <u>actual holding</u> was simply that the SEC had exceeded its authority in adding a category of broker-dealers to those already excepted by Congress from registration under the IAA.  The Court of Appeals never said, or implied, that the payment of such fees was "illegal," the histrionic tag applied (mis-applied) by Plaintiff to the 12b-1 fees at bar.

Finally, the entire premise of Plaintiff's case, *i.e.* that payment of "asset-based compensation" to broker-dealers is, somehow, "illegal" is inconsistent with the **intricate regulatory framework** which has governed such compensation for several decades.  Thus:

1.   All persons selling fund shares must, by law, be members of a securities association registered with the SEC.  *See* § 15(b)(8) of the Securities Exchange Act of 1934, 15 U.S.C. § 78o(b)(8).  Pursuant to § 22(b) of the ICA, 15 U.S.C. § 80a-22(b), the NASD (now FINRA) regulates, for its members (*i.e.* the broker-dealers), the permissible payments in connection with the distribution of fund shares.  *See* **NASD Rule 2830** (http://finra.complinet.com/).

2.   Under Rule 2830, a fund may pay <u>both</u> an "asset-based sales charge" and a "service fee" totaling 1% of the net asset value of a fund per annum.  *See* Rule 2830(d)(2)(E) and (d)(5).

3.   Rule 2830 defines "sales charge" as "all charges or fees that are paid to finance sales or sales promotion expenses …."  Rule 2830(b)(8).

4.   Rule 2830 defines "asset-based sales charge" as "a sales charge that is deducted from the net assets of an investment company [a fund] and does not include a service fee."  Rule 2830(b)(8)(A).

13

5.   Rule 2830 defines "service fees" as "payments by an investment company [a fund] for personal service and/or the maintenance of shareholder accounts."  Rule 2830(b)(9).

The SEC has explicitly opined that the asset-based compensation to broker-dealers permitted by NASD Rule 2830 is appropriate :

> *The Commission is of the opinion that the proposed rule change [NASD Rule 2830] carries out the NASD's congressional mandate to prevent excessive sales charges on mutual fund shares.   The Commission believes that the proposed rule change appropriately balances the need to ensure that the NASD's rules allow broker-dealers, sales personnel and underwriters to receive reasonable compensation, against the need to ensure that investors are charged reasonable sales loads.*  Release No. 34-30897, 1992 SEC LEXIS 1631 at *26 (July 7, 1992)  (emphasis supplied)

All of the foregoing makes patently clear that payments of "asset-based sales charges" are explicitly contemplated both by law and regulation, provided, of course, that they are within the allowable percentages decreed by NASD Rule 2830. Obviously, if the Opinion in *Financial Planning Ass'n* had changed, qualified or invalidated payment of "asset-based sales charges" under NASD Rule 2830 or Rule 12b-1, the SEC and the NASD would have said so by now.

### Conclusion

For the reasons stated herein and in the Memorandum in Support, the Court should dismiss the Verified Derivative Complaint.[5]

Dated:  March 5, 2010

---

[5]  Plaintiff argues that he has standing to sue on behalf of funds he does not own. (Memorandum in Opposition, p.24).  His argument has been rejected by the courts and the SEC.  *See Williams v. Bank One Corp.*, 2003 U.S. Dist. LEXIS 23522, at **1-3 (N.D.Ill. Dec. 15, 2003); and *In Re Mutual Funds Investment Litig.*, 519 F. Supp. 2d 580, 588 and note 11, 588 (D.Md. 2007) (lists SEC releases and no-action letters).  Plaintiff's reliance on *Lapidus* is misplaced:  that case addressed only the issue of whether the plaintiff alleged an injury separate and distinct from that suffered by shareholders generally in order to have standing to bring a direct action.

REPLY MEMORANDUM
C-09-4775 PJH
ME1 9693693v.1

1   **McCARTER & ENGLISH, LLP**                    **GOODWIN PROCTER LLP**

2
              /s/  Daniel A. Pollack                              /s/  Mark Holland
3   By:_____              By:_____
           Daniel A. Pollack                                Mark Holland
4          Edward T. McDermott                        Mary K. Dulka
           Anthony Zaccaria
5                                                    The New York Times Building
    245 Park Avenue, 27th Floor                 620 Eighth Avenue
6   New York, NY 10167                           New York, NY 10018
    Telephone:  (212) 609-6800                  Telephone:  (212) 813-8800
7   Facsimile:   (212) 609-6921                  Facsimile:   (212) 355-3333

8   *Attorneys for Defendants Franklin/Templeton*   *Attorneys for Defendants Ashton, Carlson,*
    *Distributors, Inc., Charles B. Johnson and*      *Ginn, Holiday, Lahaye, Olson, Thompson,*
9   *Rupert H. Johnson*                                 *Wilson and Franklin Custodian Funds*

10

11                                                -    and -

12                                           **GOODWIN PROCTER LLP**

13                                                    /s/  Lloyd Winawer
                                             By:_____
14                                                  Lloyd Winawer
                                                    (State Bar No. 157823)
15                                                  *lwinawer@goodwinprocter.com*

16                                           135 Commonwealth Drive
                                             Menlo Park, CA 94025-1105
17                                           Telephone:  (650) 752-3100
                                             Facsimile:   (650) 853-1038

18                                           *Attorneys for All Defendants*

19
    Of Counsel:
20      Brian E. Lorenz, Esq.

21

22

23

24

25

26

27

28                                              15

1

2          **PROOF OF SERVICE**

3          I certify that this document filed through the ECF system will be sent

4    electronically to the registered participants as identified on the Notice of Electronic Filing

5    (NEF) and paper copies will be sent to those indicated as non registered participants

6                       On this 5th day of March, 2010.

7    By:  /s/ Lloyd Winawer

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28