Jeff S. Westerman (SBN 94559)
  jwesterman@milberg.com
**MILBERG LLP**
One California Plaza
300 S. Grand Avenue, Suite 3900
Los Angeles, CA  90071
Telephone:  (213) 617-1200
Facsimile:  (213) 617-1975

Michael C. Spencer (SBN 79349) [admitted *pro hac vice*]
  mspencer@milberg.com
Janine L. Pollack [admitted *pro hac vice*]
  jpollack@milberg.com
**MILBERG LLP**
One Pennsylvania Plaza
New York, NY  10119
Telephone:  (212) 594-5300
Facsimile:  (212) 868-1229

Eric M. George (SBN 166403)
  egeorge@bwgfirm.com
**BROWNE WOODS GEORGE LLP**
2121 Avenue of the Stars, Suite 2400
Los Angeles, CA  90067
Telephone:  (310) 274-7100
Facsimile:  (310) 275-5697

Lee A. Weiss [admitted *pro hac vice*]
  lweiss@bwgfirm.com
**BROWNE WOODS GEORGE LLP**
49 West 37th Street, 15th Floor
New York, NY  10018
Telephone:  (212) 354-4901
Facsimile:  (212) 354-4904

(Additional Counsel on Signature Page)

*Attorneys for Plaintiff*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| BRADLEY C. SMITH, derivatively on behalf of FRANKLIN CUSTODIAN FUNDS, <br><br> Plaintiff, <br><br> vs. <br><br> FRANKLIN/TEMPLETON DISTRIBUTORS, INC., HARRIS J. ASHTON, ROBERT F. CARLSON, SAM GINN, EDITH E. HOLIDAY, FRANK W.T. LAHAYE, FRANK A. OLSON, LARRY D. THOMPSON, JOHN B. WILSON, CHARLES B. JOHNSON, and RUPERT H. JOHNSON, JR. <br> Defendants, <br> and <br><br> FRANKLIN CUSTODIAN FUNDS, <br> Nominal Defendant. | Civil Action No. C 09-4775 PJH <br><br><br> **AMENDED COMPLAINT** <br><br> DEMAND FOR JURY TRIAL |

## AMENDED COMPLAINT

1.     Plaintiff, through his attorneys, derivatively on behalf of Franklin Custodian Funds ("the Trust"), makes the following allegations for his Amended Complaint.  The allegations are based upon personal knowledge as to plaintiff and his own acts.  As to other matters, the allegations are made upon information and belief based on an investigation conducted by plaintiff's attorneys, including a review of the Trust's regulatory filings.

## NATURE OF THE ACTION

2.     This is a shareholder derivative action.  It is brought on behalf of the Trust, a Delaware statutory trust registered with the SEC as an investment company (mutual fund).  The action seeks to void certain contractual obligations by which Trust assets are being used to pay "asset-based compensation" to broker-dealer firms holding Trust shares in brokerage accounts.  For 70 years, since the inception of the Investment Advisers Act of 1940 ("Advisers Act"), it has been understood that broker-dealer firms cannot lawfully receive asset-based compensation in connection with brokerage accounts.   To receive any form of compensation other than transactional commissions, a broker-dealer firm must register as an investment adviser pursuant to the Advisers Act, and provide the investor with an "advisory account" -- *i.e.* an account that is subject to the enhanced investor protections of the Advisers Act -- rather than a "brokerage account."

3.     However, beginning in the 1990's, the SEC, using what it believed to be its statutory authority to create exceptions to the Advisers Act, excluded broker-dealers from the statutory bar against receiving asset-based compensation.  Taking advantage of the more permissive regulatory environment, mutual fund companies, including Franklin Templeton, began to use asset-based compensation, rather than transactional commissions, to pay broker-dealers with respect to mutual fund shares held in customer accounts.

4.     Three years ago, in *Financial Planning Association v. SEC,* 482 F.3d 481 (D.C. Cir. 2007), the D.C. Circuit ruled that the SEC had exceeded its authority and vacated the regulatory exclusion, reinstating the statutory bar against asset-based compensation in connection with brokerage accounts as of October 1, 2007.  The Trust has nevertheless continued to use Trust assets to pay asset-based compensation to broker-dealer firms in connection with Trust shares held in brokerage accounts.  The Trust's practices violate its duties under the Investment Company Act of 1940 ("ICA") (i) to use Trust assets for proper purposes only, (ii) to prevent securities law violations by service providers to the Trust, and (iii) to act as a fiduciary in the interest of shareholders harmed by the unlawful payments.  Plaintiff made a shareholder demand by letter dated January 8, 2009, asking the Board to take corrective action, which the Board denied by letter dated March 4, 2009.  On October 6, 2009, plaintiff filed this action.

5.     The Trust has entered into a master Distribution Agreement with Franklin/Templeton Distributors, Inc. ("Franklin/Templeton Distributors"), a broker-dealer, for "distribution-related services" (*i.e.* sales and servicing shareholders), in return for which the Trust agrees to pay asset-based compensation as specified in Rule 12b-1 Distribution Plans.  Franklin/Templeton Distributors forwards the payments to the retail broker-dealer firms that entered into selling agreements with Franklin/Templeton Distributors and sold trust shares into customer accounts at those firms.  The asset-based compensation is calculated on daily net asset value of Trust shares held in each respective customer account, accrued daily and disbursed quarterly from the Trust.  In this lawsuit, plaintiff, on behalf of the Trust, alleges that these contractual obligations to pay asset-based compensation by the Trust violate duties under Section 36(a) of the ICA, and Rule 38a-1 promulgated thereunder, to use Trust assets for lawful purposes only.  Based on the Trust's duties under the ICA, plaintiff, on behalf of the Trust, invokes Section 47(b) of the ICA, which provides that a court may void the unlawful portion of a contract whose performance would cause a violation

of any provision of the ICA (or any rule, regulation, or order thereunder), as is the case here, so that the Distribution Agreement can be reformed to comply with the law, including applicable Advisers Act requirements.  Plaintiff, on behalf of the Trust, also seeks restitution of amounts of asset-based compensation unlawfully paid by the Trust and Franklin/Templeton Distributors.  Plaintiff, on behalf of the Trust, also asserts state-law claims for injunctive relief and damages against the Trustees, arising from their ongoing failure to comply with statutory law, and their breaches of duty in directly approving the unlawful payments and waste of Trust assets.  This lawsuit is properly being pursued on a derivative basis, and the Trustees' "business judgment" cannot justify ongoing violation of the securities laws (which is *ultra vires* conduct).

## JURISDICTION AND VENUE

6.     This Court has federal question subject matter jurisdiction over all claims asserted herein pursuant to 15 U.S.C. § 80a-43, and 28 U.S.C. § 1331 and § 1337, because each claim involves issues arising under the ICA and the Advisers Act, and the rules and regulations thereunder, and this Court has supplemental jurisdiction pursuant to 28 U.S.C. § 1367(a).  This action is not a collusive one to confer jurisdiction that the Court would otherwise lack.

7.     This Court has personal jurisdiction over each of the defendants because the Trust's principal place of business is located within this District and all of the defendants have conducted business in this District, including business relating to the claims herein being asserted on behalf of the Trust.

8.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(2) and 15 U.S.C. § 80a-43 because the Trust maintains its headquarters within this District and because many of the acts complained of herein occurred in this District.

**THE PARTIES**

9.    Plaintiff Bradley C. Smith is a resident of North Carolina.  Plaintiff owns Class C shares of the Franklin Income Fund, a series of the Trust, and is therefore a shareholder in the Trust. Plaintiff has been a shareholder in the Trust at all times relevant to this Action.  Plaintiff's shares are held in a brokerage account at Merrill Lynch, Pierce, Fenner & Smith Incorporated.

