Jeff S. Westerman (SBN 94559)
 jwesterman@milberg.com
**MILBERG LLP**
One California Plaza
300 S. Grand Avenue, Suite 3900
Los Angeles, CA  90071
Telephone:  (213) 617-1200
Facsimile:   (213) 617-1975

Michael C. Spencer (*admitted pro hac vice*)
 mspencer@milberg.com
Janine L. Pollack (*admitted pro hac vice*)
 jpollack@milberg.com
**MILBERG LLP**
One Pennsylvania Plaza
New York NY  10119
Telephone:  (212) 594-5300
Facsimile:   (212) 868-1229

Eric M. George (SBN 166403)
 egeorge@bwgfirm.com
**BROWNE WOODS GEORGE LLP**
2121 Avenue of the Stars, Suite 2400
Los Angeles, CA  90067
Telephone:  (310) 274-7100
Facsimile:   (310) 275-5697

Lee A. Weiss
 lweiss@bwgfirm.com
**BROWNE WOODS GEORGE LLP**
1 Liberty Plaza, Suite 2329
New York, NY  10006
Telephone:  (212) 354-4901
Facsimile:   (212) 354-4904

(Additional Counsel on Signature Page)

*Attorneys for Plaintiff*

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
### OAKLAND DIVISION

| | |
|---|---|
| BRADLEY C. SMITH, derivatively on behalf of FRANKLIN CUSTODIAN FUNDS,<br><br>            Plaintiff,<br><br>    vs.<br><br>FRANKLIN/TEMPLETON DISTRIBUTORS, INC., HARRIS J. ASHTON, ROBERT F. CARLSON, SAM GINN, EDITH E. HOLIDAY, FRANK W.T. LAHAYE, FRANK A. OLSON, LARRY D. THOMPSON, JOHN B. WILSON, CHARLES B. JOHNSON, AND RUPERT H. JOHNSON,<br>            Defendants,<br>and<br><br>FRANKLIN CUSTODIAN FUNDS,<br><br>            Nominal Defendant. | Civil Action No. C 09-4775 PJH<br><br><br>**PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE AMENDED COMPLAINT** |

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ........................................................................................1

FACTS .........................................................................................................................6

    A.    Recent Development:  The SEC Proposes to Rescind Rule 12b-1 ............................6

    B.    Relevant Facts.................................................................................6

ARGUMENT .................................................................................................................9

    A.    The Amended Complaint Comports With Notice Pleading Requirements ...............9

    B.    The Amended Complaint States a Cognizable Claim for Contract Voiding ...........10

        1.    *Transamerica* Is Binding Authority Holding That Contract Voiding is a Valid Cause of Action ............................................10

        2.    § 36(a) Is a Predicate Violation ...................................................14

        3.    Rule 38a-1 Is a Predicate Violation ............................................15

        4.    Additional Allegations in Support of the ICA Predicate Violations.............16

CONCLUSION.............................................................................................................19

1

2

## <u>TABLE OF AUTHORITIES</u>

3                                                                                    **Page(s)**

CASES

4

*Alexander v. Sandoval*,
5        532 U.S. 275 (2001) ........................................................................................5

6   *Ante v. Office Depot Bus. Servs.*,
7        641 F. Supp. 2d 906 (N.D. Cal. 2009) ...........................................................10

8   *Bellikoff v. Eaton Vance Corp.*,
         481 F.3d 110 (2d Cir. 2007) ...........................................................................10
9
    *Berckeley Inv. Group Ltd. v. Colkitt*,
10       455 F.3d 195 (3d Cir. 2006) ...........................................................................12

11  *Continental Lab. Prods., Inc. v. Medax Int'l, Inc.*,
12       No. 97-359, 1999 U.S. Dist. LEXIS 15383 (S.D. Cal. Aug. 12, 1999) ...................11

13  *Davis v. Bailey*,
         No. 05-0042, 2005 U.S. Dist. LEXIS 38204 (D. Colo. Dec. 22, 2005) .................13
14
    *Dreiling v. Am. Exp. Co.*,
15       458 F.3d 942 (9th Cir. 2006) ............................................................................8

16  *Dull v. Arch*,
17       No. 05 C 140, 2005 U.S. Dist. LEXIS 14988 (N.D. Ill. July 27, 2005) .................13

18  *Everett v. Bozic*,
         No. 05-296, 2006 U.S. Dist. LEXIS 55824 (S.D.N.Y. Aug. 2, 2006) ....................13
19
    *Financial Planning Association v. SEC*,
20       482 F.3d 481 (D.C. Cir. 2007) ............................................................... *passim*

21  *Flaxel v. Johnson*,
22       541 F. Supp. 2d 1127 (S.D. Cal. 2008) ...........................................................12

23  *Hamilton v. Allen*,
         396 F. Supp. 2d 545 (E.D. Pa. 2005) ..........................................................13, 14
24
    *Jacobs v. Bremner*,
25       378 F. Supp. 2d 861 (N.D. Ill. 2005) ...............................................................13

26  *Kashani v. Tsann Kuen China Enterprise Co., Ltd*,
         118 Cal. App. 4th 531 (2d App. Dist. 2004) ....................................................12
27
    *Mutchka v. Harris*,
28       373 F. Supp. 2d 1021 (C.D. Cal. 2005) ...........................................................13

*Northstar Financial Advisors, Inc. v. Schwab Investments*,
   No. 09-16347, 2010 U.S. App. LEXIS 16706 (9th Cir. Aug. 12, 2010) ..............................5, 14

*Olmsted v. Pruco Life Ins. Co.*,
   283 F.3d 429 (2d Cir. 2002).......................................................................................11, 12

*SEC v. Treadway*,
   430 F. Supp. 2d 293 (S.D.N.Y. 2006)................................................................................15

*Smith v. Franklin/Templeton Distributors, Inc.*,
   No. C 09-4775, 2010 U.S. Dist. LEXIS 56516................................................ *passim*

*Stegall v. Ladner*,
   394 F. Supp. 2d 358 (D. Mass. 2005) ................................................................................13

*Torsiello Capital Partners LLC v. Sunshine State Holding Corp.*,
   600397/06, 2008 N.Y. Misc. LEXIS 2879 (N.Y. Sup. Ct. April 1, 2008), at *19..................12

*Transamerica Mortgage Advisors, Inc. v. Lewis*,
   444 U.S. 11 (1979)................................................................................................ *passim*

*United States v. First City Nat'l Bank*,
   386 U.S. 361 (1967).........................................................................................................18

STATUTES

15 U.S.C. § 78cc(b).............................................................................................5, 11, 12

15 U.S.C. § 80b-2(11).........................................................................................................17

15 U.S.C. § 80b-3(a).......................................................................................................2, 17

Fed. R. Civ. P. 8(a)(2)....................................................................................................9, 10

Fed. R. Civ. P. 8(a)(c)(1) ...................................................................................................13

17 C.F.R. § 270.6c-10(a)(i)...................................................................................................6

17 C.F.R. § 270.12b-1(a)(2)..................................................................................................7

17 C.F.R. § 275.202(a)(11)-1...............................................................................................18