10.    Nominal defendant, the Trust, is a Delaware statutory trust.  Prior to February 1, 2008, the Trust was organized as a Maryland corporation.  The Trust maintains its principal place of business at One Franklin Parkway, San Mateo, CA 94403-1906.  The Trust is classified under the ICA as an open-end management investment company of the series type, and is comprised of five series, or portfolios, commonly referred to as mutual funds -- Franklin DynaTech Fund, Franklin Growth Fund, Franklin Income Fund, Franklin U.S. Government Securities Fund, and Franklin Utilities Fund (the "Funds").  As of December 31, 2008, the Trust held net assets in excess of $41.5 billion.

11.    Defendant Harris J. Ashton is a current trustee of the Trust.  He has served since 1976, and has been classified by the Trust as an independent board member for purposes of the ICA.

12.    Defendant Robert F. Carlson is a current trustee of the Trust.  He has served since 2007, and has been classified by the Trust as an independent board member for purposes of the ICA.

13.    Defendant Sam Ginn is a current trustee of the Trust.  He has served since 2007, and has been classified by the Trust as an independent board member for purposes of the ICA.

14.    Defendant Edith E. Holiday is a current trustee of the Trust.  She has served since 1998, and has been classified by the Trust as an independent board member for purposes of the ICA.

15.     Defendant Frank W.T. LaHaye is a current trustee of the Trust. He has served since 2007, and has been classified by the Trust as an independent board member for purposes of the ICA.

16.     Defendant Frank A. Olson is a current trustee of the Trust. He has served since 2005, and has been classified by the Trust as an independent board member for purposes of the ICA.

17.     Defendant Larry D. Thompson is a current trustee of the Trust. He has served since 2007, and has been classified by the Trust as an independent board member for purposes of the ICA.

18.     Defendant John B. Wilson is a current trustee of the Trust. He has served since 2007, and has been classified by the Trust as an independent board member for purposes of the ICA.

19.     Defendant Charles B. Johnson is a current trustee of the Trust. He has served since 1969, and has been classified by the Trust as an interested board member for purposes of the ICA.

20.     Defendant Rupert H. Johnson, Jr. (brother of Charles B. Johnson) is a current trustee of the Trust. He has served since 1983, and has been classified by the Trust as an interested board member for purposes of the ICA. The defendants referenced in ¶¶ 11-20 are referred to collectively herein as the "Trustee Defendants."

21.     Defendant Franklin/Templeton Distributors is a New York corporation with its principal place of business at One Franklin Parkway, San Mateo, CA 94403-1906. Franklin/Templeton Distributors is a wholly-owned subsidiary of Franklin Resources, Inc. (NYSE:BEN). Franklin Resources is a holding company, and its operating subsidiaries do business collectively as "Franklin Templeton Investments." Franklin/Templeton Distributors is a broker-dealer member of the Financial Industry Regulatory Authority (FINRA), formerly known as NASD.

Pursuant to the Distribution Agreement with the Trust, Franklin/Templeton Distributors acts as the principal underwriter/distributor for shares in the Trust, and in turn enters into selling agreements with retail broker-dealers, which act in an agency capacity for Franklin/Templeton Distributors and the Trust in the distribution of shares of the Trust to members of the public.

## STATUTORY AND REGULATORY BACKGROUND

### Broker-Dealers Are Prohibited From Receiving Asset-Based Compensation With Respect to Brokerage Accounts

22.    The Advisers Act mandates certain disclosure, liability, record-keeping, and conflict-management requirements to protect the clients of professional investment advisers.    An "investment adviser" is defined as "any person who, for compensation, engages in the business of advising others. . . as to the value of securities or as to the advisability of investing in, purchasing, or selling securities[.]" *See* Section 202(a)(11), 15 U.S.C. § 80b-2(a)(11).

23.    Broker-dealer firms advising retail customers[1] -- which include all of the broker-dealer firms that have selling agreements with Franklin/Templeton Distributors for sale of Trust shares --  are "engage[d] in the business of advising others. . . as to the value of securities or as to the advisability of investing in, purchasing, or selling securities[.]"   Each firm makes securities recommendations, conducts suitability reviews, and otherwise provides investment advice to its customers (who are also Trust shareholders).[2]

24.    Each of the broker-dealer firms that has a selling agreement with Franklin/Templeton Distributors and is servicing Trust shareholders is receiving "compensation."   The term

---

[1] Broker-dealer firms are regulated by the Securities Exchange Act of 1934 ("Exchange Act"), which defines a "broker" as "any person engaged in the business of effecting transactions in securities for the account of others" and a "dealer" as "any person engaged in the business of buying and selling securities for such person's own account through a broker or otherwise."  15 U.S.C. §§ 78c(a)(4)(A), (5)(A).  A firm acting as a broker is commonly referred to as a "brokerage firm" or a "broker-dealer" firm.

[2] A broker-dealer may provide an "execution-only" account (such as an Internet-based trading account) that excludes any investment advice, but the Trust is not selling shares through such accounts.

AMENDED COMPLAINT                    - 6 -

"compensation" is not defined by the Advisers Act, but the SEC has always given it a broad meaning to include any economic benefit in connection with a customer account, regardless of the label on the fee, the form of the fee, or the source of the fee.  The "compensation element is satisfied by the receipt of any economic benefit, whether in the form of an advisory fee or some other fee relating to the total services rendered, commissions, or some combination of the foregoing. . . It is not necessary that an adviser's compensation be paid directly by the person receiving investment advisory services, but only that the investment adviser receive compensation from some source for his services." SEC Release No. IA-1092, 1987 SEC LEXIS 3487, at *14-*15 (October 8, 1987).

25.     Accordingly, every broker-dealer firm that offers full-service brokerage accounts, including every broker-dealer firm that has a selling agreement with Franklin/Templeton Distributors, is within the statutory definition of an "investment adviser" -- because each firm provides investment advice to customers, and each firm receives compensation in connection with those customer accounts (whether in the form of transaction sales commissions or otherwise) -- and, unless a statutory exclusion applies, the Advisers Act applies to the accounts.

26.     Every broker-dealer firm that has a selling agreement with Franklin/Templeton Distributors is required to register as an "investment adviser," thereby becoming a "dual registrant" (*i.e.* registered as both a broker-dealer and an investment adviser), or affiliate with a registered investment adviser, and provide customers with "advisory accounts" subject to both the Exchange Act and the Advisers Act, rather than brokerage accounts -- unless a statutory exclusion applies.

27.     The difference between a "brokerage account" and an "advisory account" is highly significant.  Many broker-dealers avoid becoming dual registrants, or do not provide advisory accounts even if they become dual registrants, because the fiduciary standard of care required under the Advisers Act is higher than the "salesman" standard applicable to brokerage accounts under the

Exchange Act and FINRA rules.[3]  Meanwhile, few investors are aware that there are two kinds of accounts with different standards of care and different rules for disclosure of conflicts.

28.     A broker-dealer that serves a retail customer through a brokerage account -- *i.e.*, an account not governed by the enhanced investor protections of the Advisers Act -- must qualify for one of the statutory exclusions from the definition of investment adviser.

29.     One statutory exclusion, known as the "Broker-Dealer Exclusion," excludes from the definition of investment adviser "any broker or dealer whose performance of such services [advice] is solely incidental to the conduct of his business as a broker or dealer and who receives no special compensation therefor."  15 U.S.C. § 80b-2(11)(C).

30.     The Broker-Dealer Exclusion "amounts to a recognition that brokers and dealers commonly give a certain amount of advice to their customers in the course of their regular business and that it would be inappropriate to bring them within the scope of the [Advisers Act] merely because of this aspect of their business."  *Opinion of the General Counsel Relating To Section 202(a)(11)(C) of the Investment Advisers Act of 1940*, Investment Advisers Act Release No. 2 (Oct. 28, 1940), 11 Fed. Reg. 10996 (Sept. 27, 1946).