OTHER AUTHORITIES

Arthur B. Laby, *Reforming the Regulation of Broker-Dealers and Investment Advisers,"*
   65 Bus. Law. 395, 417 (Feb. 2010) ..................................................................................19

*In re: O'Brien Partners, Inc.*,
   No. 7594, IA-1772, 1998 SEC LEXIS 2318 (Oct. 27, 1998)..............................................17

*In re: Quest Capital Strategies, Inc.*,
    1999 SEC LEXIS 727 (Apr. 12, 1999) ......................................................................19

Restatement (Second) of Contracts § 178, comment ................................................................12

SEC Release,
    No. IA-1092, 1987 SEC LEXIS 3487 (October 8, 1987) ..........................................17

SEC Release,
    No. IC-26299, 2003 SEC LEXIS 2980 (Dec. 17, 2003) ....................................3, 16

SEC Release,
    Nos. 34-42099, IA-1845, 1999 SEC LEXIS 2356 (Nov. 4, 1999) (1999 Rule Proposal)........8

Plaintiff Bradley C. Smith, suing derivatively on behalf of Franklin Custodian Funds (hereinafter the "Trust"), respectfully submits this opposition to Defendants' Motion to Dsmiss the Amended Complaint ("MTD").

**PRELIMINARY STATEMENT**

The Court previously dismissed Plaintiff's derivative claim on behalf of the Trust under § 47(b) of the Investment Company Act of 1940 ("ICA"), 15 U.S.C. § 80a-46(b), with leave to amend, "[b]ecause the complaint alleges no violation of the ICA which can provide a predicate for the claim under § 47(b)[.]"  *Smith v. Franklin/Templeton Distributors, Inc.*, No. C 09-4775, 2010 U.S. Dist. LEXIS 56516, at **23-24 (N.D. Cal. June 8, 2010) ("*Smith*").  Plaintiff's Amended Complaint cures each of the deficiencies identified by the Court by pleading substantial additional facts in support of the predicate ICA violations that in turn establish a voidable contract and a cause of action that may be maintained under § 47(b):

(a)  With respect to the issue of whether payments by the Trust to the broker-dealers pursuant to a Rule 12b-1 distribution plan are not "for services to customers" and are not "fees for investment advice," *see Smith*, at **21-22, the Amended Complaint alleges that Rule 12b-1 fees are predominantly used to compensate broker-dealers for providing investment advice to shareholders – a fact that Defendants have admitted outside of the courtroom.  *See* Amended Complaint ("AC") ¶ 55 (alleging that Franklin/Templeton Distributors prominently states on its own website that mutual funds with Rule 12b-1 fees are designed for investors that "**prefer to 'pay as they go' for professional investment advice**").[1]

The Amended Complaint further alleges, consistent with Franklin/Templeton Distributors admission, that the trade group that represents the interests of independent directors/trustees of mutual funds, the Independent Directors Council (IDC), has issued a comprehensive industry study showing that: "**Today, the overwhelmingly predominant use (98%) of 12b-1 fees is for professional advice (initial and ongoing) and shareholder servicing.  Only a small fraction**

---

[1] *Citing* www.franklintempleton.com/retail/pages/generic_content/education/fund_basic/about/ share_cl_options.jsf. A copy is also attached to the Declaration of Janine Pollack (Pollack Decl.), Ex. 1, submitted herewith.

**(2%) of 12b-1 fees are used by funds for promotion, advertising and other miscellaneous expenses.**"[2]  The IDC accordingly proposed in a comment letter to the SEC that Rule 12b-1 fees be properly labeled -- calling them, in their words, a "**third-party advice**" fee.  *Id.*; *see also* AC ¶ 57 (the mutual fund industry's trade group, the Investment Company Institute (ICI), recommended to the SEC that "**12b-1 fees should be listed in the prospectus fee table using tailored, straightforward, descriptive terms such as `third-party investment advice'**[.]").[3]

(b)  With respect to the issue of whether the Trust may lawfully make asset-based compensation payments to unregistered investment advisers, *see Smith*, at *22, the Amended Complaint identifies Section 203 of the Investment Advisers Act (the "Advisers Act" or the "IAA"), which states that it is unlawful for any investment adviser that has not registered under the Advisers Act "to make use of the mails or any means or instrumentality of interstate commerce in connection with his or its business as an investment adviser."  AC ¶ 69; 15 U.S.C. § 80b-3(a).  The receipt of compensation constitutes the use of the means of interstate commerce.  AC ¶ 69.  The Amended Complaint alleges that when the Trust and Franklin/Templeton Distributors make payments of asset-based compensation to broker-dealers (other than broker-dealers that are dual registrants holding Trust shares in advisory accounts), they are participating in, and using Trust assets for, unlawful activity.  AC ¶ 71.  If the broker-dealer properly becomes a dual registrant and moves the Trust shares into an advisory account, future violations would probably be avoided, but the past violations would remain.  AC ¶ 70.

(c)  With respect to the issue of whether Plaintiff adequately pleaded a violation of ICA § 36(a), *Smith*, at *24, the Amended Complaint alleges that the use of Trust assets to make illegal compensation payments (*i.e.*, payments that violate § 203 of the Advisers Act) is a clear violation of

---

[2] AC ¶ 59, *quoting* IDC letter to SEC dated July 19, 2007, at 2 n. 3, available at www.sec.gov/comments/4-538/4538-277.pdf.

[3] Defense counsel for the Trustees here, Goodwin Procter LLP, has also said that 12b-1 fees compensate for investment advice.  In a recent newspaper interview, a Goodwin Procter partner is quoted as saying that broker-dealers "give advice on asset-allocation and performance," and if Rule 12b-1 were to be rescinded by the SEC, "[l]imiting the amounts of money available to compensate those advisers could have the unintended consequence of limiting the advice available to investors."  *See* Pollack Decl., Ex. 2, submitted herewith.

---

the statutory fiduciary duty that governs the Trustees and Franklin/Templeton Distributors under the ICA to use Trust assets properly.  AC ¶¶ 72-75, 103-105.

(d)  With respect to the  issue of whether Plaintiff "has pled no facts identifying any defect in the Rule 38a-1-related compliance policies and procedures of [the Trust]," *see Smith,* at *21, the Amended Complaint alleges that "checking each of its broker-dealer selling agents to make sure they are registered and licensed under the Exchange Act, as applicable, but not checking to make sure the firms are also registered and licensed under the Advisers Act, as applicable, is a material defect" in the compliance policies and procedures of Franklin/Templeton Distributors, as approved and overseen by the trustees of the Trust, because the "Advisers Act is no less of an important federal securities law than the Exchange Act."  AC ¶ 80.

The Amended Complaint also quotes from the promulgating release for Rule 38a-1 stating that "serious compliance issues must, of course, always be brought to the board's attention promptly, and cannot be delayed until an annual report."  AC ¶ 79 *quoting* Final Rule, Promulgating Release No. IC-26299, 2003 SEC LEXIS 2980, at *6 (Dec. 17, 2003).  Accordingly, under Rule 38a-1, the Chief Compliance Officer of the Trust and the Trustees have a duty to act immediately if Trust assets are being used improperly.  *Id*.