31.     The terms "solely incidental" and "special compensation" as used in the Broker-Dealer Exclusion are not defined in the statute, but the SEC and the courts have given the terms consistent meanings, based on what Congress intended by that language as it was used in 1940.

---

[3] A 204-page SEC-sponsored report, published on January 8, 2008, authored by the RAND Corporation, titled "Investor and Industry Perspectives on Investment Advisers and Broker-Dealers" (available at www.sec.gov/news/press/2008/2008-1.htm ) ("RAND Report"), contains an extensive comparison of the legal duties owed by broker-dealers versus investment advisers.  The RAND Report observes that "unlike broker-dealers, federally registered investment advisers owe fiduciary obligations to their clients as a *categorical* matter. . . such obligations require the adviser to act solely with the client's investment goals and interests in mind, free from any direct or indirect conflicts of interest that would tempt the adviser to make recommendations that would also benefit him or her. . . ."  Report at 13 (emphasis in original).

32. The term "solely incidental" means "the advisory services rendered to an account are in connection with and reasonably related to the brokerage services provided to that account. This understanding is consistent with the legislative history of the Advisers Act, which indicates Congress' intent to exclude broker-dealers providing advice as part of traditional brokerage services." SEC Release No. IA-2340, 2005 SEC LEXIS 25 at *70 (Jan. 6, 2005).

33. The term "special compensation" means any form of compensation other than transactional commissions. *See* S. Rep. No. 76-1775, 76th Cong., 3d Sess. 22 (1940) (Section 202(a)(11)(C) of the Advisers Act applies to broker-dealers "insofar as their advice is merely incidental to brokerage transactions for which they receive *only* brokerage commissions") (emphasis added).

34. Accordingly, to satisfy both prongs of the Broker-Dealer Exclusion: (a) the broker-dealer firm can provide advice only as part of an undivided package of services, and (b) in connection with that undivided package of services that includes advice, the broker-dealer can receive compensation only in the form of transactional commissions.

35. Any broker-dealer that receives asset-based compensation in connection with Trust shares held in a brokerage account *cannot* qualify for the Broker-Dealer Exclusion, because asset-based compensation is not a transactional commission. Asset-based compensation is ongoing payments calculated on the value of assets held in an account, not a transactional payment calculated on the purchase or sale of securities.

36. Therefore, a broker-dealer receiving asset-based compensation in connection with an account does not qualify for the Broker-Dealer Exclusion with respect to that account. *See* SEC Release No. IA-2652, 2007 SEC LEXIS 2229 at *7 (Sept. 24, 2007) (proposal to codify a long-standing SEC interpretation that a broker-dealer "is an investment adviser solely with respect to

those accounts for which it provides services or receives compensation that subject the broker-dealer to the Advisers Act.").

**The Rise and Fall of SEC Rule 202(a)(11)-1, Permitting Broker-Dealers to Receive Asset-Based Compensation With Respect to Brokerage Accounts**

37.     Another statutory exclusion from the Advisers Act -- the "SEC Designates Exclusion" -- excludes "such other persons not within the intent of this paragraph, as the Commission may designate by rules and regulations or order" from the definition of investment adviser. *See* 15 U.S.C. § 80b-2(a)(11)(G).

38.     In the 1990's, the SEC invoked the SEC Designates Exclusion to encourage broker-dealers to shift to asset-based compensation.  With a roaring bull market increasing the value of customers' accounts, many in the broker-dealer industry wanted to receive asset-based compensation in connection with brokerage accounts without having to become dual registrants and offer advisory accounts.  The SEC encouraged the shift to asset-based compensation.  Through a series of "no-action" orders and temporary regulations, culminating with the promulgation of a new regulation -- SEC Rule 202(a)(11)-1, 17 C.F.R. § 275.202(a)(11)-1 -- the SEC invoked what it believed to be its authority under the SEC Designates Exclusion to allow broker-dealers to receive "special compensation," -- effectively eliminating the second prong of the Broker-Dealer Exclusion, *i.e.*, the bar against "special compensation."  On policy grounds, the SEC took the position that asset-based compensation was merely a re-pricing of the same package of brokerage and investment advice services that broker-dealers had always provided, while eliminating the incentive to churn accounts for increased transactional commissions, relying in part on an SEC-sponsored study for these conclusions.  *See generally* Report of the Committee on Compensation Practices (April 10, 1995) (known as the Tully Report), available at www.sec.gov/news/studies/bkrcomp.txt.[4]

---

[4] According to the Tully Report, "[t]he most important role of the [broker-dealer] registered representative is, after all, to provide investment counsel to individual clients, not to generate

39.     The Final Rule promulgated by the SEC stated that a broker or dealer "will not be deemed to be an investment adviser based solely on its receipt of special compensation" if certain disclosure and other conditions were met, and that a broker or dealer "is an investment adviser solely with respect to those accounts for which it provides services or receives compensation that subject the broker or dealer to the Advisers Act." *See* 17 C.F.R. § 275.202(a)(11)-1(a)(1) and (c) (the "Rule").

40.     In the 1990s, mutual fund companies, including Franklin Templeton, began offering share classes that reduced or replaced transactional commissions with asset-based compensation for broker-dealers.   On information and belief, the Trust shifted to asset-based compensation for broker-dealers on May 1, 1995.  Prior to the 1990's, 12b-1 fees were used to recoup the cost of paying upfront transactional commissions to broker-dealers.   The decision to make asset-based compensation payments to broker-dealers as a substitute for transactional commissions occurred only in the context of the change in the regulatory environment.

41.     The SEC believed that it had the authority under the SEC Designates Exclusion to encourage broker-dealers holding customer shares in brokerage accounts to enter into asset-based compensation arrangements, despite the fact that Congress had written the Broker-Dealer Exclusion, which specifically circumscribed the status and conduct of broker-dealers, not to allow asset-based compensation.

42.     The financial services industry recognized that all of the new asset-based compensation arrangements needed legal protection.  For instance, in a client newsletter published in 1999, the law firm of WilmerHale (then Wilmer, Cutler & Pickering), told its mutual fund company and broker-dealer clients that, while "[i]nvestment companies have used asset-based fees

---

transaction revenues.  The prevailing commission-based compensation system inevitably leads to conflicts of interest among the parties involved." *Id.* at 3.

under rule 12b-1 plans as compensation for brokerage services, especially for the sale of so-called 'B' and 'C' shares," and although this form of compensation could "involve special compensation," the SEC's "proposed rule 202(a)(11)-1 would provide a clean solution to any questions about the applicability of the term 'special compensation' by providing exemptions from the definitions of 'investment adviser' and 'special compensation' for asset-based compensation[.]"[5]

43.     The Rule required broker-dealer firms, as a condition to their ability to receive "special compensation," to inform their customers, among other disclosures, that their "account is a brokerage account and not an advisory account," and that arrangements with "people who compensate us based on what you buy" may create conflicts of interest.   *See* 17 C.F.R. § 275.202(a)(11)-1(a)(1)(ii).

44.     The Rule was subsequently vacated in its entirety on March 30, 2007 by the Court of Appeals for the D.C. Circuit in *Financial Planning Association*, 482 F.3d at 493.   The court ruled that the SEC lacked the authority to contradict the Broker-Dealer Exclusion and its prohibition on special compensation.   *Id*.   The opinion is also significant because it holds that asset-based compensation is "special compensation" under the Broker-Dealer Exclusion.   *Id*. at 488 ("By seeking to exempt broker-dealers beyond those who receive only brokerage commissions for investment advice, the SEC has promulgated a final rule that is in direct conflict with both the statutory text and the Committee Reports.").[6]

---

[5] *See* http://www.mondaq.com/unitedstates/article.asp?articleid=8001 .