(e)  With respect to the issue of whether "the broker-dealers in the *Financial Planning* case" received a different kind of asset-based compensation than the payments at issue here, s*ee Smith*, at *21, the Amended Complaint pleads evidence demonstrating that the package of services provided to brokerage accounts (*i.e.* brokerage services and investment advice) and the form of compensation received by the broker-dealer in connection with those customer accounts (*i.e*., a set percentage of assets held in the account that is paid by the investor and received by the broker-dealer) are identical irrespective of whether the mutual fund company (as here) or the broker-dealer is processing the asset-based compensation payments.  *See* AC ¶ 50.  In particular, documentation from Merrill Lynch -- the broker-dealer firm that, prior to October 2007, maintained the largest number of brokerage accounts in which the broker-dealer charged an asset-based fee -- explains that Merrill Lynch's asset-based fee arrangements "are simply pricing alternatives" to charging transactional sales commissions, because the services provided to the account are the same as to any commission-

1   based brokerage account, and because the asset-based fees, like sales commissions, are not

2   specifically charged for investment advice.  *Id.*[4]

3       (f)  With respect to the issue of whether SEC Rule 202(a)(11)-1, the rule that was vacated by

4   *Financial Planning Association v. SEC*, 482 F.3d 481 (D.C. Cir. 2007), is "irrelevant" to Rule 12b-

5   1 asset-based compensation payments, s*ee Smith*, at *21, the Amended Complaint alleges that the

6   mutual fund industry thought the rule was relevant, and relied on it, prior to its being vacated:  the

7   industry had celebrated the rule as a "clean solution" to the legality of Rule 12b-1 payments to

8   broker-dealers.  AC ¶ 42.  According to a client newsletter published in 1999 by the law firm of

9   WilmerHale (then Wilmer, Cutler & Pickering) for its mutual fund and broker-dealer clients,

10  "[i]nvestment companies have used asset-based fees under rule 12b-1 plans as compensation for

11  brokerage services, especially for the sale of so-called 'B' and 'C' shares," and this form of

12  compensation could involve "special compensation," but the SEC's "proposed rule 202(a)(11)-1

13  would provide a clean solution to any questions about the applicability of the term 'special

14  compensation' by providing exemptions from the definitions of 'investment adviser' and 'special

15  compensation' for asset-based compensation[.]" *Id.*[5]

16      (g)  With respect to the issue of whether there is an "absence" of rights-creating language in

17  § 47(b) creating a cause of action for contract voiding, *see Smith,* at *20, Plaintiff cannot, of course,

18  alter this legal issue by amending the complaint.  However, it is appropriate for the Court to

19  consider that the Supreme Court explicitly found rights-creating language in the parallel contract

20  voiding statutory provision in the Advisers Act – where the language and congressional intent was

21  substantively indistinguishable from that in the ICA.  *See Transamerica Mortgage Advisors, Inc. v.*

22  *Lewis*, 444 U.S. 11, 19 (1979) ("we conclude that when Congress declared in [the contract voiding

23  statute] that certain contracts are void, *it intended that the customary legal incidents of voidness*

24  *would follow, including the availability of a suit for rescission or for an injunction against*

25  *continued operation of the contract, and for restitution*." (emphasis added)).

---

26  [4] *See* Comment Letter to SEC by Merrill Lynch dated September 22, 2004, at 3 (available at
27  www.sec.gov/rules/proposed/s72599/s72599-1191.pdf ).

28  [5] A copy is also attached to the Pollack Declaration.  *See* Pollack Decl., Ex. 3.

---

The contract voiding statutes in the federal securities laws have always been construed *in pari materia*, and *Transamerica* has been consistently followed, for contract voiding actions and as a model approach to ascertaining "rights-creating language."  *See Alexander v. Sandoval*, 532 U.S. 275, 286, 290 (2001) (citing *Transamerica*); *Northstar Financial Advisors, Inc. v. Schwab Investments*, No. 09-16347, 2010 U.S. App. LEXIS 16706, at *27 (9th Cir. Aug. 12, 2010) (citing *Transamerica*).  *Transamerica* reflects the intent of Congress from the "rights-creating language" in the contract voiding statute itself, and not as a judicially-created implied right of action.

Moreover, the Amended Complaint clarifies that the first cause of action is "an action maintained in reliance upon Section 47(b)." AC ¶ 101.  As discussed further below, this language is identical to the language that Congress uses to refer to a private right of action for contract voiding under the federal securities laws.  AC ¶¶ 89-92 (the contract voiding provision in the Exchange Act, Section 29(b), lists certain excepted predicate statutes and refers to "*in any action maintained in reliance upon this subsection [Section 29(b)]*").  Accordingly, the intent of Congress to create a *cause of action* cannot reasonably be disputed.

Defendants' renewed motion to dismiss does not respond to or discuss any of these new allegations in the Amended Complaint.  *See* MTD at 5 ("No new facts of consequence have been added by Plaintiff in the Amended Complaint[.]").  Instead, Defendants urge the Court to make factual findings that directly contradict the facts alleged in the Amended Complaint.  *See* MTD at 4, 5 n.1 (restating that Rule 12b-1 fees paid by the Trust are not "for services to customers" and not "for investment advice" and these false facts are "law of the case"); AC ¶¶ 56-60.  Plaintiff's new allegations cure the pleading deficiencies identified by the Court, as Defendants tacitly acknowledge by simply refusing to acknowledge and address the new allegations in the Amended Complaint.

A core purpose of the ICA is to ensure that mutual fund assets are not used for unlawful purposes.  Given that *Transamerica* dispositively held that Congress intended to, and did, provide a court forum to void contractual obligations that violate the ICA, Plaintiff respectively submits that his derivative action on behalf of the Trust, maintained in reliance upon § 47(b), is cognizable, and therefore the Motion to Dismiss should be denied.

# FACTS

## A.     Recent Development:  The SEC Proposes to Rescind Rule 12b-1

On July 21, 2010, the SEC released for public comment a proposal to rescind Rule 12b-1 in its entirety.[6]  Under the proposal, Rule 12b-1 will be replaced by new rules that allow the use of fund assets to pay "transaction-based compensation"[7] to broker-dealers.  The amount of any "deferred sales load" charged to fund investors can be no higher than the amount of the "reference load," as defined in the new rules.  The "reference load" is "a specified percentage of the net asset value of the offering price at the time of purchase[,]"[8] including any breakpoint discounts that the investor is entitled to receive.[9]

The Release refers to the pendency of this litigation, and also discloses that, beginning in 2007, numerous prominent experts have urged the SEC to address the Advisers Act violation that occurs when Rule 12b-1 fees are paid in the form of ongoing asset-based compensation to broker-dealers, in light of the *Financial Planning Association* decision.[10]  In the Release, the SEC requests public comment on these issues and on whether its proposed new rules will "appropriately address" the Advisers Act issue "by requiring a nexus between the sale of a share of a mutual fund and the amount of ongoing sales charges an intermediary's customer pays through the fund."[11]

## B.     Relevant Facts

Plaintiff Bradley C. Smith is invested in Class C shares of the Franklin Income Fund, a series of the Trust, and is therefore a shareholder in the Trust.  AC ¶ 9.  (The Franklin Income Fund

---

[6] *See* SEC Release Nos 33-9128, 34-62544, IC-29367 (July 21, 2010) (the "Release"), available at http://www.sec.gov/rules/proposed/2010/33-9128.pdf .