[6] The dissenting opinion agreed with the majority's holding that asset-based compensation is "special compensation." *Financial Planning Association*, 482 F.3d at 494 ("a broker-dealer who receives any kind of compensation other than commissions does not come within the [Broker-Dealer Exclusion], even if he, too, provides advice solely as an incident to his business as a broker-dealer."). However, unlike the majority, the dissenting judge would have allowed the SEC to proceed under the SEC Designates Exclusion to authorize "special compensation," based on the judge's view that the "other persons" language in the SEC Designates Exclusion is ambiguous, and that the SEC had made a reasonable interpretation of its rulemaking authority to classify broker-dealers that receive "special compensation" as "other persons." *Id*. Therefore, the *Financial Planning Association* decision reflects that the SEC, the D.C. Circuit Court of Appeals majority, and the dissenting judge were all in agreement that asset-based compensation is "special

45. At the SEC's request, the court stayed its mandate for six months, until October 1, 2007. *See* 2007 U.S. App. LEXIS 15169 (D.C. Cir. June 25, 2007).

46. Accordingly, since March 30, 2007, the law has been re-affirmed that asset-based compensation is "special compensation," and as of October 1, 2007, the statutory bar on "special compensation" in connection with brokerage accounts has been reinstated. Broker-dealers must instead either (a) receive their compensation solely in the form of transactional commissions or (b) provide an advisory account, subject to the Advisers Act, to hold shares, upon which asset-based compensation may be received.

**The Trust's Asset-Based Compensation Arrangements In Connection With Brokerage Accounts Are Only Lawful If SEC Rule 202(a)(11)-1 Was A Valid Regulation**

47. Reportedly, broker-dealers holding over $300 billion in assets in over a million brokerage accounts with asset-based fees complied with the *Financial Planning Association* mandate by the October 1, 2007 deadline, by either converting brokerage accounts to advisory accounts, or returning to transactional commissions only.

48. Meanwhile, despite the reinstatement of the statutory bar on "special compensation," and despite the clear holding in *Financial Planning Association* that asset-based compensation is "special compensation" subject to the statutory bar, the Trust has continued with its asset-based compensation arrangements without modification, and has not required that broker-dealers comply with the Advisers Act and hold Trust shares in advisory accounts.

49. As noted above, for purposes of the "compensation" element of the definition of investment adviser, compensation means any economic benefit from any source, including third-party payments, that is received in connection with an account to which a package of services that

---

compensation," that broker-dealers are prohibited by the terms of the Broker-Dealer Exclusion from receiving such compensation, and that broker-dealers can only receive asset-based compensation if the SEC had the jurisdiction to create a regulatory exclusion.

includes investment advice is being provided. Therefore, for purposes of the Advisers Act, it is legally irrelevant that the asset-based compensation arrangements paid by the Trust are third-party payments (*i.e.* the immediate source of the compensation (the Trust) is different than the person/account owner who is receiving investment advice).

50.     In both types of arrangements -- whether it is a "first-party" asset-based compensation arrangement or a "third-party" asset-based compensation arrangement -- the asset-based compensation is paid in connection with an account to which a package of services that includes investment advice is being provided.[7]

51.     As noted above, the "label" or "purpose" of compensation is legally irrelevant under the statutory definition of "investment adviser," because compensation means any economic benefit in connection with an account to which a package of services that includes advice is provided.

52.     For instance, transactional sales commissions or sales loads, which are plainly not "labeled" as advice fees, and are not for the "purpose" of compensating for investment advice or, for that matter, any other services to customers (they are payments for sales), nevertheless

---

[7] Merrill Lynch, who maintained more "first-party" asset-based fee brokerage accounts than any other broker-dealer, strongly supported the promulgation of SEC Rule 202(a)(11)-1. Merrill Lynch explained that the Rule made sense because Merrill Lynch was not charging for advice in its asset-based compensation brokerage accounts, but was merely replacing transaction sales commissions with an asset-based account fee. According to Merrill Lynch:

> [T]he services offered in fee-based arrangements are fundamentally the same as those available in traditional full service brokerage relationships. Properly viewed, these new brokerage arrangements are simply pricing alternatives. Clients receive a package of brokerage services: trade execution, asset custody, recordkeeping and our traditional full service advice and guidance. The manner in which a brokerage firm is compensated should not be determinative as to whether an account is brokerage or advisory in nature.

*See* Comment Letter to SEC by Merrill Lynch dated September 22, 2004, at 3 (available at www.sec.gov/rules/proposed/s72599/s72599-1191.pdf ).

unequivocally constitute "compensation" for purposes of the Advisers Act if they are received in connection with an account to which a package of services that includes advice is provided.

53.     Similarly, asset-based compensation for "sales" or "distribution" or "shareholder servicing" -- the labels used on the payments at issue here -- is unequivocally "compensation" for purposes of the Advisers Act if the payments are received in connection with an account to which a package of services that includes advice is provided.  The payments at issue here are received in connection with customer accounts (they are separately calculated on the assets held in each individual customer account), and each broker-dealer is proving a package of services that includes investment advice to each Trust shareholder.

54.     Assuming that the "label" or "purpose" of a compensation payment were legally relevant, as a matter of fact, the purpose of the payments at issue in this lawsuit is to compensate broker-dealers for providing investment advice to customers.  According to Franklin Templeton's own web site, the purpose of the sales loads and Rule 12b-1 fees on Trust shares is to compensate broker-dealers for providing investment advice.  According to Franklin Templeton's description of its mutual funds: "Depending on which share class you choose, you'll pay a sales charge when you buy or sell your shares.  The majority of this sales charge then goes to financial advisors as compensation for their advice and expertise."[8]

55.     The Franklin Templeton web site also tells investors who purchase Class C shares -- the share class that has no upfront transactional sales charge and high Rule 12b-1 fees -- that: "Investors who purchase Class C shares. . .  usually prefer to 'pay as they go' for professional investment advice." *Id.*

---

[8] *See* www.franklintempleton.com/retail/pages/generic_content/education/fund_basic/about/share_cl_options.jsf

56.     Defendants' trade group, the Investment Company Institute (ICI), has stated that: "The primary use of 12b-1 fees is to compensate financial intermediaries for advice and other services to their clients."     ICI letter to SEC dated July 19, 2007, at 4.     *See* www.sec.gov/comments/4-538/4538-382.pdf.

57.     Similarly, the "*Report of the Working Group on Rule 12b-1*," prepared for the Board of Governors of the ICI and submitted to the SEC in May 2007, states: "The primary purpose of [12b-1 plan] fees is to compensate financial advisers for advice and other services to their clients." *Id.* at 4.   The report also states that the label "12b-1 fees":

> is legalese that does not convey the nature and purpose of these fees.
> Identifying 12b-1 fees solely in a manner that describes their purpose without
> reference to a rule number, could demystify the term for investors.
> Specifically, 12b-1 fees should be listed in the prospectus fee table using
> tailored, straightforward, descriptive terms such as "third-party investment
> advice" or "sales and service charges." *Id.* at 8-9.

58.     Similarly, after a bench trial involving the largest mutual fund family sold through broker-dealers, the court entered a finding of fact that: "12b-1 fees are widely used in the mutual fund industry as a method of compensating broker-dealers for distributing fund shares as well as providing information, advice, and ongoing support services to mutual fund investors." *American Mutual Funds Fee Litig.*, 2009 U.S. Dist. LEXIS 120597, at *32, *56-57 (C.D. Cal. Dec. 28, 2009).