[7] *Id*. at 47 n. 168.

[8] *Id.* at 258; Proposed Rule 17 C.F.R. § 270.6c-10(a)(i).

[9] For instance, under the proposal, if an investor would have had to pay a 2% upfront sales load based on the sales load breakpoint discount schedule in effect for the fund family, then, as an alternative, the investor could be charged a deferred sales charge that cannot exceed 2% for one year, or 1% for two years, or 0.50% for four years, for example.  *Id*. at 49.

[10] *Id*. at 125 n. 372.

[11] *Id*. at 125.

---

is not a legal entity, is not an issuer of shares, and has no capacity to sue or be sued).  Plaintiff's shares in the Trust are held in a brokerage account at Merrill Lynch, Pierce, Fenner & Smith Incorporated, AC ¶ 9, which provides traditional brokerage services, of which investment advice is an auxiliary component.  AC ¶ 23.

The Trust has elected to act as the distributor of its own shares.  AC ¶ 65; *see* SEC Rule 12b-1, 17 C.F.R. § 270.12b-1(a)(2) ("a company will be deemed to be acting as a distributor of securities of which it is the issuer. . . if it engages directly or indirectly in financing [distribution activities]").  The Trust is financing distribution activities, including the costs of distributing prospectuses, and compensating broker-dealers for servicing shareholders, out of Trust assets, as allowed by SEC Rule 12b-1.  AC ¶ 61.

The current operative Distribution Agreement between the Trust and Franklin/Templeton Distributors is dated February 8, 2008, and it contractually commits the Trust to pay certain amounts specified in the Trust's Rule 12b-1 distribution plans to Franklin/Templeton Distributors for disbursement to subcontracting retail broker/dealer firms, including payments as a percentage of average daily net assets of Trust shares.  AC ¶ 61.[12]

Franklin/Templeton Distributors allocates the payments to broker-dealers, broken down to each customer account, calculated to the penny based on the daily net asset value of the respective Trust shares held in each customer account.  AC ¶ 62.  These payments are ongoing, which means that for each customer the payments continue to be made to the customer's broker-dealer for as long as the customer owns Trust shares held in an account serviced by that broker-dealer.  AC ¶ 62.  The payments are accrued daily and paid quarterly.  AC ¶ 61.

The Trust began the practice of paying asset-based compensation to broker-dealers on May 1, 1995.  AC ¶ 40; *see also* Pollack Decl., Exhibit 6 (excerpt from Franklin Custodian Funds

---

[12] According to the Trust's SEC filings, in addition to payments financed pursuant to Rule 12b-1 distribution plans, Franklin/Templeton Distributors makes ongoing "marketing support payments" to broker-dealers based on daily net asset values of shares held in customer accounts.  The Rule 12b-1 Plan payments and "marketing support payments" combined will be in excess of a rate of 1% per year of average daily net assets for Class C shares of equity funds, in excess of 0.65% for Class C shares of bond funds, and other rates for other share classes, and continue for as long as the shares are owned.  AC ¶ 61.

---

PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS AMENDED COMPLAINT
C-09-4775 PJH                                    - 7 -

prospectus supplement effective May 1, 1995).[13]  At the time, the SEC was encouraging broker-dealers to shift away from transactional commissions, in favor of asset-based compensation arrangements, a development that broker-dealers welcomed, at least so long as they did not have to also provide customers with the enhanced investor protections of the Advisers Act.  AC ¶¶ 38-40.

Prior to the 1990's, some mutual fund firms had issued share classes where Rule 12b-1 fees were used to recoup the cost of paying upfront transactional commissions to broker-dealers.  In those arrangements, the broker-dealer received a one-time transactional commission payment.  AC ¶ 40.

Recognizing that the Advisers Act prohibits asset-based compensation in connection with brokerage accounts, in 1999, the SEC formalized its support for asset-based compensation arrangements by issuing a no-action position[14] and a proposed regulation, which eventually was enacted in final form in April 2005,[15] that effectively suspended the statutory bar on asset-based compensation.  The final rule was immediately challenged in court by a trade group of registered investment advisers and subsequently vacated as *ultra vires*.  *See Financial Planning Association*, 482 F.3d at 488 ("**By seeking to exempt broker-dealers beyond those who receive only brokerage commissions for investment advice, the SEC has promulgated a final rule that is in direct conflict with both the statutory text and the Committee Reports.**").

Following *Financial Planning Association*, over one million brokerage accounts holding in excess of $300 billion in assets in which asset-based compensation arrangements were in place were converted by broker-dealers to advisory accounts or otherwise reformed to comply with the

---

[13] On a motion to dismiss, the court may take judicial notice of SEC filings and other public records.  *Dreiling v. Am. Exp. Co.*, 458 F.3d 942, 946 n.2 (9th Cir. 2006).

[14] The no-action position states that "the Division of Investment Management will not recommend, based on the form of compensation received, that the Commission take any action against a broker-dealer for failure to treat any account over which the broker-dealer does not exercise investment discretion as subject to the [Advisers] Act."  *See* Certain Broker-Dealers Deemed Not To Be Investment Advisers, Release Nos. 34-42099, IA-1845, 1999 SEC LEXIS 2356 at 5 (Nov. 4, 1999) (1999 Rule Proposal).  Industry interpreted the no-action position as retroactive, as the SEC acknowledged in the release that asset-based compensation arrangements had begun earlier in the decade.

[15] 2005 Final Rule Release, 70 Fed. Reg. 20424 (April 19, 2005).

---

1    Advisers Act.  AC ¶ 47.  However, the Trust has continued with its asset-based compensation

2    arrangements without modification, allowing broker-dealers to easily evade the Advisers Act and

3    receive asset-based compensation in connection with brokerage accounts.  AC ¶ 48.

4           Through his attorneys, Plaintiff made demand on the Board of Trustees by letter dated

5    January 8, 2009 to take corrective action, *see* AC ¶ 97; AC Exhibit 1, which was refused by letter

6    dated March 4, 2009, signed by counsel for the non-affiliated Trustees.  *See* AC ¶ 98; AC Exhibit 2

7    ("The Board of Trustees has determined that the demands are not well-founded, as a matter of law,

8    and declines to take the steps, including litigation, that you propose.").

9           In the absence of any substantive content in the response from the Board, Plaintiff's counsel

10   continued their pre-suit investigation, and subsequently filed this shareholder derivative action on

11   behalf of the Trust on October 6, 2009.  Service of process on the Trustees "was not completed until

12   December 18, 2009," *see* MTD at 3, as this was the length of time that counsel to the Trustees

13   requested to coordinate consent to service, which Plaintiff provided as a courtesy.  Defendants

14   moved to dismiss the original complaint, which the Court granted as to the first cause of action,

15   providing leave to amend "only the § 47(b) claim."  *Smith*, at *23.  Plaintiff filed an Amended

16   Complaint on July 7, 2010.

17                                         **ARGUMENT**

18          Defendants argue that the Amended Complaint contains too many legal conclusions and

19   fails to meet the notice pleading standard of Fed. R. Civ. P. 8(a)(2), and that contract voiding is

20   never a cognizable federal cause of action, and can only occur as a secondary remedy to a damages

21   cause of action.  MTD at 6.  Neither argument has any merit.