59.     According to the Independent Directors Council (IDC),[9] which advances policy positions on behalf of independent directors and trustees of mutual funds, Rule 12b-1 fees are used to compensate financial intermediaries for providing professional investment advice: "Today, the overwhelmingly predominant use (98%) of 12b-1 fees is for professional advice (initial and ongoing) and shareholder servicing.   Only a fraction (2%) of 12b-1 fees are used by funds for

---

[9] The IDC serves the membership of the ICI, who collectively oversee 98 percent of all assets in U.S. mutual funds on behalf of approximately 93.9 million shareholders in more than 53.8 million households. *See* IDC letter to SEC dated July 19, 2007, at 1. *See* www.sec.gov/comments/4-538/4538-277.pdf .

promotion, advertising and other miscellaneous expenses." *Id*. at 2.  The IDC also states that Rule

12b-1 fees should be labeled with "descriptive terminology" -- such as calling it a "third-party

advice" fee. *Id*. at 6.

      60.    A 2003 report from the Government Accountability Office on the use of 12b-1 fees

and related disclosure issues states: "Rule 12b-1 provides investors an alternative way of paying for

investment advice and purchases of fund shares."  *See* "Mutual Funds: Greater Transparency

Needed In Disclosures To Investors," GAO Report 03-763 (June 2003).

**THE TRUST'S CONTRACTUAL COMMITMENTS TO PAY ASSET-BASED
COMPENSATION WITH RESPECT TO BROKERAGE ACCOUNTS**

      61.    On information and belief, the current operative Distribution Agreement between the

Trust and Franklin/Templeton Distributors is dated February 8, 2008.  The agreement provides that

Franklin/Templeton Distributors is "the exclusive selling agent and distributor" for Trust shares,

and may appoint "sub-agents or distribute through dealers or otherwise as you may determine from

time to time[.]"  ¶¶ 1, 2. The Distribution Agreement states that Franklin/Templeton Distributors is

entitled to sales commissions and is also "entitled to compensation for your services as provided in

any Distribution Plan adopted as to any series and class of any Fund's Shares pursuant to Rule 12b-

1 under the 1940 Act."  ¶ 4.B.  The respective Distribution Plans/Rule 12b-1 Plans provide for

payments as a percentage of average daily net assets of Trust shares "as compensation for

Distributors' distribution-related services including compensation for amounts advanced to

securities dealers or their firms or others selling shares" and as compensation for "distribution fees

paid to securities dealers or their firms or others who have executed agreements with the Trust,

Distributors or its affiliates[.]"  According to the Trust's SEC filings, in addition to payments

financed by Rule 12b-1 Plans, Franklin/Templeton Distributors makes ongoing "marketing support

payments" to broker-dealers based on daily net asset values of shares held in customer accounts.

The Rule 12b-1 Plan payments and "marketing support payments" combined will be in excess of a rate of 1% per year of average daily net assets for Class C shares of equity funds, in excess of 0.65% for Class C shares of bond funds, and other rates for other share classes, and continue for as long as the shares are owned. The payments are accrued daily and paid quarterly.

62.     Franklin/Templeton Distributors allocates the payments to broker-dealers, broken down to each customer account, calculated to the penny based on daily net asset value of the respective Trust shares held in each customer account. These payments are ongoing, which means that for each customer the payments continue to be made to the customer's broker-dealer for as long as the customer owns Trust shares held in an account serviced by that broker-dealer.

63.     Under the Distribution Agreement, Franklin/Templeton Distributors promises that it will "comply with the applicable Federal and State laws and regulations where [Trust] shares are offered for sale[.]" ¶ 11.

64.     SEC Rule 12b-1 under the ICA states that a registered open-end management investment company (*i.e.,* the Trust) "may act as a distributor of securities of which it is the issuer: Provided, that any payments made by such company in connection with such distribution are made pursuant to a written plan describing all material aspects of the proposed financing of distribution and that all agreements with any person relating to implementation of the plan are in writing[.]" 17 C.F.R. § 270.12b-1.

65.     Accordingly, since the Trust is making payments to broker-dealers financed out of Trust assets, the Trust has elected to "act as a distributor of securities of which it is the issuer." Therefore, Franklin/Templeton Distributors is acting in an agency capacity on behalf of the Trust, and the retail broker-dealers are acting in a sub-agency capacity, in connection with the compensation payments they receive pursuant to Rule 12b-1 Plans.

66.     Nothing in Rule 12b-1 indicates that a mutual fund's financing of distribution-related activities pursuant to the Rule makes it exempt from any other applicable securities laws.  For example, advertising financed by Rule 12b-1 Plans is not exempt from all other applicable securities laws.  The financing of the distribution of prospectuses under Rule 12b-1 does not exempt the prospectuses from other applicable securities laws governing the content and distribution of prospectuses.

67.     The financing of compensation payments to sales personnel under Rule 12b-1 does not exempt the compensation payments from all other applicable laws governing the receipt of compensation.  Nothing in Rule 12b-1 precludes broker-dealers from becoming dual registrants or otherwise providing advisory accounts for holding customers' shares.  Indeed, nothing in Rule 12b-1 requires asset-based compensation, as opposed to upfront transactional compensation, as the form of payment, if compensation to broker-dealers is being financed.

68.     Accordingly, there is no conflict between Rule 12b-1 under the ICA and other applicable laws, such as the Exchange Act and the Advisers Act.  The Trust and its distribution partners can comply with Rule 12b-1, the Exchange Act and the Advisers Act.

**THE TRUST'S PARTICIPATION IN UNLAWFUL CONDUCT**

69.     Section 203 of the Advisers Act states that it is unlawful for any investment adviser that has not registered under the Act "to make use of the mails or any means or instrumentality of interstate commerce in connection with his or its business as an investment adviser."  15 U.S.C. § 80b-3(a).  The receipt of compensation constitutes the use of the means of interstate commerce.

70.     Accordingly, a broker-dealer's receipt of asset-based compensation in connection with a brokerage account is unlawful.  The broker-dealer may avoid future violations by becoming a dual registrant and moving the securities into an advisory account; or it may decide to terminate its receipt of asset-based compensation.  Prior to such compliance, its activity is unlawful.

71.     When the Trust and Franklin/Templeton Distributors make payments of asset-based compensation to broker-dealers, they are participating in the unlawful activity.

**THE DEFENDANTS' DUTIES UNDER THE ICA**

72.     The ICA is structured to prevent the Trust and its assets from being used for improper purposes, such as being used to perpetrate violations of the federal securities laws.

73.     Improper use of Trust assets is regulated through Section 36(a) of the ICA, which sets forth that mutual fund directors and trustees have a fiduciary duty of care to the Trust.[10] Congress may have chosen from numerous other, potentially more robust, statutory frameworks for regulating mutual funds (and alternative legislative reform proposals have been discussed over the years), but as the ICA is currently structured, and as applicable to the Trust, the Trust's duty to use Trust assets properly is regulated through the fiduciary duty of the Trustees.

74.     Section 36(a) also creates a federal fiduciary duty for the principal underwriter (Franklin/Templeton Distributors).  Franklin/Templeton Distributors already has a fiduciary duty to maximize income for its own shareholder (in this case, Franklin Resources, Inc., a publicly traded company) – but it must also, under the ICA, act in the best interests of the mutual fund and *its* shareholders, which gives rise to an obvious conflict of interest.  The ICA deals with this conflict by requiring the unaffiliated board members – the only non-conflicted advocates for the fund and its

---

[10] Although the provision speaks only of the SEC's authority to file civil actions for breach of fiduciary duty, it implicitly codifies the duty, because the SEC could not enforce a duty that does not exist. *See Fogel v. Chestnutt*, 533 F.2d 731, 745 (2d Cir. 1975) ("the Act implicitly established a federal standard of fiduciary duty").

shareholders – to actively police[11] service providers' compliance with their fiduciary duties to the fund and its shareholders.[12]

75.     Using Trust assets to make compensation payments to unregistered firms is an improper use of Trust assets, in violation of the ICA fiduciary duty imposed on the Trustees and Franklin/Templeton Distributors.   Broker-dealers are not proper entities to receive asset-based compensation, unless they comply with the Advisers Act by obtaining the proper registration and holding trust shares in advisory accounts subject to the investor protections of the Advisers Act.