22   **A.      The Amended Complaint Comports With Notice Pleading Requirements**

23          Under Fed. R. Civ. P. 8(a)(2), a pleading must contain "a short and plain statement of the

24   claim showing that the pleader is entitled to relief," in order to "give the defendant fair notice of

25   what the. . . claim is and the grounds upon which it rests."  *Ante v. Office Depot Bus. Servs.*, 641 F.

26   Supp. 2d 906, 912 (N.D. Cal. 2009) (quoting *Mendiondo v. Centinela Hosp. Med. Ctr.*, 521 F.3d

27   1097, 1104 (9th Cir. 2008)).  When a plaintiff's complaint "outlines the 'who, what, where, and

28   when' of the alleged injury, it is hard to see how the complaint has not put defendant on 'notice.'"

*Id.*

Defendants are on notice of the "who, what, where, and when" of the asset-based compensation arrangements at issue in this case, and they do not contend otherwise. The source of the duty of the Defendants to not use Trust assets for improper and unlawful purposes (§ 36(a) of the ICA and Rule 38a-1 promulgated thereunder), and the injuries suffered by the Trust (depletion of assets) and by its shareholders (who have been deprived of the advisory accounts they are lawfully entitled to receive after paying ongoing relationship compensation), are clearly and plainly alleged. AC ¶¶ 72-84, 103-107. Accordingly, the Amended Complaint comports with Fed. R. Civ. P. 8(a)(2).

### B. The Amended Complaint States a Cognizable Claim for Contract Voiding

#### 1. *Transamerica* Is Binding Authority Holding That Contract Voiding is a Valid Cause of Action

"Congressional intent is the keystone as to whether a federal right of action exists for a federal statute." *Bellikoff v. Eaton Vance Corp.*, 481 F.3d 110, 116 (2d Cir. 2007), citing *Sandoval*, 532 U.S. at 286, which in turn is citing *Transamerica,* 444 U.S. at 15. The Supreme Court in *Transamerica* found that Congress intended to establish a private right of action for rescission and restitution for violations of the IAA, based on the text of the IAA's contract voiding statute (§ 215), while at the same time intending not to establish a private right of action for damages under any section of the IAA. *Transamerica*, 444 U.S. at 19. The Supreme Court affirmed the plaintiff's right to bring a derivative action on behalf of the trust in that case for contract voiding and restitution for the trust, arising from asserted violations of a predicate provision with no private right of action for damages. *Id.* As the SEC has explained, after *Transamerica*, it is "beyond reasonable dispute that private plaintiffs may seek rescission of a contract" under § 47(b), because the text of § 47(b) is substantively indistinguishable from the text of § 215.[16] Defendants here tacitly concede that they

---

[16] *See* Brief of the SEC, Amicus Curiae, Submitted at the Court's Request (Dec. 5, 2001) at Section II, filed in *Olmsted v. Pruco Life Ins. Co.*, 283 F.3d 429 (2d Cir. 2002), *available at* www.sec.gov/litigation/briefs/olmsted.htm ("SEC Amicus Brief") (§ 47(b) of the ICA provides distinct cause of action irrespective of whether predicate statute in the ICA alleged to be violated contains any express or implied private right of action for damages). The court in *Olmsted* declined to "consider the relevance of § 47(b)" to the plaintiffs' claims in that case because "plaintiffs make

1   have no colorable basis to distinguish *Transamerica*, because their motion refuses to cite or discuss

2   it.[17]

3         Defendants' interpretation of § 47(b) guts the plain language of the provision.  Through the

4   use of the language "any provision" of the ICA, and "any rule, regulation or order thereunder" to

5   describe the predicate laws for contract voiding, Congress in § 47(b) made plain its intent to include

6   all ICA provisions and regulations.  Congress demonstrated, in the counterpart section of the

7   Exchange Act (§ 29(b)), that it knew how to exclude predicate provisions when it wished to do so.

8   *See* 15 U.S.C. § 78cc(b) (containing the same "any provisions" language, but then excluding a

9   predicate provision, and providing for a special statute of limitations period for two other predicate

10  provisions).  None of the predicate provisions referred to has any private right of action for

11  damages.

12        Moreover, in connection with listing the predicate provisions subject to the special statute of

13  limitations in § 29(b), the statute states that "no contract shall be deemed to be void by reason of

14  this subsection *in any action maintained in reliance upon this subsection* [filed after the statute of

15  limitations period]," (emphasis added).  That language plainly confirms that Congress intended the

16  contract voiding statute to be a *private right of action* for contract voiding.

17        Defendants' contrary argument -- that § 47(b) was intended only as a superfluous remedy

18  after the prosecution of a claim for damages – would actually mean that § 47(b) (and § 215 of the

19  IAA) were enacted as statutory nullities, because, as enacted in 1940, the ICA and IAA themselves

20  contained no private rights of action for damages.

21        Moreover, the plain language of § 47(b), as with each of the similar contract voiding statutes

22  in the securities laws, refers to *violations* of predicate provisions, not the prosecution of claims

23  under predicate provisions. *See, e.g., Berckeley Inv. Group Ltd. v. Colkitt*, 455 F.3d 195, 208 (3d

---

24  no claim under § 47(b), and because an issue raised only by an *amicus curiae* is normally not
25  considered on appeal."  283 F.3d at 436 n.5.

26  [17] By failing to cite controlling Supreme Court authority contrary to their legal position, to
    distinguish it on the facts, or arguing that the precedent is no longer good law, or using some other
27  permissible form of advocacy, defendants are testing the limits of proper advocacy. *See*
    *Continental Lab. Prods., Inc. v. Medax Int'l, Inc.*, No. 97-359, 1999 U.S. Dist. LEXIS 15383, at *55
28  (S.D. Cal. Aug. 12, 1999).

---

Cir. 2006) ("[an Exchange Act] Section 29(b) rescission claim premised on a Section 10(b) violation, however, differs from a private damages action brought under *Section 10(b)*. In the *Section 29(b)* context, a plaintiff seeking rescission does not have to establish reliance and causation" because those are elements of a private right of action for damages, not elements of the violation) (citing *GFL Advantage Fund, Ltd v. Colkitt*, 272 F.3d 189, 206 n.6 (3d Cir. 2001)).

In addition, § 47(b) also includes, in connection with contracts not yet performed, a future tense, *i.e.* rescission due to performance that "would violate," further establishing that no predicate claim for damages is required. A party cannot prosecute a claim for damages when no violation has yet occurred. Moreover, as a practical matter, a regulated party seeking to void an agreement that violates, or will violate, *its own regulatory duties*, has no interest in suing itself for damages.