76.     Using Trust assets to make unlawful compensation payments to unregistered firms also contravenes SEC Rule 38a-1, promulgated under the ICA, which reinforces the Section 36(a) fiduciary duty by requiring Trustees to adopt compliance programs for the Trust designed to prevent, detect and correct violations of the securities laws by service providers.   17 C.F.R. § 270.38a-1.

77.     SEC Rule 38a-1 was adopted following a series of scandals that rocked the mutual fund industry in 2003, in which service providers to some mutual funds were discovered to be entering into improper and illegal arrangements that were abusive to fund investors, due to inadequate or ineffective oversight by fund directors/trustees.   *See* Final Rule, Promulgating Release No. IC-26299, 2003 SEC LEXIS 2980, at *6 (Dec. 17, 2003) ("Rule 38a-1 Promulgating

---

[11] *See Burks v. Lasker*, 441 U.S. 471, 484 (1979) (ICA was "designed to place the unaffiliated directors in the role of 'independent watchdogs'. . . [with] the primary responsibility for looking after the interests of the funds' shareholders"), *quoting Tannenbaum v. Zeller*, 552 F.2d 402, 406 (2d Cir. 1977).

[12] As explained by the ICI, the mutual fund industry's trade group: "Unlike the directors of other corporations, mutual fund directors are responsible for protecting consumers, in this case, the fund's investors.  This unique 'watchdog' role, which does not exist in any other type of company in America, provides investors with the confidence of knowing that directors oversee the advisers who manage and service their investments.  In particular, under the Investment Company Act of 1940, the board of directors of a mutual fund is charged with looking after how the fund operates and overseeing matters where the interests of the fund and its shareholders differ from the interests of its investment adviser or management company." *See* Brochure titled "Understanding the Role of Mutual Fund Directors" at 3-4 (1999) available at www.ici.org/pdf/bro_mf_directors.pdf.

---

AMENDED COMPLAINT                           - 21 -

Release") (stating that "unlawful conduct involving a number of fund advisers, broker-dealers, and other service providers. . . confirms the need for these rules. . . [the service providers] placed the. . . business interests of the fund adviser ahead of the interests of fund shareholders, thus breaching their fiduciary obligations to the funds involved and their shareholders").[13]

78. Rule 38a-1 requires the board to elect a Chief Compliance Officer ("CCO"). The CCO is required to provide an annual written report to the board that addresses the operation of the compliance policies and procedures of the mutual fund and each of its service providers. The report must also address any "material compliance matter," which is defined to include a violation of the federal securities laws by the service provider "or agents thereof." *See* 17 C.F.R. § 270.38a-1(e)(2)(i).[14] As noted above, the retail broker-dealers are agents of the Trust and Franklin/Templeton Distributors with respect to receipt of Trust assets, because Rule 12b-1 specifically states that the Trust is deemed to be the distributor in such circumstances. The Trust can only act as distributor through its agents acting in an agency capacity.

79. The promulgating release for Rule 38a-1 clarifies that "[s]erious compliance issues must, of course, always be brought to the board's attention promptly, and cannot be delayed until an annual report." Rule 38a-1 Promulgating Release at *51 n. 84.[15] Therefore, there is a clear duty to act immediately if Trust assets are being used improperly.

---

[13] *See also* "Special Report: Breach of Trust," BusinessWeek (Dec. 15, 2003) (available at www.businessweek.com ); "The Mutual Fund Scandal: Unfair Fight," Newsweek (Dec. 8, 2003) (www.newsweek.com/id/60819 ); Alan R. Palmiter, "The Mutual Fund Board: A Failed Experiment In Regulatory Outsourcing," 1 Brook. J. Corp. Fin. & Com. L. 165 (Fall 2006); Patrick E. McCabe, "The Economics Of The Mutual Fund Trading Scandal," Board of Governors of the Federal Reserve System staff working paper # 2009-06 (available at www.federalreserve.gov ).

[14] The term "federal securities laws" is specifically defined to include the Advisers Act. *See* 17 C.F.R. § 270.38a-1(e)(1).

[15] In addition, the CCO is required to meet in executive session with the independent trustees at least once each year, without the presence of anyone else (such as fund management or interested trustees), other than independent counsel to the independent trustees. *See* Rule 38a-1(a)(4)(iv). This allows the CCO and independent trustees to speak freely about any sensitive compliance issues of

80.     Moreover, as required by Rule 38a-1, Franklin/Templeton Distributors' compliance policies and procedures must be adequate to prevent violations of the Advisers Act.  By checking each of its broker-dealer selling agents to make sure they are registered and licensed under the Exchange Act, as applicable, but not checking to make sure the firms are also registered and licensed under the Advisers Act, as applicable, is a material defect.  The Advisers Act is no less of an important federal securities law than the Exchange Act.

81.     Moreover, Rule 12b-1 requires the Trustees to review "at least quarterly, a written report of the amounts so expended and the purposes for which such expenditures were made," thus providing the board with numerous additional opportunities to ascertain that asset-based compensation was improperly being paid in connection with brokerage accounts.

82.     In addition, the customers of the broker-dealers who are being deprived of the advisory accounts that they are entitled by law to receive are the same persons who are the shareholders of the Trust to whom the Trustees and Franklin/Templeton Distributors owe a fiduciary duty of care.

83.     According, the Trustees have (i) a duty under the ICA to not make improper use of Trust assets, including making compensation payments to broker-dealers that are unlawful under the Advisers Act; (ii) a duty under the ICA to oversee the compliance of Franklin/Templeton Distributors and its sub-agents receiving Trust assets, and immediately correct any violations of the Advisers Act; and (iii) a fiduciary duty to the persons deprived of advisory accounts, *i.e.* Trust shareholders, to cease unlawful compensation payments for brokerage accounts.

84.     Franklin/Templeton Distributors also has duties under the ICA, including (i) a duty under Section 36(a) to not make improper use of Trust assets, by making compensation payments to

concern to any of them, including any reservations about the cooperativeness or compliance practices of fund management or service providers.

broker-dealers that are unlawful under the Advisers Act; (ii) a duty to maintain compliance procedures to address the lawful use of Trust assets and enforce that firms involved in Trust sales are properly licensed under both the Exchange Act and Advisers Act; and (iii) a fiduciary duty under Section 36(a) to the persons deprived of advisory accounts, *i.e.* Trust shareholders, to cease unlawful compensation payments for brokerage accounts.

**THE DEFENDANTS' DUTIES UNDER THE ICA TRUMP CONFLICTING CONTRACTUAL OBLIGATIONS**

85.     Section 47(b) of the ICA provides that a contract made in violation of the ICA, or whose performance involves a violation of the ICA, or any rule thereunder, is unenforceable by either party, and provides for whole or partial rescission and restitution by a court.

86.     The purpose of Section 47(b) is to promote compliance with the ICA by the party or parties that are subject to ICA regulation (hereinafter, "regulated party"), by making sure that a regulated party's duties under the ICA trump its contractual obligations.

87.     The plain language of the statute that "either party" may void an offending contract is highly significant.  A contract between the Trust (a regulated party) and a vendor (providing services) can be voided by "either party," which means the Trust may seek to void its own contractual obligation.

88.     The plain language of the statute that "any provision" of the ICA -- and "any rule regulation, or order thereunder" -- is the predicate source of duty is also highly significant.  The plain language -- "any provision" of the ICA -- does not provide for exceptions.  If "any provision" is construed to be limited to only provisions containing private rights of action for damages, then Section 47(b) as enacted in 1940 is a total nullity -- the ICA as enacted does not contain any private rights of action for damages.