It is also important to observe that § 47(b) is "a version of the common law doctrine of 'void for illegality,'" *see* SEC Amicus Brief at Section II, and does not give anyone any rights they do not already have under state law. *See, e.g., Kashani v. Tsann Kuen China Enterprise Co., Ltd*, 118 Cal. App. 4th 531, 543 (2d App. Dist. 2004) ("a violation of federal law is a violation of law for purposes of determining whether or not a contract is unenforceable as contrary to the public policy of California"); *see also* Restatement (Second) of Contracts § 178, comment a (for purposes of the void for illegality doctrine, the law is "any fixed text enacted by a body with authority to promulgate rules, including not only statutes, but constitutions and local ordinances, as well as administrative regulations issued pursuant to them."). [18] As the Supreme Court noted in *Transamerica*, it would be "anomalous" if the legality of contracts under federal laws and regulations could only be litigated in state court. 444 U.S. at 19 n.8.

Finally, illegality is a recognized affirmative defense to a breach of contract claim. *See* Fed. R. Civ. P. 8(a)(c)(1). As the Supreme Court noted in *Transamerica*, there is no substantive

---

[18] Courts routinely void contracts in violation of federal statutes and regulations that have no private rights of action. *See*, *e.g., Flaxel v. Johnson*, 541 F. Supp. 2d 1127, 1142 (S.D. Cal. 2008) (plaintiff moved for summary judgment on claim for contract rescission due to violation of Regulation D under the Exchange Act); *Torsiello Capital Partners LLC v. Sunshine State Holding Corp.*, 600397/06, 2008 N.Y. Misc. LEXIS 2879 (N.Y. Sup. Ct. April 1, 2008), at *19 ("First International's failure to register as a securities broker [under the Exchange Act] also renders the contract unenforceable under the common law doctrine of illegality.").

difference between the defense of illegality and an affirmative action for contract voiding. 444 U.S. at 18. If a mutual fund unilaterally stopped performing an illegal contract, and was sued for breach of contract, would a court refuse to recognize the illegality defense until a counterclaim for damages was prosecuted? Would the court strike the defense and order performance of the illegal contract? A claim for contract voiding is merely the more civilized version of the illegality defense that is already universally recognized.

In short, a plaintiff seeking to void a contract, whether directly or derivatively, is not acting to "enforce" the law as a private attorney general, but rather is acting to *comply* with the law. The district court cases on which Defendants rely[19] did not reach the issue of legal compliance, which is the form of contract voiding recognized by *Transamerica*. Defendants' cases all involved an identical complaint filed by the same plaintiffs' law firm[20] where the plaintiffs sought to invoke § 47(b) as a "remedy," rather than as a cause of action, because the plaintiffs had no standing to maintain a cause of action under § 47(b) -- as they were not parties to the contract between the mutual fund and its manager sought to be rescinded.

The lack of standing is significant, because the plaintiffs in those cases were making a frivolous argument, *i.e.* "Plaintiffs argue that because *Section 47(b)* 'provides a remedy rather than a distinct cause of action or basis for liability,' there is no need for them to show independent standing to pursue a claim under the section." *Hamilton*, 396 F. Supp. 2d at 558. The courts simply repeated plaintiffs' theory, and correctly dismissed the § 47(b) claim, because the plaintiffs had no viable claims under any other section of the ICA and, under that circumstance, essentially had consented to a voluntary dismissal of the § 47(b) "remedy."

---

[19] *See Dull v. Arch*, No. 05 C 140, 2005 U.S. Dist. LEXIS 14988 at *8 (N.D. Ill. July 27, 2005); *Hamilton v. Allen*, 396 F. Supp. 2d 545, 558 (E.D. Pa. 2005); *Mutchka v. Harris*, 373 F. Supp. 2d 1021, 1027 (C.D. Cal. 2005); *Stegall v. Ladner*, 394 F. Supp. 2d 358, 378 (D. Mass. 2005); *Davis v. Bailey*, No. 05-0042, 2005 U.S. Dist. LEXIS 38204, at *18-19 (D. Colo. Dec. 22, 2005); *Jacobs v. Bremner*, 378 F. Supp. 2d 861, 869 (N.D. Ill. 2005).

[20] The suits each contended that a defendant mutual fund company had failed to participate in class action settlements involving underlying securities held in the mutual funds. *See Everett v. Bozic*, No. 05-296, 2006 U.S. Dist. LEXIS 55824, at *3 (S.D.N.Y. Aug. 2, 2006) (another of "more than 40 virtually identical actions filed by Plaintiffs' counsel against major U.S. mutual fund companies"). In *Everett*, the court dismissed the Section 47(b) count for failure to plead as a derivative action.

---

Without standing to void the contracts at issue, the plaintiffs in those cases were acting as private attorneys general. The courts in those cases were, therefore, correct in requiring that the plaintiffs needed a private right of action for damages. But the decisions cited by Defendants here do not purport to limit contract voiding when it is invoked by a party with standing, as evidenced by the fact that those courts had no occasion to consider *Transamerica*.

The Ninth Circuit's recent decision in *Northstar* (MTD at 7-8), finds no implied rights of action for damages in the ICA, and cites *Transamerica* as a model for the *correct* approach to finding rights-creating language in a statute. *Northstar*, 2010 U.S. App. LEXIS 16706, at *27. The plaintiff in *Northstar* sought damages, and the court did not opine on illegality defenses, contract voiding, § 47(b) or any other issue relating to equitable relief in connection with compliance with the ICA. However, by citing to *Northstar*, which relies on *Transamerica*, Defendants appear to be conceding that *Transamerica* is relevant and applicable authority to analyzing the presence of rights-creating language in the ICA.

Accordingly, the Court should defer to Congressional intent, as found in *Transamerica*, and recognize Plaintiff's valid § 47(b) cause of action.[21]

### 2. § 36(a) Is a Predicate Violation

Plaintiff alleges that Defendants' violations of § 36(a) are a predicate violation to support a claim for contract voiding under § 47(b). AC ¶¶ 73-75, 104-107. Defendants disagree, contending that Plaintiffs have pled no facts alleging "breach of fiduciary duty involving **personal misconduct**" (emphasis by Defendants). MTD at 9, *citing Prescott v. Allstate Life Ins. Co.*, 341 F. Supp. 2d 1023, 1029 (N.D. Ill. 2004) (personal misconduct refers to misconduct that involves self-dealing). However, the Amended Complaint contains extensive allegations of self-dealing by Defendants. AC ¶ 74 & n.11, n.12 (Franklin/Templeton Distributors placed the pecuniary interests of its shareowner, Franklin Resources, Inc., which has an interest in maximizing sales and distribution to increase total assets upon which management fees are earned, ahead of the interests of the Trust and its shareholders in legal compliance and providing the advisory accounts that Trust

---

[21] If the Court finds no cause of action under § 47(b), Plaintiff respectfully requests that the Trust's § 47(b) claim be dismissed without prejudice to refilling a contract voiding claim under state law.

shareholders are paying for).

In any event, the majority view is that "the breaches of fiduciary duty Congress meant to reach are not limited to those involving self-dealing, fraud, or conflicts of interest, given that 'nonfeasance of duty' and 'abdication of responsibility' can also serve as violations of Section 36(a)." *SEC v. Treadway*, 430 F. Supp. 2d 293, 340-43 (S.D.N.Y. 2006) (citing cases). Accordingly, under either standard, Plaintiff has adequately pled facts demonstrating a fiduciary duty involving personal misconduct.