89.     Section 47(b) has a number of sister provisions in the other securities laws, which are construed *in pari materia*. *See* Section 29(b) of the Exchange Act, 15 U.S.C. § 78cc(b), and Section 215(b) of the Advisers Act, 15 U.S.C. § 80b-15.   Section 29(b) of the Exchange Act also contains the "any provision" language, but goes on to state an exception, for contracts made void because of a violation of Section 15(c)(3) of the Exchange Act, and a special statute of limitations period for actions seeking to void contracts that violate Section 15(c)(1) or (2), which are sections that do not contain any private right of action for damages.   This further establishes that "any provision" is intended to be construed as the plain language states, and is not limited to provisions containing private rights of action for damages.   The "*any provision*" language in Section 47(b) is the same as the "*any provision*" language in Section 29(b) of the Exchange Act and should be construed in *pari materia*.

90.     The sister contract voiding provision in the Advisers Act has been the subject of a controlling U.S. Supreme Court opinion on the question of whether it is an independent right of action. *See  Transamerica Mortgage Advisors, Inc. v. Lewis*, 444 U.S. 11, 18 (1979) (Section 215 of the Advisers Act provides for contract voiding and restitution irrespective of whether the predicate provision violated by the contract contains a right of action for damages).

91.     In Section 29(b) of the Exchange Act, Congress uses the language "no contract shall be *deemed to be void by reason of this subsection in any action maintained in reliance upon this subsection. . .* " (emphasis added) in the clause providing a special statute of limitations for voiding contracts that violate certain underlying provisions that contain no private right of action for damages.

92.     The language "deemed to be void by reason of this subsection in any action maintained in reliance upon this subsection" indicates the intent of Congress that a cause of action may be maintained in reliance on the contract voiding provision.

93.     In any event, no party can sue itself for damages.  Any requirement of a private right of damages would read the "*either party*" language out of the statute -- because the regulated party, *i.e.* the party subject to duties under the ICA, cannot sue itself for damages as a condition precedent to voiding its offending contract.

94.     Moreover, the Trust is not seeking damages through Section 47(b).  The presence, or lack thereof, of any private right of damages in any provision of the ICA, or any regulation thereunder, to which the Trust must maintain compliance, is legally irrelevant to a contract voiding claim.

## ADDITIONAL DERIVATIVE AND DEMAND REQUIREMENT ALLEGATIONS

95.     In addition to the allegations set forth above, as described below, plaintiff brings this action derivatively in the right and for the benefit of the Trust to obtain redress for injuries suffered and to be suffered by the Trust as a direct result of the failure to reform the Distribution Agreement to comply with statutory law, for which demand on the Trust's Board of Trustees was made.  The Trust is named as a nominal defendant solely in a derivative capacity.

96.     Plaintiff will adequately and fairly represent the interests of the Trust and its shareholders in enforcing and prosecuting their rights.

97.     Through his attorneys, plaintiff made demand on the Trust's Board of Trustees.  By letter dated January 8, 2009, plaintiff demanded that the Board cause the Trust and its service providers to cease funding and paying asset-based compensation to broker-dealers in connection with Trust shares held in brokerage accounts in the United States, to restore to the Trust certain of such payments made in the past, and to remedy the Trustees' breaches of their fiduciary duties of loyalty and due care, and their waste of Trust assets.  Exhibit 1.

98.     By letter dated March 4, 2009, counsel for "the Trustees of the Franklin Custodian Funds who are not 'interested persons' of such Fund" responded that: "The Board of Trustees has

carefully considered Mr. Smith's demands on behalf of the Trust, and has sought and considered legal advice on the subject matter of the demands. The Board of Trustees has determined that the demands are not well-founded, as a matter of law, and declines to take the steps, including litigation, that you propose." Exhibit 2.

99. The response to the demand is a wrongful refusal, for the reasons stated in this complaint, and does not mention the words "business judgment." In any event, no business judgment is involved in ongoing violations of the federal securities laws. Moreover, the federal policies underlying the claims asserted herein preempt any state law grounds for terminating this litigation. Accordingly, the prosecution of these claims on a shareholder derivative basis is appropriate.

## FIRST CAUSE OF ACTION

### Contract Voiding Pursuant to Section 47(b) of the ICA Against Defendant Franklin/Templeton Distributors

100. Plaintiff incorporates by reference each of the foregoing allegations as if fully stated herein.

101. In this cause of action, due to the violation of core provisions of the ICA, Section 36(a) and Rule 38a-1, described herein, that require proper and lawful use of Trust assets, the Trust seeks to have its own contractual obligation deemed to be void by reason of Section 47(b), in an action maintained in reliance upon Section 47(b). The Trust seeks a declaration that the contractual obligation to make payments of Trust assets in the form of asset-based compensation to broker-dealers holding Trust shares in brokerage account violates the Trustees' duties under Section 36(a) of the ICA and Rule 38a-1 to avoid improper use of Trust assets.

102. The purpose of Section 47(b) is to promote compliance with the ICA by the regulated party or parties that are subject to ICA regulation, by ensuring that a regulated party's duties under the ICA trump its contractual obligations.

103.    The Trust is a regulated party under the ICA, and has certain duties under the ICA. Under Section 36(a), the Trustees must make proper use of Trust assets, which precludes using Trust assets to pay sales personnel who are not properly registered under both the Exchange Act and the Advisers Act as required to receive asset-based compensation.

104.    Under Section 36(a) of the ICA and Rule 38a-1 thereunder, the Trustees are required to oversee the compliance policies and procedures of Franklin/Templeton Distributors and its sub-agents receiving Trust assets, and immediately correct any violations of the Advisers Act. The compliance policies and procedures are defective because they provide for checking that broker-dealers are properly registered under the Exchange Act, but fail to ascertain whether there is compliance with the Advisers Act, which is an equally important federal securities law.

105.    Under Section 36(a) of the ICA, the Trustees have a fiduciary duty to Trust shareholders, who have been unlawfully deprived of advisory accounts due to the Trust's maintenance of contract obligations to make compensation payments in connection with Trust shares held in brokerage accounts.

106.    Franklin/Templeton Distributors is a third-party vendor to the Trust and a proper defendant to a contract voiding claim. Section 47(b) allows "either party," including the regulated party, to bring an action to void a contract.

107.    Nevertheless, Franklin/Templeton Distributors is also a regulated party under the ICA. Franklin/Templeton Distributors provides distribution services to the Trust and has certain statutory duties under the ICA. The duties of Franklin/Templeton Distributors under the ICA provide additional grounds in support of contract voiding. Franklin/Templeton Distributors has a duty under Section 36(a) of the ICA to not make improper use of Trust assets, such as paying unregistered firms, including using the means of interstate commerce in violation of Section 203 of the Advisers Act. Franklin/Templeton Distributors also owes a fiduciary duty under Section 36(a)

to Trust shareholders, who have been unlawfully deprived of advisory accounts due to the Trust's maintenance of contract obligations to make compensation payments in connection with Trust shares held in brokerage accounts.

108.   Past unlawful payments to Franklin/Templeton Distributors and its sub-agents pursuant to the Distribution Agreement constitute unjust enrichment to be restituted to the Trust by Franklin/Templeton Distributors, as follows: for the period July 22, 2005[16] to September 30, 2007, the amount of the past payments of asset-based compensation to Franklin/Templeton Distributors and/or its sub-agents in connection with Trust shares held in brokerage accounts in which the requirements of former SEC Rule 202(a)(11)-1 were not satisfied, and from the period of October 1, 2007 to present, the amount of asset-based compensation in connection with Trust shares held in brokerage accounts paid to Franklin/Templeton Distributors and/or its sub-agents.