### 3.    Rule 38a-1 Is a Predicate Violation

Without discussing the Amended Complaint, Defendants contend that the Amended Complaint does not plead any facts identifying any defect in the Rule 38a-1-related compliance programs of the Trust and its service providers.  MTD at 10.  However, the Amended Complaint states that the Trust and Franklin/Templeton Distributors have a duty to use Trust assets properly, and "checking each of its broker-dealer selling agents to make sure they are registered and licensed under the Exchange Act, as applicable, but not checking to make sure the firms are also registered and licensed under the Advisers Act, as applicable, is a material defect" because the "Advisers Act is no less of an important federal securities law than the Exchange Act."  AC ¶ 80; *see also* In re *Steadman Security Corp.*, 1983 SEC No-Act. LEXIS 2238 (Apr. 18, 1983) (improper use of mutual fund assets will result in violation by trustees of § 36(a)).

Checking the licensing and registration status of the recipients of Trust assets is a function performed by Franklin/Templeton Distributors, whose compliance program is subject to oversight by the Trustees under Rule 38a-1.  Therefore, plaintiff has adequately alleged, in the Amended Complaint, that the Trustees have a duty under Rule 38a-1 to ensure that the Trust and Franklin/Templeton Distributors not use Trust assets to make asset-based compensation payments to firms that are not dual registrants offering advisory accounts.

For example, if the Trust decided to sell shares and service shareholders through pizza parlors, Rule 12b-1 would allow the Trust to make compensation payments to pizza parlors, since such a distribution plan clearly would promote distribution of Trust shares.  However, the Rule 12b-1 payments would violate the Exchange Act, and would also violate, depending on the form of

compensation paid, the IAA as well.  In this example, the Trust is not responsible for overseeing the compliance policies and procedures of pizza parlors.  Rather, the Trust is responsible for not using Trust assets to make unlawful payments, in violation of the Exchange Act and the IAA, to pizza parlors.

Rule 38a-1 was enacted to clarify the fiduciary duty imposed by § 36(a), and the promulgating release states that "serious compliance issues must, of course, always be brought to the board's attention promptly, and cannot be delayed until an annual report."  AC ¶ 79 *quoting* Final Rule, Promulgating Release No. IC-26299, 2003 SEC LEXIS 2980, at *6 (Dec. 17, 2003).  Accordingly, under Rule 38a-1, the Chief Compliance Officer of the Trust and the Trustees have a duty to act immediately if Trust assets are being used improperly.  *Id*.

### 4.    Additional Allegations in Support of the ICA Predicate Violations

The Amended Complaint also alleges that "the customers of the broker-dealers who are being deprived of the advisory accounts that they are entitled by law to receive are the same persons who are the shareholders of the Trust to whom the Trustees and Franklin/Templeton Distributors owe a fiduciary duty of care."  AC ¶ 82-84, 107-108.  Accordingly, on the basis of their direct duty to shareholders under § 36(a), Defendants are required to cease or reform the Trust's asset-based compensation arrangements until Trust shareholders are given the advisory accounts they have paid for and are lawfully entitled to receive.

All of the allegations of breach of duty under the ICA are predicated on a finding that the payments at issue are unlawful.  The new allegations in the Amended Complaint plead that the payments at issue are unlawful because the IAA states that the use of the means of interstate commerce by unregistered investment advisors is unlawful.  AC ¶ 69; 15 U.S.C. § 80b-3(a).  In this case, the Trust and Franklin/Templeton Distributors are using Trust assets to make compensation payments to broker-dealers that, because of the form of compensation (asset-based compensation), requires that the broker-dealers be dual registrants (registered under the Exchange Act and the IAA), and hold Trust shares in advisory accounts.  AC ¶¶ 22-46.

Previously, Defendants argued that the IAA was not implicated because the payments were not for investment advice.  The Amended Complaint shows that to be factually untrue, as

Defendants themselves have admitted outside of the courtroom, AC ¶¶ 51-60, 22-46, and in any event, the subjective intent of parties to compensate for investment advice is legally irrelevant to the applicability of the Advisers Act.

The definition of "investment adviser" is "**any person who, for compensation, engages in the business of advising others. . . as to the value of securities or as to the advisability of investing in, purchasing, or selling securities**[.]"  15 U.S.C. § 80b-2(11).  The compensation element is satisfied by *any economic benefit* received in connection with a customer account to which investment advice is included in the package of services provided, including any third-party payments.  *See* SEC Release No. IA-1092, 1987 SEC LEXIS 3487, at *14-15 (October 8, 1987) (extensive discussion of the definition of investment adviser); *see also College Resource Network*, 1993 SEC No-Act. LEXIS 630 at *4 (Apr. 9, 1993) (third-party payments are "compensation"); *In re O'Brien Partners, Inc.*, Sec. Act Release No. 7594, IA-1772, 1998 SEC LEXIS 2318 at *21, *25 (Oct. 27, 1998) (there is no requirement that compensation be paid directly by the person receiving the investment advice).

Accordingly, the label on the fee, the purpose of the fee, the intent of the fee, the form of the fee, and the source of the fee are all legally irrelevant.  If investment advice is part of the package of services provided to an account, then any compensation received in connection with that account is considered to be "compensation" for investment advice.[22]  The only issue remaining is whether a statutory exclusion applies.

Virtually all professionals who give investment advice do so as part of a package of services (portfolio manager, brokerage, custodial and/or recordkeeping services, etc.) and their compensation arrangements (commissions, management fees, etc.) rarely label their fees as specifically for investment advice.  Under Defendants' version of the IAA, compliance with the IAA would essentially be voluntary, based on the labels chosen for compensation payments.

---

[22] Similarly, a registered investment adviser that executes securities transactions must become a dual registrant (*i.e.,* register as a broker-dealer), irrespective of whether the investment adviser is receiving no compensation specifically for the transactions.  *See PRA Sec. Advisors, L.P.*, 1993 SEC No-Act. LEXIS 387 (Mar. 3, 1993) (investment adviser receiving only asset-based compensation must nevertheless register as a broker-dealer if executing securities transactions).

Previously, after insisting that the IAA was "irrelevant" and not implicated by Rule 12b-1 payments, Defendants used the final minutes of the reply portion of their oral argument to contend that the compensation payments at issue fell within the Broker-Dealer Exclusion to the IAA, which necessarily means that the IAA is implicated and the payments need a statutory exclusion..[23]  Yet, Defendants' interpretation of the Broker-Dealer Exclusion – *i.e.*, that broker-dealers can receive any form of compensation so long as it is not specifically for investment advice – is identical to the SEC Rule that was vacated in *Financial Planning Association* because it conflicted with the Broker-Dealer Exclusion.[24]  *See Financial Planning Association,* 482 F.3d at 488 ("**By seeking to exempt broker-dealers beyond those who receive only brokerage commissions for investment advice, the SEC has promulgated a final rule that is in direct conflict with both the statutory text and the Committee Reports.**").