## SECOND CAUSE OF ACTION

### Breach of Contract Against Defendant Franklin/Templeton Distributors

109.   Plaintiff incorporates by reference each of the foregoing allegations as if fully stated herein.

110.   In the operative written distribution agreement between the Trust and Franklin/Templeton Distributors, Franklin/Templeton Distributors, on behalf of itself and its sub-agent broker-dealers, warranted that it would comply with the federal securities laws.

111.   In material breach of its contractual promise, Franklin/Templeton Distributors has received and continues to receive asset-based compensation from Trust assets in connection with Trust shares held in brokerage accounts, which is prohibited by the Advisers Act.

---

[16] The Final Rule's revised disclosure requirements applied to brokerage accounts opened on or after July 22, 2005 for which broker-dealers were relying on the new rule to receive "special compensation." *See* 70 Fed. Reg. 20424, 20441 (Apr. 19, 2005).

112.     As a result of Franklin/Templeton Distributors' breach, there has been a *per se* waste of Trust assets, causing harm to the Trust and its shareholders.  In addition, Franklin/Templeton Distributors' breach of contract caused Trust shareholders to be deprived of advisory accounts subject to the investor protections and benefits of the Advisers Act.  The Trust's damages equal, for the period July 22, 2005 to September 30, 2007, the amount of the past payments of asset-based compensation to Franklin/Templeton Distributors and/or its sub-agents in connection with Trust shares held in brokerage accounts in which the requirements of former SEC Rule 202(a)(11)-1 were not satisfied, and from the period of October 1, 2007 to present, the amount of asset-based compensation in connection with Trust shares held in brokerage accounts paid to Franklin/Templeton Distributors and/or its sub-agents.

## THIRD CAUSE OF ACTION

### Breach of Fiduciary Duty Against the Trustee Defendants

113.     Plaintiff incorporates by reference each of the foregoing allegations as if fully stated herein.

114.     The Trustee Defendants are fiduciaries of the Trust and of all of its shareholders and owe them the duty to conduct the affairs of the Trust loyally, faithfully, carefully, diligently and prudently.  This cause of action is based upon the Trustee Defendants' acts in violation of state law, which acts constitute breach of fiduciary duty.

115.     Each of the Trustee Defendants participated in the acts of mismanagement alleged herein, or acted in reckless disregard of the facts and law known to them, and failed to exercise due care to prevent the misuse of Trust assets.  The Trustee Defendants became aware, or should have become aware through reasonable inquiry, of the facts alleged herein including, among others, the deficiencies in the compliance policies and procedures of the Trust and its service providers permitting unlawful payments of asset-based compensation to broker-dealers in connection with

Trust shares held in brokerage accounts. The Trustee Defendants thereby breached their duty of care and loyalty to the shareholders of the Trust by failing to act as an ordinary prudent person would have acted in a like position.

116.   Each of the Trustee Defendants also engaged in an intentional dereliction of duty and demonstrated a conscious disregard for his or her responsibilities. The Board of Trustees had an affirmative duty to investigate the legality of the broker-dealer compensation payments, including through mandated quarterly reviews of 12b-1 fee payments, and the annual compliance reviews of service providers, mandated by SEC rules, including determining whether Trust shares were held in brokerage accounts. The Trustee Defendants thereby acted in bad faith to the shareholders of the Trust by failing to act as an ordinary prudent person would have acted in a like position.

117.   As a result of the foregoing, the Trust has suffered considerable damage to and material diminution in the value of its assets paid as illegal compensation to Franklin/Templeton Distributors and Franklin/Templeton Distributors' sub-agents.

118.   Each of the Trustee Defendants, singly and in concert, engaged in the aforesaid conduct in reckless disregard and/or intentional breach of his or her fiduciary duties to the Trust.

119.   As such, plaintiff, on behalf of the Trust, seeks declaratory and injunctive relief and damages and other relief for the Trust.

## FOURTH CAUSE OF ACTION

### Waste of Trust Assets Against the Trustee Defendants

120.   Plaintiff incorporates by reference each of the foregoing allegations as if fully stated herein.

121.   As a result of the unlawful asset-based compensation paid from Trust assets to Franklin/Templeton Distributors and its sub-agents, and by failing to properly consider the interests

of the Trust and its shareholders by failing to conduct proper supervision, the Trustee Defendants have caused a *per se* waste of valuable Trust assets through illegal payments from Trust assets.

122. As a result of the waste of Trust assets, the Trustee Defendants are liable to the Trust.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff demands judgment on behalf of the Trust as follows:

(1) Determining that this action is a proper derivative action maintainable under law, that the demand requirement was satisfied, and that demand was wrongfully refused;

(2) Against each Defendant for restitution and/or damages in favor of the Trust;

(3) Declaratory and injunctive relief as permitted by law, including attaching, impounding, imposing a constructive trust on or otherwise restricting the asset-based compensation previously paid to Franklin/Templeton Distributors and enjoining the Trust and Franklin/Templeton Distributors from any further payments of asset-based compensation to broker-dealers in connection with Trust shares held in brokerage accounts in the United States;

(4) Awarding pre-judgment interest on all monetary damages;

(5) Awarding plaintiff the costs and disbursements of this action, including reasonable attorneys', accountants', and experts' fees; and

(6) Granting such other and further relief as this Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

DATED:   July 7, 2010

**MILBERG LLP**


_____/s/  Janine L. Pollack_____
Janine L. Pollack
Michael C. Spencer (SBN 79349) [admitted *pro hac vice*]
mspencer@milberg.com
Janine L. Pollack [admitted *pro hac vice*]
jpollack@milberg.com

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**MILBERG LLP**
One Pennsylvania Plaza
New York NY  10119
Telephone:  (212) 594-5300
Facsimile:  (212) 868-1229

Jeff S. Westerman (SBN 94559)
jwesterman@milberg.com
**MILBERG LLP**
One California Plaza
300 S. Grand Avenue, Suite 3900
Los Angeles, CA  90071
Telephone:  (213) 617-1200
Facsimile:  (213) 617-1975

Eric M. George (SBN 166403)
egeorge@bwgfirm.com
**BROWNE WOODS GEORGE LLP**
2121 Avenue of the Stars
Suite 2400
Los Angeles, CA  90067
Telephone:  (310) 274-7100
Facsimile:  (310) 275-5697

Lee A. Weiss [admitted *pro hac vice*]
lweiss@bwgfirm.com
**BROWNE WOODS GEORGE LLP**
49 West 37th Street, 15th Floor
New York, NY  10018
Telephone:  (212) 354-4901
Facsimile:  (212) 354-4904

Ronald A. Uitz [admitted *pro hac vice*]
ron877@yahoo.com
**UITZ & ASSOCIATES**
1629 K Street, N.W. Suite 300
Washington, D.C.  20006
Telephone:  (202) 296-5280
Facsimile:  (202) 521-0619

Alfred G. Yates, Jr. Esq.
yateslaw@aol.com
**LAW OFFICE OF ALFRED G. YATES,
JR. P.C.**
519 Allegheny Building
429 Forbes Avenue
Pittsburgh, Pennsylvania 15219
Telephone:  (412) 391-5164
Facsimile:  (412) 471-1033

***Attorneys for Plaintiff***

## VERIFICATION

I, Bradley C. Smith, under penalties of perjury, state that I have read the foregoing

Amended Verified Derivative Complaint and authorize its filing, and that the foregoing is true

and correct to the best of my knowledge, information, and belief.

Dated:  July 7, 2010

Bradley C. Smith

## CERTIFICATE OF SERVICE

I hereby certify that on July 7, 2010, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system.

Participants in the case who are registered CM/ECF users will be served by the CM/ECF system.

I further certify that some of the participants in the case are not registered CM/ECF users and paper copies will be sent to participants.

I certify under penalty of perjury that the foregoing is true and correct.  Executed on July 7, 2010.

_____
Erin Dennehy

Certificate of Service