The statutory text referred to by the *Financial Planning Association* court is the "no special compensation" prong, and the Committee Reports constitute the legislative history establishing that "special compensation" means any compensation not in the form of transactional commissions.[25]

_____

[23] The general rule is that the party claiming the benefits of a statutory exclusion has the burden of proving its applicability.  *See United States v. First City Nat'l Bank*, 386 U.S. 361, 366 (1967).  A party cannot carry its burden of proof by making an argument -- for the first time on reply --  on a motion to dismiss challenging the adequacy of plaintiff's pleading.

[24] The text of the invalidated Rule is, in pertinent part, that a broker-dealer "will not be deemed to be an investment adviser based solely on its receipt of special compensation" provided that "[a]ny investment advice provided by the broker or dealer with respect to accounts from which it receives special compensation is solely incidental to the brokerage service provided to those accounts[.]"  The Rule goes on to codify several long-standing SEC interpretations of "solely incidental," including that "[a] broker or dealer provides advice that is not solely incidental. . . to the brokerage services provided to accounts from which it receives special compensation within the meaning of paragraph (a)(1)(i) of this section if the broker or dealer. . . charges a separate fee, or separately contracts, for advisory services[.]"  *See* 2005 Final Rule Release, 70 Fed. Reg. at 20454; 17 C.F.R. § 275.202(a)(11)-1.

[25] *See* S. Rep. No. 76-1775, 76th Cong., 3d Sess. 22 (1940) (Section 202(a)(11)(C) of the Advisers Act applies to broker-dealers "**insofar as their advice is merely incidental to brokerage transactions for which they receive** *only* **brokerage commissions**") (emphasis added). The SEC has consistently found compensation other than transactional sales commissions to be "special compensation." *See Hugh Johnson & Co.*, 1976 SEC No-Act. LEXIS 420 (Feb. 22, 1976) (account fee of 0.25% per year); *In re: Quest Capital Strategies, Inc.*, 1999 SEC LEXIS 727 at *42 (Apr. 12, 1999) (retention of interest rate spread); *Calton & Assocs., Inc.,* 1988 SEC No-Act. LEXIS 1348 (Oct. 11, 1988) (2.5% per year of net asset value for market timing service); *CFS Securities Corp.*, 1987 SEC No-Act. LEXIS 1663 (Feb. 27, 1987) (fee of $39 for customer to attend a seminar is "special compensation" that disqualifies broker-dealer from invoking the broker-dealer exclusion to the Advisers Act).

1    Defendants' interpretation of the Broker-Dealer Exclusion thus is identical to the invalidated

2    Rule, and therefore is also "in direct conflict with both the statutory text and the Committee

3    Reports."  Defendants' interpretation would render the "no special compensation" prong of the

4    Broker-Dealer Exclusion superfluous.  The "solely incidental" prong of the Broker-Dealer

5    Exclusion already prohibits broker-dealers from separately contracting to be paid for advice.[26]

6    Therefore, if there ever was, prior to *Financial Planning Association*, a sliver of doubt about

7    whether "special compensation" includes asset-based compensation, the law is now clear.[27]

8    Moreover, Congress subsequently declined to amend the Broker-Dealer Exclusion to remove the

9    ban on "special compensation," despite an aggressive lobbying campaign by industry in the months

10   following the *Financial Planning Association* decision.[28]  Accordingly, there is *no colorable basis,*

11   in the wake of those developments, for Defendants to argue that broker-dealers may receive non-

12   transactional compensation in connection with brokerage accounts.[29]

### CONCLUSION

14   For the reasons above, Defendants' motion to dismiss should be denied in its entirety.

15   Dated:  September 17, 2010                **MILBERG LLP**

16                                            /s/  Janine L. Pollack
                                             Janine L. Pollack (*admitted pro hac vice*)

17                                           Michael C. Spencer
                                             mspencer@milberg.com
18                                           Janine L. Pollack
                                             jpollack@milberg.com
19                                           **MILBERG LLP**

---

[26] *See also* 2005 Final Rule Release, 70 Fed. Reg. at 20434 n. 103 (stating that although the final Rule allows broker-dealers to receive any form of compensation, under the Rule, broker-dealers may not receive compensation specifically for advice:  "When the form of compensation demonstrates that the advice is not solely incidental to brokerage, however, as in the case of separate fees paid specifically for advice, the [Rule] will not be available.").

[27] *See also* Arthur B. Laby, *Reforming the Regulation of Broker-Dealers and Investment Advisers,*" 65 Bus. Law. 395, 417 (Feb. 2010) ("As a technical matter, the receipt of asset-based compensation has made the broker-dealer exclusion inapplicable to brokers receiving such compensation.  After the *Financial Planning Ass'n* decision, asset-based fees must be considered 'special compensation,' which vitiates application of the exclusion.").

[28] Burke, "The Hot Seat," *Registered Representative* at 44 (Sept. 2007) (Pollack Decl., Ex. 5).

[29] To the extent the Court reaches defendants' other arguments for dismissal, plaintiff respectfully relies on the arguments made in his opposition brief filed February 12, 2010.

---

One Pennsylvania Plaza
New York NY  10119
Telephone:  (212) 594-5300
Facsimile:   (212) 868-1229

Jeff S. Westerman (SBN 94559)
jwesterman@milberg.com
**MILBERG LLP**
One California Plaza
300 S. Grand Avenue, Suite 3900
Los Angeles, CA  90071
Telephone:  (213) 617-1200
Facsimile:   (213) 617-1975

Eric M. George (SBN 166403)
egeorge@bwgfirm.com
**BROWNE WOODS GEORGE LLP**
2121 Avenue of the Stars
Suite 2400
Los Angeles, CA  90067
Telephone:  (310) 274-7100
Facsimile:   (310) 275-5697

Lee A. Weiss
lweiss@bwgfirm.com
**BROWNE WOODS GEORGE LLP**
1 Liberty Plaza, Suite 2329
New York, NY  10006
Telephone:  (212) 354-4901
Facsimile:   (212) 354-4904

Ronald A. Uitz
ron877@yahoo.com
**UITZ & ASSOCIATES**
1629 K Street, N.W. Suite 300
Washington, D.C.  20006
Telephone:  (202) 296-5280
Facsimile:   (202) 521-0619

Alfred G. Yates, Jr. Esq.
yateslaw@aol.com
**LAW OFFICE OF**
   **ALFRED G. YATES, JR. P.C.**
519 Allegheny Building
429 Forbes Avenue
Pittsburgh, Pennsylvania 15219
Telephone:  (412) 391-5164
Facsimile:   (412) 471-1033

*Attorneys for Plaintiff*

### CERTIFICATE OF SERVICE

I hereby certify that on September 17, 2010, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system.

Participants in the case who are registered CM/ECF users will be served by the CM/ECF system.

I further certify that some of the participants in the case are not registered CM/ECF users.  I have mailed the foregoing document by First-Class Mail, postage prepaid to the non-CM/ECF participants indicated on the attached Manual Notice List.

I certify under penalty of perjury that the foregoing is true and correct.  Executed on September 17, 2010.

_____
Jason Joseph